## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
                                              X
                                              :
PATRICK L. GEARREN and JAN                    :
DEPERRY, on Behalf of Themselves and a        :
Class of Persons Similarly Situated,          :
                                              :
                    Plaintiffs,               :
           v.                                 :
                                              :
THE MCGRAW-HILL COMPANIES, INC.;              :
THE PENSION INVESTMENT                        :
COMMITTEE OF MCGRAW-HILL;                     :
MARTY MARTIN; THE BOARD OF                    :
DIRECTORS OF THE THE MCGRAW-                   :
HILL COMPANIES, INC.; PEDRO ASPE;             :
SIR WINFRIED BISCHOFF; DOUGLAS N.             :
DAFT; LINDA KOCH LORIMER;                     :
ROBERT P. MCGRAW; HAROLD                       :
MCGRAW, III; HILDA OCHOA-                      :
BRILLEMBOURG; SIR MICHAEL RAKE;               :
JAMES H. ROSS; EDWARD B. RUST, JR.;           :
KURT L. SCHMOKE, SIDNEY TAUREL,               :
and; JOHN DOES 1-20,                          :
                                              :
                    Defendants.               :
                                              X
```

CLASS ACTION  08 CIV 7890

COMPLAINT FOR BREACH OF
FIDUCIARY DUTY AND VIOLATION
OF ERISA DISCLOSURE
REQUIREMENTS

JURY TRIAL DEMANDED



### COMPLAINT

Plaintiffs Patrick L. Gearren and Jan DePerry ("Plaintiffs"), on behalf of themselves and

on behalf of a class consisting of similarly situated participants and beneficiaries (the

"Participants") of the 401(k) Savings and Profit Sharing Plan of The McGraw-Hill Companies,

Inc. and Its Subsidiaries  (the "McGraw-Hill Plan") and the Standard and Poor's 401(k) Savings

and Profit Sharing Plan for Represented Employees  (the "S&P Plan," and with the McGraw-Hill

Plan, hereinafter collectively the "Plans")[1], by their attorneys, allege the following for their

---

[1]      Effective December 31, 2007, the assets and liabilities of the Standard & Poor's Employee Retirement

Complaint (the "Complaint").  The allegations contained herein are based on the investigation of

counsel, except for those allegations pertaining to the Plaintiffs, which are based upon personal

knowledge.  Plaintiffs may, after discovery and/or disclosure proceedings in this case, seek leave

to amend this Complaint to add new parties or claims.

## NATURE OF ACTION

1.      Plaintiffs, who are Participants in one of the Plans, bring this civil enforcement

action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1132(a), for plan-wide relief on behalf of a class consisting of all current and former

Participants in the Plans for whose individual accounts the Plans held shares of common stock of

The McGraw-Hill Companies, Inc. (hereinafter "McGraw-Hill" or the "Company") at any time

from December 31, 2006 through and including March 11, 2008 (the period from December 31,

2006 through and including March 11, 2008 being hereinafter referred to as the "Class Period").

Plaintiffs bring this action on behalf of the Plans and the Class pursuant to § 502(a)(2) and (3) of

ERISA, 29 U.S.C. § 1132(a)(2) and (3).  As more fully set forth below, Defendants breached

their fiduciary duties to the Participants, including those fiduciary duties set forth in ERISA §

404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550.

Defendants breached their fiduciary duties to the Participants in various ways, including, but not

limited to, (i) misrepresenting and failing to disclose material facts to the Participants in

connection with the administration of the Plans; (ii) failing to exercise their fiduciary duties to

the Participants solely in the interests of the Participants for the exclusive purpose of providing

benefits to Participants and their beneficiaries; (iii) failing to manage the Plans'-assets with the

---

Account Plan for Represented Employees and the trust there under were merged into the Standard & Poor's Savings
Incentive Plan for Represented Employees and the trust there-under, and the name of the Plan was changed to
Standard & Poor's 401(k) Savings and Profit Sharing Plan for Represented Employees.

care, skill, prudence or diligence of a prudent person under the circumstances; (iv) imprudently

failing to diversify the investments in the Plans so as to minimize the risk of large losses; and (v)

permitting the Participants to continue to elect to invest their retirement monies in McGraw-Hill

common stock when the market price of McGraw-Hill common stock was artificially inflated,

when it was imprudent to do so, and when the Participants were not provided with timely,

accurate and complete information concerning the Company as required by applicable law.  As a

result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are

personally liable to make good to the Plans the losses resulting from each such breach of

fiduciary duty.  In addition, under § 502(a)(3) of ERISA (29 U.S.C. § 1132(a)(3)), Plaintiffs seek

other forms of appropriate equitable relief, including, without limitation, injunctive relief and, as

available under applicable law, imposition of a constructive trust, restitution, and other monetary

relief.  Insofar as any Defendant is sued alternatively as a knowing participant in a breach of

fiduciary duty for equitable relief, Plaintiffs intend to proceed pursuant to § 502(a)(3) of ERISA

(29 U.S.C. § 1132(a)(3)).

## JURISDICTION AND VENUE

2.     Plaintiffs' claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

3.     This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29

U.S.C. § 1132(e)(1).

4.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C.

§ 1132(e)(2), because this is a District where the Plans were administered, where breaches of

fiduciary duty took place and/or where one or more Defendants reside or may be found.

## THE PARTIES

5.     Plaintiff Patrick L. Gearren is a resident of the State of New Jersey.  Plaintiff

Gearren was employed by McGraw-Hill or Standard & Poor's (or a subsidiary or division of McGraw-Hill or Standard & Poor's) and maintained an investment in McGraw-Hill common stock in his individual account in the one of the Plans during the Class Period (as defined herein).

6.      Plaintiff Jan DePerry is a resident of the State of California.  Plaintiff DePerry was employed by McGraw-Hill or Standard & Poor's (or a subsidiary or division of McGraw-Hill or Standard & Poor's) and maintained an investment in McGraw-Hill common stock in her individual account in the one of the Plans during the Class Period (as defined herein).

7.      Defendant The McGraw-Hill Companies, Inc. is a global information services provider serving the financial services, education and business information markets with a range of information products and services. The Company's markets include energy, construction, aerospace and defense, and marketing information services.  The Company is incorporated in New York and maintains its principal place of business at 1221 Avenue of the Americas, New York, NY 10020.

8.      At all times relevant to this Complaint, Defendant the Pension Investment Committee of McGraw-Hill (the "Committee") supervised the Plans.  At all times relevant to this Complaint, the Committee managed and administered the Plans and the assets of the Plans and acted as a fiduciary with respect to the Plans.  The Plans' Forms 11-K Annual Reports for the fiscal year ended December 31, 2007 which were filed with the SEC on or about July 15, 2008 (collectively the "2008 Forms 11-K" and individually the "S&P 2008 Form 11-K" and the "McGraw-Hill 2008 Form 11-K" for the S&P Plan and the Plan, respectively) state that "[t]he investments for the Plan, excluding investments in the Self Directed Accounts[as defined therein as not including the McGraw-Hill Companies Stock Account], are directed by the Pension Investment Committee and by outside investment managers."

4

9.     Defendant Marty Martin ("Martin"), served as Vice President, Employee Benefits at the Company during the Class Period.  Martin signed the 2008 Forms 11-K on behalf of the Plans.  The 2008 Forms 11-K state that "[t]he Plan is administered by the Vice-President, Employee Benefits (the Plan Administrator) who is responsible for carrying out the provisions of the Plan.  The appointment was approved by the Board of Directors of the Company."  Liability is only asserted against Defendant Martin for such periods of time as he was Vice-President, Employee Benefits or otherwise acted as a fiduciary with respect to the Plans.

10.     Defendant the Board of Directors of The McGraw-Hill Companies, Inc. (the "Board of Directors") had the duty and responsibility to properly appoint, monitor and inform the members of the Committee (as defined herein) and/or other persons who exercised day-to-day responsibility for the management and administration of the Plans and their assets.  The 2008 Forms 11-K state that "The Pension Investment Committee is appointed by the Board of Directors of the Company[.]"  The Board of Directors failed to properly appoint, monitor and inform such persons in that the Board of Directors failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Board of Directors did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by McGraw-Hill during the Class Period identified herein) but nonetheless continued to allow such persons to offer McGraw-Hill common stock as an investment option under the Plans when the market price of McGraw-Hill common stock was artificially inflated and when McGraw-Hill common stock was not a prudent investment for Participants' retirement accounts under the Plans.  The Board of Directors acted as a fiduciary with respect to the Plans.

11.     Defendants Pedro Aspe; Sir Winfried Bischoff; Douglas N. Daft; Linda Koch

Lorimer; Robert P. McGraw; Harold McGraw, III[2]; Hilda Ochoa-Brillembourg; Sir Michael

Rake; James H. Ross; Edward B. Rust, Jr.; Kurt L. Schmoke, and; Sidney Taurel (the "Director

Defendants") had the duty and responsibility to properly appoint, monitor and inform the

members of the Committee (as defined herein) and/or other persons who exercised day-to-day

responsibility for the management and administration of the Plans and their assets.  The Director

Defendants failed to properly appoint, monitor and inform such persons in that the Director

Defendants failed to adequately inform such persons about the true financial and operating

condition of the Company or, alternatively, the Director Defendants did adequately inform such

persons of the true financial and operating condition of the Company (including the financial and

operating problems being experienced by McGraw-Hill during the Class Period identified herein)

but nonetheless continued to allow such persons to offer McGraw-Hill common stock as an

investment option under the Plans when the market price of McGraw-Hill common stock was

artificially inflated and when McGraw-Hill common stock was not a prudent investment for

Participants' retirement accounts under the Plans.  Liability is only asserted against each of the

Director Defendants for such periods of time as the Director Defendant was a member of the

Board of Directors of McGraw-Hill or otherwise acted as a fiduciary with respect to the Plans.

    12.    John Does 1-20 were the individual members of the Committee and members of

any other committee(s) which administered the Plans.  The identity of the members of the

Committee, and of any other committee(s) which was or were responsible for carrying out the

provisions of the Plans, is currently not known.

---

[2]    As Chairman of the Board, President and CEO of the Company, Harold McGraw, III exercised
discretionary authority over the Plans and was thus a fiduciary of the Plans.

## CLASS ACTION ALLEGATIONS

13.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all current and former Participants in the Plans for whose individual accounts the Plans held shares of McGraw-Hill common stock (including in the form of McGraw-Hill common stock or units of the McGraw-Hill Stock Fund or the McGraw-Hill Companies Stock Account investment option (the "Fund")) at any time from December 31, 2006 through and including March 11, 2008  (the "Class").

14.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at minimum, thousands of members of the Class.  The Form 5500 Annual Return/Report of Employee Benefit Plan for the McGraw-Hill Plan states that there were 20,449 McGraw-Hill Plan participants as of December 31, 2006; The Form 5500 Annual Return/Report of Employee Benefit Plan for the S&P Plan states that there were 887 S&P Plan participants as of December 31, 2006.

15.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)     Whether Defendants were fiduciaries;

      (b)     Whether Defendants breached their fiduciary duties;

      (c)     Whether the Plans and the Participants were injured by such breaches; and

      (d)     Whether the Class is entitled to damages and injunctive relief.

16.     Plaintiffs' claims are typical of the claims of the other members of the Class, as Plaintiffs and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

17.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained able counsel with extensive experience in class action ERISA litigation. The interests of Plaintiffs are coincident with and not antagonistic to the interests of the other class members.

18.     Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

19.     The claims herein are under ERISA and related principles of federal common law cannot be asserted by the Plaintiffs in derivative actions against the company or in class actions under securities law.

20.     Under and as required by ERISA, Defendants carry insurance for claims asserted herein that may not be available to the defendants in any other actions.

### DESCRIPTION OF THE PLAN

21.     At all times relevant to this Complaint, the Plans were employee benefit plans within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

22.     At all times relevant to this Complaint, the Plans were "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that

8

the Plans provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.

23.     At all times relevant to this Complaint, the Plans provided a number of different options for investment of the Plans' assets, including McGraw-Hill common stock.

24.     At all times relevant to this Complaint, Participants were allowed to direct the Plans to purchase investments from among the investment options available under the Plans and allocate them to their individual accounts.

25.     The McGraw-Hill 2008 Form 11-K, states, among other things:

**2. Plan Description**

The following is a summary of benefit guidelines. A more detailed description is contained in the Plan Documents.

The Plan is a defined contribution plan. Employees of participating units have immediate eligibility, as long as the employee has completed the enrollment process.

Participants may contribute to the Plan up to 25% of their Plan earnings, limited to $15,500 and $15,000 in 2007 and 2006, respectively. Plan contribution amounts allowable are limited pursuant to Sections 401(k), 401(m) and 415 of the Code.

Plan earnings include base earnings and certain other forms of compensation as provided under the Plan. Plan earnings were limited to $225,000 in 2007 and $220,000 in 2006, respectively.

The Company matches 100% of the first 3% of tax-deferred compensation contributed to the plan and 50% of the next 3%.

The assets of the Plan may be invested in the twelve Investment Accounts or in Self Directed Accounts. Participants can elect to designate, in 1% increments, their investment preference(s). There is no limit to the number of investment allocation changes for future allocations. The first four changes or reallocations of

existing balances, in any calendar year, are permitted at no charge.
A $10 charge is assessed to the participant's account for each
additional change or reallocation of existing balances, if the
balance is reallocated more than eight times per year.

26.     The McGraw-Hill Plan's 2008 Form 11-K filing also that approximately

$ 181,011,000 of the McGraw-Hill Plan's total investments of approximately $ 1,927,326,000, or

approximately 9.4% of the investments of the McGraw-Hill Plan, were invested in McGraw-Hill

common stock as of December 31, 2006.

27.     The S&P 2008 Form 11-K similarly states, among other things:

**2. Plan Description**

The following is a summary of benefit guidelines. A more detailed
description is contained in the Plan Documents.

The Plan is a defined contribution plan. Effective January 1, 2002,
the Plan was amended to reduce the service period requirement
from one year to immediate eligibility, as long as the employee has
completed the enrollment process. Prior to January 1, 2002, an
employee was eligible to become a participant upon the attainment
of age 21 and the completion of one year of continuous service.

Employees are eligible to have profit sharing contributions credited
to their profit sharing contribution account on the first day of the
month coincident with or following the date the employee attains
age 21 and completes one year of continuous service. Participants
may contribute to the Plan up to 25% of their Plan earnings,
limited to $15,500 and $15,000 in 2007 and 2006, respectively.
Plan contribution amounts allowable are limited pursuant to
Sections 401(k), 401(m) and 415 of the Code.

Plan earnings include base earnings and certain other forms of
compensation as provided under the Plan. Plan earnings were
limited to $225,000 in 2007 and $220,000 in 2006, respectively.

Of the participant's voluntary tax-deferred contribution, the
Company matches all of the first 3% and one-half of the next 3%.

The Company also contributes, at the discretion of the Board of
Directors, a profit sharing contribution of a percentage of each

participant's earnings based on the Company's consolidated net profits subject to certain limitations.

The assets of the Plan may be invested in the twelve Investment Accounts or in the Self Directed Accounts. Participants can elect to designate, in 1% increments, their investment preference(s). There is no limit to the number of investment allocation changes. The first four changes or reallocations of existing balances, in any calendar year, are permitted at no charge. A $10 charge is assessed to the participant's account for each additional change or reallocation of existing balances if the balance is reallocated more than eight times per year.

28.     The S&P Plan's 2008 Form 11-K filing also that approximately $ 9,346,000 of the Plan's total investments of approximately $494,847,000, or approximately 2% of the investments of the Plan, were invested in McGraw-Hill common stock as of December 31, 2006.

29.     During the Class Period the market price of McGraw-Hill common stock was artificially inflated due to the concealment of McGraw-Hill's true financial and operating condition as described herein.  Throughout the Class Period, McGraw-Hill common stock was not a prudent investment for the Participants' individual retirement accounts under the Plans.  If Defendants had made full disclosure to the Participants of McGraw-Hill's true financial and operating condition, as described herein, the Participants would not have chosen McGraw-Hill common stock as an investment option under the Plans to the extent that they did.  Indeed, had the truth been disclosed to the Participants, McGraw-Hill common stock would not have been chosen by many Participants as an investment option at all.

## ADMINISTRATION OF THE PLANS

30.     Defendants, as fiduciaries of the Plans, were required by ERISA to furnish certain information to Participants.  For example, ERISA Section 101 (29 U.S.C. § 1021) requires the Plan's Administrator to furnish Summary Plan Descriptions ("SPD") to Participants.  ERISA Section 102 (29 U.S.C. § 1022) provides that an SPD must apprise Participants of their rights and

obligations under a plan. In addition, every person who held McGraw-Hill stock in a Plans account received annually a Proxy Statement which purported to describe (including through the incorporation of other company documents) the business and operations of McGraw-Hill, as well as important information concerning McGraw-Hill's Directors and senior executives, including some of the Defendants in this case.

31.   At all times relevant to this Complaint, Defendants had the discretion to establish and change the investment alternatives among which Participants could direct the investment of the Plans' assets allocated to their accounts.

32.   At all times relevant to this Complaint, Defendants had a duty to review the Plans' investment policies and the selection and the performance of investment alternatives offered under the Plans. There was no requirement that any assets of the Plans be invested in Company stock or that Company stock be continued as an investment alternative.

33.   At all times relevant to this Complaint, Defendants had a duty to obtain from the Company information necessary for the proper administration of the Plans.

34.   At all times relevant to this Complaint, Defendants were fiduciaries of the Plans as defined by ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control respecting management of the Plans or exercised discretionary authority or control respecting management or disposition of assets and had discretionary authority or responsibility in the administration of the Plans.

35.   Each Defendant is liable for the breaches of fiduciary duty of the other Defendants under ERISA § 405, 29 U.S.C. § 1105.

## BRACHES OF FIDUCIARY DUTY

36.   As required by ERISA, Defendants issued one or more SPDs, each of which either

12

referred to or incorporated by reference the documents filed by McGraw-Hill with the SEC under the federal securities laws. These filings, however, contained numerous material misrepresentations and omitted to state material facts which were necessary to make the statements which were made not misleading.

37.     In particular, McGraw-Hill was an imprudent retirement investment for the Plans during the Class Period because of, inter alia, the fact that:

a.     The Company's Standard & Poor's division's ratings system assigned collateralized debt obligations ("CDOs") and residential mortgage backed securities ("RMBS") ratings that were supposedly based upon the actual riskiness of the products but were in fact predisposed towards higher ratings because the Company did not possess or review sufficient information at the loan-level to accurately rate such products. Standard & Poor's maintained artificially high ratings on CDO and RMBS products that were not stable, and did not reflect current information or known risk;

b.     The company was also predisposed to issue higher ratings to CDO and RMBS products in order to generate financial services fees because the Company was aware that investment banks would hire whichever of the Company or its competitors provided the best rating for each product;

c.     Besides reputational risk, the Company's Standard & Poor's division's inaccurate ratings system led to regulatory action by, inter alia, the European Union, the SEC, and many of the states' attorneys general;

d.     The Company's CDO and RMBS problems caused the Company to withdraw its earnings guidance and refuse to issue further guidance as to

13

earnings;

e.     The Company, with the tone set at the top, pushed short term earnings at
the expense of reputation and its long-term horizons and the clear
reputational risk associated therewith;

f.     the Company lacked qualified management in its CDO and RMBS rating
unit;

g.     as a result of the above, the Company's actual and projected results for the
Class Period were grossly inflated;

h.     the Company lacked the require internal controls, and, as a result, the
Company's projections and reported results were based upon defective
assumptions and/or manipulated facts;

i.     the Company lacked the necessary personnel to issue accurate financial
reports and projections.

38.     Defendants were not obligated by ERISA or by the Plans to discharge their duty to
provide information to Participants through the mechanism of incorporation of SEC filings.
Defendants could have fulfilled this duty by setting forth sufficient and accurate information in
the SPDs themselves, and updating such information as appropriate.  Defendants chose, however,
to adopt the mechanism of incorporation of SEC filings into the SPDs, and the SEC filings
contained materially false and misleading information which caused loss to the Plans and the
Participants as set forth above.

39.     At all relevant times, Defendants should have known that Company stock was an
imprudent retirement investment for the Participants and the Plans.

40.     At all relevant times, Defendants should have known of the material

14

misrepresentations and omissions, including those filed with the SEC and incorporated by reference in the SPDs.

## FACTUAL ALLEGATIONS

41.     As is been well-documented, over the last few years the proliferation of nontraditional mortgages (subprime, Alt-A, etc.) has trended towards riskier lending standards with increasingly favorable terms for borrowers. By the start of the Class Period, persons who would have not been able to receive a mortgage in the recent past were able to secure favorable loans for houses that in the recent past would have been well-beyond their means.

42.     Many of these mortgages are grouped into financial vehicles including collateralized debt obligations ("CDOs") and residential mortgage backed securities ("RMBS") and then sold to investors on the secondary market.

43.     McGraw-Hill's Financial Services segment, which operates as Standard & Poor's, assigns credit ratings and provides the investment community with information on such financial vehicles including CDOs and RMBS.

44.     McGraw-Hill generated much of its profit in recent years from the high-margin business of rating mortgage-backed securities, and now faces regulatory scrutiny because of the way it rated "subprime" mortgage and other bonds.

45.     At the start of the Class Period, on December 31, 2006, McGraw-Hill's stock was trading at $ 68.02 per share (closing price as of December 29, 2006, the last trading day of the year).

46.     During the Class Period, despite clear trends of quality decreasing in the CDO and RBMS markets, Standard & Poor's continued to highly rate CDOs and RMBS despite that it and Defendants knew or should have known that the ratings of CDOs and RMBS were not stable, did

not reflect current information, and did not reflect the understood risk.  Defendants did not alert

Plans Participants that Standard & Poor's was unable and/or unwilling to provide adequate

surveillance to the structured finance transactions it rated, in which fraud had become

commonplace, during the Class Period.  In fact, as admitted in the Company's April 9, 2008

press release entitled "Criteria: Standard & Poor's Requests Access To U.S. Loan-Level

Performance Data For Surveillance; Issuers To Confirm Data Accuracy" the Company did not

require verified loan level data until May 1, 2008, after the close of the Class Period.

47.     Defendants also recognized that Standard & Poor's relied upon its reputation.  For

example, as Harold McGraw III stated on a July 25, 2006, earnings conference call, "Standard &

Poor's has been rating bonds since 1916, so the market knows our capability and our reputation

very well. The integrity, reliability and credibility of S&P has enabled us to compete successfully

in an increasingly global and complex market, and that is true today and we are confident it will

be so in the future."

48.     The touted strength of the Financial Services segment was, at best, the end-

product of superficial ratings and the inability to properly evaluate accurate CDO and RMBS

data on a loan-level basis.  Because of this, Defendants continued to predict double-digit growth

for many more years.

49.     The actions by the Company were untimely and insufficient.  By March 2007, the

market was clearly concerned subprime mortgage products.  As the *Wall Street Journal* reported

on March 22, 2007 in an article entitled "Moving the Market: Credit-Ratings Firms Get Caught

Up in Subprime Meltdown":

> The meltdown in mortgages for risky, "subprime" borrowers is
> claiming its latest casualties: credit-ratings companies.

Trading in many bonds backed by subprime mortgages reveals a widening gap between investors' perception of their risk and the opinions of large ratings providers like Moody's Investors Service, Standard & Poor's and Fitch Ratings. Some subprime-mortgage bonds that were assigned investment-grade ratings as recently as 2006 are even trading at prices that imply they could be as risky as junk bonds. Yet most of their ratings haven't changed.

At the same time, the stock prices of Moody's Corp. and S&P's parent, McGraw-Hill Cos., have taken a hit over concerns that turmoil in the subprime-mortgage market may spread to the broader credit markets and damp issuance of other types of debt products like collateralized debt obligations.

Moody's and McGraw Hill's shares are down 11% and 6%, respectively, since early February, versus a 1% fall in the S&P 500-stock index over the same period.

For years, the ratings companies reaped profits by charging issuers for rating bonds backed by home loans to borrowers with weak credit, known as subprime mortgages. Many Wall Street firms also followed guidelines from the ratings companies when they bundled loans together and sold billions of dollars in highly rated securities backed by them.

50.     Despite intense pressure in the RMBS and CDO markets, Standard & Poor's did not begin significantly downgrading structured finance. Rather Standard & Poor's maintained artificially high ratings on RMBS and CDO products despite lacking sufficient knowledge to do so. This caused the company to downgrade billions of dollars worth of RMBS and CDO transactions in the summer and autumn of 2007.

51.     While the sheer volume of downgrades in the summer and autumn of 2007 were of historical proportions for the Company, the majority of the downgrades lay ahead. In December of 2007, Standard & Poor's downgraded an additional $6.42 billion of collateralized debt obligations.

52.     Nevertheless, McGraw-Hill continued touting its and its Financial Services segment's growth prospects for the Class Period during the entire Class Period.

53. On August 16, 2007, the Associated Press released an article entitled "EU to Examine Credit Rating Agencies" reported that

> The European Union will examine why credit rating agencies were slow to react to early signs of U.S. loan defaults that led to last week's market plunge, EU officials said Thursday.
>
> The inquiry will looking specifically at whether there were conflicts of interest, they said.
>
> Credit rating agencies such as Standard & Poor's Corp., Moody's Investors Service Inc. and Fitch Ratings are paid by the banks that they rate for credit-worthiness.
>
> A senior EU official, who spoke on condition he not be quoted by name because of the sensitivity of the issue, said the EU needed to look at possibly strengthening its code of conduct and whether other measures would be appropriate.
>
> He said there was a "very significant delay" between banks reporting a sharp climb in poor returns from U.S. subprime housing loans made to people with poor credit and the agencies putting banks on credit watch.

54. The news surprised investors and caused the price of McGraw-Hill shares to fall as low as $48 per share on unusually high volume.

55. On September 7, 2007, *The Wall Street Journal* reported in an article entitled "Ratings Firms' Practices Get Rated --- SEC Probes if Conflicts Fueled Subprime Troubles" that the SEC and State Attorneys General of New York and Ohio were investigating and subpoenaing McGraw-Hill.

56. Again, on September 18, 2007, the Company issued a news release entitled "The McGraw-Hill Companies Reaffirms Double-Digit Earnings Growth for 2007" stating that "In a presentation today at Goldman Sachs' Communacopia XVI 2007 conference, Harold McGraw III, chairman, president and CEO of The McGraw-Hill Companies (NYSE: MHP), reaffirmed that the Corporation expects to achieve double-digit earnings growth in 2007, continuing its

long-standing record of growth."

57.    Similarly, in an October 18, 2007 news release entitled "The McGraw-Hill Companies Reports Third Quarter EPS of $1.34, a 26.4% Increase" McGraw III and the Company touted "solid performances in Financial Services even as the structured finance market deteriorated were key to our results."

58.    On March 11, 2008, the Company withdrew its 2008 guidance without giving further clarity around expectations.  That day, despite general market gains, as low as $36.32 on enormous trading volume – a decline of almost half of the value at the start of the Class Period – removing artificial inflation from the Company's stock price.

59.    Subsequent to the end of the Claim Period, on or about June 5, 2008, New York State Attorney General Andrew Cuomo announced a settlement with McGraw-Hill et al. in which the Company agreed to change its fee structures, obtain due diligence information for the first time, and to create due diligence and lender standards for residential mortgage-backed securities.  The New York State Attorney General's press release regarding the settlement further stated that the agreement :

> will dramatically increase the independence of the ratings agencies, ensure that crucial loan data is provided to the agencies before they rate loan pools, and increase transparency in the RMBS market.
>
> Under the agreements with Attorney General Cuomo, the credit rating agencies will fundamentally alter how they are compensated by investment banks for providing ratings on loan pools. In addition, the ratings firms will all now require *for the first time* that investment banks provide due diligence data on loan pools for review prior to the issuance of ratings. This will ensure that significant data, which was not previously disclosed to the rating agencies, will be received and reviewed by them before any bonds are rated.
>
> "The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of

mortgage securities. The tremendous reach of this crisis cannot be understated -- our entire economy continues to feel aftershocks from the collapse of the mortgage industry," said Attorney General Cuomo. "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse. The reforms agreed to today by S&P, Moody's, and Fitch should begin to restore investor confidence during what is a very troubling time for the mortgage industry, and I applaud the firms for their cooperation with our investigation."

* * *

The agencies were paid no fees during their initial reviews of the loan pools or during their discussions and negotiations with the investment banks about the structuring of the loan pools. Investment banks were thus able to get free previews of RMBS assessments from multiple credit rating agencies, enabling the investment banks to hire the agency that provided the best rating. In addition, the Attorney General's investigation found that credit rating agencies were not privy to pertinent due diligence information that investment banks had about the mortgages comprising the loan pools.

The agreements Attorney General Cuomo has reached with S&P, Moody's, and Fitch will help ensure the independence of the credit rating agencies, require the disclosure of due diligence information to the agencies, and increase transparency throughout the industry. All three rating agencies have agreed to implement the following reforms:

• Fee Reforms. Credit rating agencies are typically compensated only if they are selected to rate an RMBS by an investment bank. Credit rating agencies will now establish a fee-for-service structure, where they will be compensated regardless of whether the investment bank ultimately selects them to rate a RMBS.

• Disclosure Reforms. Credit rating agencies will disclose information about all securitizations submitted for their initial review. This will enable investors to determine whether issuers sought, but subsequently decided not to use, ratings from a credit rating agency.

• Loan Originator Review. Credit rating agencies will establish criteria for reviewing individual mortgage lenders (known as

originators), as well as the lender's origination processes. The credit rating agencies will review and evaluate these loan originators and disclose their originator evaluations on their websites.

• Due Diligence Reforms. Credit rating agencies will develop criteria for the due diligence information that is collected by investment banks on the mortgages comprising an RMBS. The credit rating agencies will receive loan level results of due diligence and review those results prior to issuing ratings. The credit rating agencies will also disclose their due diligence criteria on their websites.

• Credit Agency Independence. Credit rating agencies will perform an annual review of their RMBS businesses to identify practices that could compromise their independent ratings. The credit ratings agencies will remediate any practices that they find could compromise independence.

• Representations and Warranties. Credit rating agencies will require a series of representations and warranties from investment banks and other financially responsible parties about the loans underlying the RMBS.

60.   The extent of the problems with the Standard & Poor's ratings system was further revealed by the Wall Street Journal, which, in an August 2, 2008 article entitled "S&P Email: 'We Should Not Be Rating It'", revealed that:

Problems keeping up with the surging growth of mortgage-related debt products were particularly acute at Standard & Poor's Ratings Services, according to a draft version of a Securities and Exchange Commission report on bond-rating firms.

The agency's report, which included unflattering emails, was released July 8 but didn't identify the firms or individuals who wrote the emails. The SEC said that was general practice for an industry review.

Some of the most strongly worded emails from analysts questioning their own ratings came from S&P, according to a draft version of the 38-page report, which includes the firms and was reviewed by The Wall Street Journal. The unit of McGraw-Hill Cos. is the largest bond-rating firm by revenue.

In one email, an S&P analytical staffer emailed another that a mortgage or structured-finance deal was *"ridiculous" and that "we should not be rating it."* The other S&P staffer replied that *"we rate every deal,"* adding that *"it could be structured by cows and we would rate it."*

Meanwhile, an analytical manager in the collateralized debt obligations group at S&P told a senior analytical manager in a separate email that "rating agencies continue to create" an "even bigger monster -- the CDO market. *Let's hope we are all wealthy and retired by the time this house of cards falters.;O)"*

The draft report could trigger more scrutiny of how each bond-rating firm did business during the credit market's boom and bust, including how they dealt with conflicts of interest and other issues affecting the accuracy of ratings.

A McGraw-Hill spokesman said the firm wouldn't comment on specific emails.

The unredacted version of the SEC's report also shows that S&P and Moody's Corp., the industry's two biggest members, didn't add staff dealing with CDOs as fast as that business was growing. *At S&P, revenue from rating the mortgage-laden bond portfolios grew more than 800% from 2002 to 2006, but related staffing doubled.*

\* \* \*

But satisfying Wall Street issuers also crept into the process. "We are meeting with your group this week to discuss adjusting criteria for rating CDO's of real-estate assets . . . because of the ongoing threat of losing deals," S&P commercial mortgage analyst Gale Scott wrote to colleagues in August 2004, according to the draft report and a person familiar with the situation.

Richard Gugliada, a former S&P official who replied to Ms. Scott's email, said he recalls that commercial-mortgage rating criteria were changed slightly after several meetings on the subject. Ms. Scott, who still works at S&P, couldn't be reached for comment.

In early 2007, an S&P official involved in real-estate deals stated that "our staffing issues, of course, make it difficult to deliver the value that justifies our fees." In another email, an S&P official wrote: *"Just too much work, not enough people, pressure from the*

*company, quite a bit of turnover and no coordination of the non-deal stuff they want us and our staff to do."*

(emphasis added).

61.      On August 2, 2008, the *Wall Street Journal* revealed that the problems at Standard

& Poor's came from the tone set by senior management.  The *Wall Street Journal* published an

article entitled *"McGraw Scion Grapples With S&P's Woes --- Chairman Helped Set Tone in

Profit Push As Ratings Firms Feasted on New Products The Wall Street"* which stated in relevant

part that:

> Last October, a hedge-fund manager asked McGraw-Hill Cos.
> Chairman and Chief Executive Harold McGraw III whether bond
> ratings downgraded by the company's Standard & Poor's Ratings
> Services unit amid recent market turmoil should have ever been
> issued in the first place.
>
> "What we do is provide access to the capital market," Mr. McGraw
> responded. "If the market wants those kinds of products and the
> institutional investors want those products, then we move with the
> market and we're going to rate whatever."
>
> The comment on McGraw-Hill's earnings call got little notice at
> the time. But it helps explain why S&P is in a pickle.
>
> The 59-year-old Mr. McGraw, whose great-grandfather started
> McGraw-Hill in 1888 and whose family still owns an estimated
> 20% of its shares, wasn't in the day-to-day business of rating
> bonds. But he helped set the tone at the bond-rating firm, which
> stressed profit growth and keeping costs relatively low.
>
> *While that strategy led to booming profits from 2004 to 2007, S&P
> -- the world's largest bond-rating firm by revenue -- now is
> grappling with a downside that includes lost business and
> regulatory inquiries about the independence of its ratings.*
>
> S&P and other ratings firms agreed to change their fee structures
> and other practices in a June settlement with New York Attorney
> General Andrew Cuomo. Federal rules proposed in response to the
> firms' handling of the credit crunch could result in higher costs and
> diminished market power.

* * *

S&P's problems have cast a cloud over McGraw-Hill shares. After peaking at $72.50 in intraday trading in June 2007, the stock is down 43%. On Friday, the shares rose $1, or 2.5%, to $41.67, on the New York Stock Exchange.

* * *

Richard Gugliada, a former S&P executive who oversaw collateralized-debt obligations from the late 1990s until 2005, said he was given tough budget targets. "Because McGraw-Hill was suffering in other areas, there was a lot of pressure" for S&P to expand 15% to 20% a year, he said.

Building market share in existing and new products also got lots of attention. *Mr. McGraw was a big supporter of the innovative products that S&P was rating during the boom. All three ratings firms were hungry for revenue from the tidal wave of CDOs and other complex securities flooding the market.*

In late 2003, Mr. McGraw said that growth in residential-mortgage securities could decline. But the overall growth in capital markets was a 75-year trend that had more than 30 years to go, he said in 2004.

*In March 2007, Mr. McGraw described CDOs as a "high-quality" market, as shown by the high number of triple-A ratings S&P had assigned to them.*

As S&P has faced scrutiny, McGraw-Hill has been instituting reforms to strengthen the ratings firm's processes. In one sign that Mr. McGraw is taking more control over S&P, Deven Sharma, the strategic chief at McGraw-Hill, was shifted to president of S&P.

In a meeting this spring, Mr. McGraw told S&P employees that the stock's decline "breaks my heart." He insisted, though, that the fundamental growth trends haven't changed. "Over the long term, we will get it back," he said.

62.    McGraw-Hill opened the Class Period at trading at $ 68.02 per share (the closing price on December 29, 2007, was the last trading day of before Class Period), and as a result of the CDO and RMBS problems described above Company stock closed at approximately $37.30 per share (a decrease of about 45%), thereby greatly diminishing the retirement benefits of

Plaintiffs and the Plans.

## MISMANAGEMENT OF PLANS ASSETS

63.     Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this

Complaint, Defendants had a duty to discharge their duties with respect to the Plans with the

care, skill, prudence and diligence under the circumstances then prevailing that a prudent person

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise

of a like character and of like aims, and to diversify investments in the Plans so as to minimize

the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

64.     Defendants are not entitled to the protections of ERISA § 404(c), 29 U.S.C.

§ 1104(c), because the Participants did not exercise independent control over their accounts,

because Defendants subjected them to improper influence with respect to the Plans' investments

in McGraw-Hill common stock, and because Defendants concealed material non-public

information concerning McGraw-Hill that they were not precluded from disclosing under

applicable law.

65.     Defendants breached their fiduciary duties in that they should have known the

facts alleged above and should have known that the Plans should not have invested in McGraw-

Hill common stock during the Class Period.

## FIRST CLAIM:  IMPRUDENT INVESTMENT IN MCGRAW-HILL COMMON STOCK
## (AGAINST ALL DEFENDANTS)

66.     Plaintiffs reallege and incorporate herein by reference the allegations set forth

above.

67.     Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), any fiduciary who breaches any

of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to

make good to the Plans any losses to the Plans resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

68.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plans solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants. Defendants' selection, monitoring, and continuation of the investment alternatives under the Plans were subject to the above-described fiduciary duties. By their continuing to offer McGraw-Hill common stock as an investment under the Plans, when McGraw-Hill's true adverse financial and operating condition was being concealed, Defendants breached each of these fiduciary duties.

69.     As a consequence of Defendants' breaches, the Plans suffered losses.

70.     Defendants are individually liable to make good to the Plans any losses to the Plans resulting from each breach.

71.     Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

### SECOND CLAIM:  MISREPRESENTATION AND NONDISCLOSURE<br>(AGAINST ALL DEFENDANTS)

72.     Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

73.     Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plans any losses to the Plans resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

74.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with

respect to the Plans solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

75.     Defendants breached these fiduciaries in that they made material misrepresentations and nondisclosures as alleged above.

76.     In particular, McGraw-Hill's Participant communications and SEC filings during the Class Period, including its proxy statements and SEC filings on Forms 10-Q and 10-K which were incorporated into the SPDs, were materially false and misleading in that they misrepresented the truth about the Company, and misleadingly concealed material adverse information, including, inter alia, the fact that:

> a.     The Company's Standard & Poor's division's ratings system assigned collateralized debt obligations ("CDOs") and residential mortgage backed securities ("RMBS") ratings that were supposedly based upon the actual riskiness of the products but were in fact predisposed towards higher ratings because the Company did not possess or review sufficient information at the loan-level to accurately rate such products.  Standard & Poor's maintained artificially high ratings on CDO and RMBS products that were not stable, and did not reflect current information or known risk;

> b.     The company was also predisposed to issue higher ratings to CDO and RMBS products in order to generate financial services fees because the Company was aware that investment banks would hire whichever of the Company or its competitors provided the best rating for each product;

> c.     Besides reputational risk, the Company's Standard & Poor's division's inaccurate ratings system led to regulatory action by, inter alia, the

European Union, the SEC, and many of the states' attorneys general;

     d.     The Company's CDO and RMBS problems caused the Company to withdraw its earnings guidance and refuse to issue further guidance as to earnings;

     e.     The Company, with the tone set at the top, pushed short term earnings at the expense of reputation and its long-term horizons and the clear reputational risk associated therewith;

     f.     the Company lacked qualified management in its CDO and RMBS rating unit;

     g.     as a result of the above, the Company's actual and projected results for the Class Period were grossly inflated;

     h.     the Company lacked the require internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts;

     i.     the Company lacked the necessary personnel to issue accurate financial reports and projections.

77.     The Participants relied upon, and are presumed to have relied upon, Defendants' material misrepresentations and nondisclosures to their detriment.

78.     As a consequence of Defendants' material misrepresentations and misleading omissions, the Plans suffered losses.

79.     Defendants are individually liable to make good to the Plans any losses to the Plans resulting from each breach.

80.     Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## THIRD CLAIM: DIVIDED LOYALTY
## (AGAINST THE INDIVIDUAL DEFENDANTS ONLY)

81.     Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

82.     Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), any fiduciary who breaches any of the responsibilities, obligations or duties imposed by ERISA § 404 shall be personally liable to make good to the Plans any losses to the Plans resulting from each breach and shall be subject to such other equitable and remedial relief as the court may deem appropriate.

83.     Pursuant to ERISA § 404, Defendants had a duty to discharge their duties with respect to the Plans solely in the interests of the Participants and for the exclusive purpose of providing benefits to the Participants.

84.     Defendants breached their fiduciary obligations when they acted in their own interests rather than solely in the interests of the Participants and Beneficiaries.

85.     As a consequence of these breaches, the Plans suffered losses.

86.     Defendants are individually liable to make good to the Plans any losses to the Plans resulting from each breach.

87.     Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## FOURTH CLAIM:  BREACH OF THE DUTY TO PROPERLY APPOINT, MONITOR
## AND INFORM THE COMMITTEE AND MEMBERS OF THE COMMITTEE
## (AGAINST THE DIRECTOR DEFENDANTS ONLY)

88.     Plaintiffs reallege and incorporate herein by reference the allegations set forth above.

89.     The Director Defendants had the duty and responsibility to properly appoint,

monitor and inform the members of the Committee and/or other persons who exercised day-to-day responsibility for the management and administration of the Plans and their assets.

90.     The Director Defendants failed to properly appoint, monitor and inform such persons in that the Director Defendants failed to adequately inform such persons about the true financial and operating condition of the Company or, alternatively, the Director Defendants did adequately inform such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by McGraw-Hill during the Class Period identified herein) but nonetheless continued to allow such persons to offer McGraw-Hill common stock as an investment option under the Plans even though the market price of McGraw-Hill common stock was artificially inflated and even though McGraw-Hill common stock was not a prudent investment for Participants' retirement accounts under the Plans.

91.     As a consequence of these breaches, the Plans suffered losses.

92.     Director Defendants are individually liable to make good to the Plans any losses to the Plans resulting from each breach.

93.     Pursuant to ERISA § 502(a)(3), 11 U.S.C. § 1132(a)(3), the Court should also award appropriate equitable relief, including in the form of restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.     Actual damages in the amount of any losses the Plans suffered, with such losses to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

B.     Appropriate equitable relief, including in the form of restitution;

C.     Costs pursuant to 29 U.S.C. § 1132(g);

D.     Attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

and,

E.     Such other relief as the Court may deem equitable and just.

### JURY TRIAL DEMAND

Plaintiffs demand trial by jury of all issues to triable.

Dated: September ___, 2008          **STULL, STULL & BRODY**

_____

Edwin J. Mills (EM-7117)
Michael J. Klein (MK-8187)
6 East 45th Street
New York, New York 10017
Telephone: (212) 687-7230
Fax: (212) 490-2022

Major Khan (MK-5691)
**MAJOR KHAN, LLC**
20 Bellevue Street
Weehawken, NJ 07086
Telephone: (646) 546-5664
Facsimile: (646) 546-5755

***Attorneys for Plaintiffs***