Exhibit G (1 of 2)

THE 401(k) SAVINGS AND PROFIT SHARING PLAN OF
THE McGRAW-HILL COMPANIES, INC.
AND ITS SUBSIDIARIES

(As Amended and Restated as of January 1, 2007, Unless Otherwise Provided)

NYDOCS01/1032206 21

## Table of Contents

**Page**

### SECTION I INTRODUCTION

1.1    Establishment and Restatement of the Plan........................................................................1
1.2    Participants Whose Employment Terminated Prior to January 1, 2006 and Their
       Beneficiaries .................................................................................................................1

### SECTION II DEFINITIONS

2.1    Definitions ......................................................................................................................2
       *Account* ........................................................................................................................2
       *Account Balance* .........................................................................................................2
       *Affiliate* .......................................................................................................................2
       *After Tax Contribution*...............................................................................................2
       *After Tax Contribution Account* .................................................................................2
       *Alternate Payee*...........................................................................................................2
       *Benefit Payment Date* .................................................................................................2
       *Board of Directors*......................................................................................................2
       *Break in Service* ..........................................................................................................2
       *Broadcasting EIP* ........................................................................................................3
       *Broadcasting Employee* ..............................................................................................3
       *Common Stock of the Corporation* .............................................................................3
       *Continuous Service* .....................................................................................................3
       *Corporation* ................................................................................................................4
       *Designated Beneficiary*...............................................................................................4
       *Disability Leave*..........................................................................................................4
       *Earnings*......................................................................................................................4
       *Earnings Limitation*....................................................................................................4
       *Eligible Employee*.......................................................................................................4
       *Eligible Rollover Distribution* ....................................................................................5
       *Employer*.....................................................................................................................6
       *Employer Matching Contribution*...............................................................................6
       *Employer Matching Contribution Account*..................................................................6
       *Employment Commencement Date* ..............................................................................6
       *Employment Termination Date*....................................................................................6
       *ERISA*..........................................................................................................................6
       *Expatriate* ...................................................................................................................6
       *Family and Medical Leave* ..........................................................................................6
       *Five-Percent Owner* ....................................................................................................7
       *FMLA*..........................................................................................................................7
       *Hardship Loan*............................................................................................................7
       *Hardship Withdrawal* ..................................................................................................7
       *Highly Compensated Employee*...................................................................................7
       *Hour of Service* ...........................................................................................................7

PA000002

*Internal Revenue Code* ............................................................................................7
*Investment Options* ..............................................................................................8
*Leave of Absence* ..................................................................................................8
*Mutual Fund Window* ...........................................................................................8
*Non-Highly Compensated Employee* ....................................................................8
*Normal Retirement Date* .......................................................................................8
*Other Plan Loan* ...................................................................................................8
*Parental Leave* ......................................................................................................8
*Participant* ............................................................................................................8
*Pension Investment Committee* .............................................................................8
*Plan* .......................................................................................................................8
*Plan Administrator* ...............................................................................................8
*Plan Year* ..............................................................................................................8
*Predecessor Profit Sharing Plan* ..........................................................................8
*Predecessor SIP* ...................................................................................................8
*Profit Sharing Contribution* .................................................................................8
*Profit Sharing Contribution Account* ...................................................................9
*Qualified Individual* .............................................................................................9
*Rollover Contribution* ..........................................................................................9
*Rollover Contribution Account* .............................................................................9
*Securities Exchange Act* .......................................................................................9
*Separation Pay Plan* .............................................................................................9
*Social Security Wage Base* ....................................................................................9
*Spouse* ...................................................................................................................9
*SRIP* ......................................................................................................................9
*Stock Fund* ............................................................................................................9
*Subsidiary* .............................................................................................................9
*Survivor's Benefit* .................................................................................................9
*Tax Deferred Contribution* ..................................................................................10
*Tax Deferred Contribution Account* ....................................................................10
*Trust Agreement* ..................................................................................................10
*Trust Fund* ...........................................................................................................10
*Trustee* .................................................................................................................10
*Uniformed Services Leave* ...................................................................................10
*USERRA* ..............................................................................................................10
*Valuation Date* .....................................................................................................10
2.2     Rules of Construction .................................................................................10

## SECTION III PARTICIPATION

3.1     Previous Participants ..................................................................................11
3.2     New Participants ........................................................................................11
3.3     Deemed Elections .......................................................................................11
3.4     Participation Ends ......................................................................................11
3.5     Resumption of Participation .......................................................................12

PA000003

## SECTION IV PARTICIPANT CONTRIBUTIONS

4.1     Tax Deferred Contributions..................................................................................13
4.2     After Tax Contributions......................................................................................13
4.3     Initial and Subsequent Changes in Contribution Rate........................................14
4.4     Rollover Contributions ......................................................................................14

## SECTION V EMPLOYER CONTRIBUTIONS

5.1     Employer Matching Contribution.......................................................................17
5.2     Profit Sharing Contribution ...............................................................................18

## SECTION VI LIMITATIONS ON CONTRIBUTIONS

6.1     Definitions .........................................................................................................19
6.2     Compliance with Section 402(g) of the Internal Revenue Code ........................20
6.3     Compliance with Section 401(k) of the Internal Revenue Code ........................20
6.4     Compliance with Section 401(m) of the Internal Revenue Code........................21
6.5     Changes Effected by the Plan Administrator .....................................................22
6.6     Compliance with Section 415 of the Internal Revenue Code..............................22
6.7     Proportional Adjustment....................................................................................23

## SECTION VII ALLOCATION OF CONTRIBUTIONS

7.1     Allocation ..........................................................................................................24
7.2     Payment and Crediting of Contributions ...........................................................24
7.3     Records to Be Maintained .................................................................................24

## SECTION VIII INVESTMENT OF PLAN ACCOUNTS

8.1     Investment Options.............................................................................................25
8.2     Changes in Investment Direction for Past or Future Contributions ...................25
8.3     Allocation of Income, Gains and Losses.............................................................26
8.4     Records to Be Maintained ..................................................................................26
8.5     Special Withdrawal Rules for Section 16 Officers and Others. ..........................26
8.6     Mandatory No-Trading Periods..........................................................................26

## SECTION IX IN-SERVICE WITHDRAWALS AND PLAN LOANS

9.1     In-Service Withdrawals Other than for Hardship...............................................27
9.2     In-Service Hardship Withdrawals ......................................................................28
9.3     Hardship Loans..................................................................................................29
9.4     Special Withdrawal Rules for Section 16 Officers and Others ...........................33
9.5     In-Service Withdrawal Due to Disability ...........................................................33
9.6     Hurricane Distributions .....................................................................................34

PA000004

## SECTION X VESTING AND BENEFITS

10.1   Vesting of Account Balance...........................................................................35
10.2   Distribution Upon Employment Termination Date ......................................36
10.3   Survivor's Benefit ........................................................................................37
10.4   Form of Distribution.....................................................................................38
10.5   Payment of Small Amounts..........................................................................40
10.6   Direct Rollover of Eligible Rollover Distribution........................................40

## SECTION XI DESIGNATED BENEFICIARIES

11.1   Spouse's Consent ..........................................................................................43
11.2   Beneficiary Designation ...............................................................................43
11.3   Revocation or Modification of Designated Beneficiary ...............................43
11.4   Absence of Designated Beneficiary ..............................................................43
11.5   Beneficiary Designations Made Prior to December 31, 2006 ......................43

## SECTION XII LEAVES OF ABSENCE AND SEVERANCE

12.1   Definitions ...................................................................................................45
12.2   Disability Leave............................................................................................46
12.3   Family and Medical Leave and Leave of Absence.........................................46
12.4   Parental Leave ..............................................................................................46
12.5   Uniformed Services Leave ...........................................................................46
12.6   Separation Pay Plan ......................................................................................47
12.7   Service Credit Upon Return From Leave .....................................................48

## SECTION XIII ADMINISTRATION

13.1   Plan Administrator; Pension Investment Committee .....................................49
13.2   Pension Investment Committee — Internal Organization..............................49
13.3   Pension Investment Committee — Responsibilities ......................................50
13.4   Plan Administrator — Responsibilities .........................................................50
13.5   Claims Procedure..........................................................................................52
13.6   Liability and Indemnification of Fiduciaries ................................................53
13.7   Fees and Expenses.........................................................................................53

## SECTION XIV ADMINISTRATION OF THE TRUST FUND

14.1   Exclusive Benefit..........................................................................................55
14.2   Establishment of Trust Fund.........................................................................55
14.3   Voting of the Common Stock of the Corporation .........................................55
14.4   Tender Offers for McGraw-Hill Stock .........................................................55
14.5   Limitation of Contribution............................................................................56

## SECTION XV OBLIGATIONS OF THE EMPLOYER

15.1   Employer Obligations....................................................................................57

PA000005

## SECTION XVI PLAN MERGER, CONSOLIDATION, TRANSFER AND WITHDRAWAL OF EMPLOYER

16.1    Employer Withdrawal..................................................................................58
16.2    Merger, Consolidation or Transfer of Plan Assets ............................................58
16.3    Participation and Service Upon Merger, Transfer or Consolidation..................58
16.4    Transfers from the Plan to the Plan of an Affiliate...........................................58
16.5    Transfers from a Plan of an Affiliate to the Plan..............................................59
16.6    Plan Merger and Transfer............................................................................59
16.7    Determinations, Approvals and Notifications..................................................59
16.8    Transfers from the Kenny Group, Inc. Profit Sharing Plan to the Plan............59
16.9    Transfers from the Castelazo & Associates Profit Sharing Plan to the Plan.....60
16.10   Participants Employed by Tower Group ........................................................60
16.11   Other Transfers..........................................................................................60

## SECTION XVII MISCELLANEOUS

17.1    No Right to Assign, Transfer, Encumber, Commute or Anticipate Benefits.................61
17.2    Qualified Domestic Relations Orders ............................................................61
17.3    No Employment Agreement..........................................................................61
17.4    Unclaimed Benefits ....................................................................................61
17.5    Payment of Benefits on Behalf of Disabled Individual....................................62
17.6    Forfeitures..................................................................................................62
17.7    Headings and Titles.....................................................................................62
17.8    Governing Law............................................................................................62

## SECTION XVIII AMENDMENT AND TERMINATION OF PLAN

18.1    Amendment of Plan......................................................................................63
18.2    Termination of Plan.....................................................................................63

## SECTION XIX TOP HEAVY PROVISIONS

19.1    Definitions..................................................................................................64
19.2    Top-Heavy..................................................................................................64
19.3    Determination Date and Valuation Date ........................................................65
19.4    Vesting Requirements..................................................................................65
19.5    Minimum Benefit ........................................................................................65

Appendix A    SRIP Contribution for the Period
              from January 1, 1986 to June 30, 1986.............................................A-1

Appendix B    Participants Employed by Shepard's/McGraw-Hill, Inc......................B-1

Appendix C    List of Participating Employers ...............................................C-1

PA000006

Appendix D    Superseded Provisions .................................................................................... D-1

Appendix E    Participants Employed by Tribune Education Company
and Its Subsidiaries ("*Tribune*") .......................................................... E-1

Appendix F    Participants Employed by Mayfield Publishing Company and Its
Subsidiaries ("*Mayfield*") .................................................................... F-1

Appendix G    Participants Employed by Portfolio Management Data LLC ............................ G-1

Appendix H    Participants Employed by International Finance Corporation
Indices and Emerging Markets Data Base ("*International*") ................................ H-1

Appendix I    Participants Employed by Rational Investors, Inc. ("*Rational*") .......................... I-1

Appendix J    Participants Employed by Telekurs Financial ("*Telekurs*") .................................. J-1

Appendix K    Participants Employed by Appleton & Lange Inc. ("*Appleton*") ...................... K-1

Appendix L    Participants Employed by Optical Data ("*Optical*") ........................................... L-1

Appendix M    Participants Employed by Xebec Interactive Learning ("*Xebec*") .................... M-1

Appendix N    Participants Employed by Micropal Group ("*Micropal*") ................................... N-1

Appendix O    Participants Employed by Tower Group International ........................................ O-1

Appendix P    Participants Employed by Dodge Printing Facility ............................................. P-1

Appendix Q    Participants Employed by Chemical Week and Modern Plastics ........................ Q-1

Appendix R    Participants Employed by MMS International .................................................... R-1

Appendix S    Participants Employed by S&P ComStock ........................................................ S-1

Appendix T    Participants Employed by the McGraw-Hill Broadcasting Company, Inc. ........ T-1

Appendix U    Participants Employed by J. J. Kenny Drake, Inc ............................................. U-1

Appendix V    Participants Employed by Grow Network/McGraw-Hill ("*Grow*").................... V-1

Appendix W    Participants Employed by Capital IQ, Inc. ("*Capital*") ..................................... W-1

Appendix X    Participants Employed by Vista Research, Inc, ("*Vista*").................................... X-1

Appendix Y    Participants Employed by J.D. Power & Associates ("*JDPA*")............................ Y-1

Appendix Z    Participants Employed by TurnLeaf Solutions, Inc. ("*TSI*") ............................... Z-1

PA000007

Appendix AA  Participants Employed in the Corporate Value Consulting Unit ("CVC").......AA-1

Appendix BB  Other Corporate Transactions.........................................................................BB-1

PA000008

## SECTION I

### INTRODUCTION

1.1    Establishment and Restatement of the Plan.  The Plan was established effective as of July 1, 1986 as a restatement and continuation of the Supplemental Retirement Income Plan of McGraw-Hill Inc. and Its Subsidiaries.  Effective April 26, 1995, the name of the Plan was changed to the "Savings Incentive Plan of The McGraw-Hill Companies, Inc. and Its Subsidiaries."  The Plan was amended from time to time and was last restated as of January 1, 2004.  Effective January 1, 2004, the assets and liabilities of the Employees' Investment Plan of McGraw-Hill Broadcasting Company, Inc. and Its Subsidiaries were merged into the Plan and the Trust Fund.  Effective December 31, 2005, the assets and liabilities of The Employee Retirement Account Plan of The McGraw-Hill Companies, Inc. and Its Subsidiaries were merged into the Plan and the Trust Fund.  Effective December 31, 2005, the Plan was amended and restated and the name of the Plan was changed to "The 401(k) Savings and Profit Sharing Plan of The McGraw-Hill Companies, Inc. and Its Subsidiaries"  Except as otherwise provided herein, the Plan is hereby amended and restated effective as of January 1, 2007.

1.2    Participants Whose Employment Terminated Prior to January 1, 2006 and Their Beneficiaries.  Except as may be otherwise specifically provided herein, Participants who incurred an Employment Termination Date prior to January 1, 2006 and beneficiaries of such Participants will be entitled only to the benefits, options and rights, if any, provided to them in accordance with the terms of the Plan in effect on their Employment Termination Date.

PA000009

## SECTION II

## DEFINITIONS

2.1   <u>Definitions</u>. Whenever used in the Plan, the following terms will have the respective meanings set forth below; *provided, however*, that certain special purpose definitions are also set forth in Sections VI, X, XII and XIX:

"*Account*" means, with respect to a Participant, his After Tax Contribution Account, Employer Matching Contribution Account, Tax Deferred Contribution Account, Rollover Contribution Account, Profit Sharing Contribution Account and any other account which may be established under the Plan on behalf of such Participant.

"*Account Balance*" means, with respect to a Participant, the sum of balances of each of the components of the Account held by the Plan on behalf of such Participant as of a Valuation Date.

"*Affiliate*" means each Employer and all members of a controlled group of corporations (as defined in Section 414(b) of the Internal Revenue Code), all commonly controlled trades or businesses (as defined in Section 414(c) of the Internal Revenue Code), or affiliated service groups (as defined in Section 414(m) of the Internal Revenue Code) of which an Employer is a part, and any other entity required to be aggregated with an Employer pursuant to Section 414(o) of the Internal Revenue Code.

"*After Tax Contribution*" means a contribution made pursuant to Section 4.2 that is credited to the After Tax Contribution Account of a Participant.

"*After Tax Contribution Account*" means that portion of a Participant's Account Balance attributable to (i) After Tax Contributions made on behalf of such Participant, (ii) voluntary, After Tax Contributions, if any, made by such Participant under the SRIP, (iii) after-tax contributions, if any, made by such Participant under the Broadcasting EIP and transferred to the Plan as of the close of business on December 31, 2003, and (iv) any income, gains and losses attributable to the foregoing. Pre-1987 and post-1986 accounts will be maintained within the After Tax Contribution Account to account separately for pre-1987 and post-1986 After Tax Contributions, respectively and the earnings attributable to each.

"*Alternate Payee*" has the meaning given such term under Section 17.2.

"*Benefit Payment Date*" means the first date with respect to which an amount is paid pursuant to Section X.

"*Board of Directors*" means the Board of Directors of the Corporation.

"*Break in Service*" means each period of twelve consecutive months beginning on an Employee's Employment Commencement Date or any anniversary thereof in which an Employee who has incurred an Employment Termination Date is credited with less than 501 Hours of Service.

PA000010

"*Broadcasting EIP*" means the Employees' Investment Plan of McGraw-Hill Broadcasting Company, Inc. and Its Subsidiaries, as in effect on December 31, 2003.

"*Broadcasting Employee*" means an Employee who is employed by the McGraw-Hill Broadcasting Company, Inc.

"*Common Stock of the Corporation*" means the common stock of The McGraw-Hill Companies, Inc.

"*Continuous Service*" means a period of twelve consecutive months commencing on an Employee's Employment Commencement Date or any anniversary thereof, during which an Employee is credited with at least 1,000 Hours of Service, subject to the following:

(a)    Continuous Service with respect to an Employee ends when the Employee incurs an Employment Termination Date.

(b)    In determining an Employee's years of Continuous Service, the Employee's years of Continuous Service preceding a Break in Service will be included if such service was not forfeited as a result of a prior Break in Service.

(c)    If an individual who was a leased employee within the meaning of Section 414(n)(2) of the Internal Revenue Code, but without regard to the one-year service requirement included in Internal Revenue Code Section 414(n)(2)(B), becomes an Eligible Employee, and an Affiliate was the recipient of such individual's services as a leased employee, his period of service as a leased employee shall be counted in determining his Continuous Service solely for purposes of determining eligibility to participate and vesting, but not for purposes of benefit accruals, subject to the requirements of this definition of Continuous Service. An individual shall be considered a leased employee within the meaning of Internal Revenue Code Section 414(n)(2) if he provides services under the primary direction or control of an Employer pursuant to an agreement between an Employer and another person on a substantially full-time basis.

(d)    Service with the Macmillan/McGraw-Hill School Publishing Company (the "*Joint Venture*") from January 1, 1990 through December 31, 1993 will be considered Continuous Service for purposes of eligibility (as provided in Section III of the Plan) and vesting under the Plan (as provided in Section 10.1 of the Plan).

(e)    Service with Macmillan, Inc. from January 1, 1989 to December 31, 1989 will be considered Continuous Service for purposes of eligibility (as provided in Section III of the Plan) and vesting under the Plan (as provided in Section 10.1 of the Plan). Participants who, as of December 31, 1989, (i) are employees of the Joint Venture and (ii) have completed one year of Continuous Service will be deemed to have completed five years of Continuous Service as of December 31, 1989.

PA000011

"*Corporation*" means The McGraw-Hill Companies, Inc., a New York corporation, and any successor thereto.

"*Designated Beneficiary*" means a person designated pursuant to Section XI to receive a Survivor's Benefit.

"*Disability Leave*" has the meaning given such term under Section 12.1.

"*Earnings*" means, for any Eligible Employee, salary, regular pay, overtime pay, commissions, shift differentials, short-term incentive compensation and premiums paid in cash, and any reductions in cash earnings not includible in a Participant's gross income by reason of Section 125, Section 129, or Section 132(f)(4) of the Internal Revenue Code, including but not limited to reductions in cash earnings made pursuant to The McGraw-Hill Companies, Inc. Flexible Spending Account Plan and the Transportation Benefit Program, and Tax Deferred Contributions under the Plan and such contributions under any other qualified cash or deferred arrangement, within the meaning of Section 401(k)(2) of the Internal Revenue Code, of an Affiliate, that are paid to the Eligible Employee by an Affiliate during the Plan Year, plus, in the case of an Eligible Employee who regularly receives talent fees, commissions and/or other incentive compensation paid on a formula basis, such compensation received during the Plan Year in the regular course of his employment with an Affiliate. Earnings will not include bonuses, Christmas gifts and any executive incentive compensation other than short-term incentive compensation received as cash and not deferred. Earnings will not include any payments under a Separation Pay Plan or amounts paid following the end of the month following the month in which an Employee's Employment Termination Date occurs.

"*Earnings Limitation*" means $225,000, or such other amount as adjusted after 2007 pursuant to Section 401(a)(17) of the Internal Revenue Code.

"*Eligible Employee*" means an Employee of an Employer whom the Employer treats as subject to federal wage withholding by the Employer for purposes of Section 3401 of the Internal Revenue Code. The previous sentence notwithstanding, Eligible Employee shall not include:

      (a)     Any Employee in a unit of Employees covered by a collective bargaining agreement when such collective bargaining agreement (i) provides that (A) no Employer will make contributions for the benefit of the Employees of such unit to the Plan or (B) Employees of such unit will not be Eligible Employees or (ii) does not provide that an Employer will make contributions for the benefit of the Employees of such unit to the Plan;

      (b)     Any Employee of an Employer employed outside of the United States; *provided, however*, that an Expatriate shall be an Eligible Employee;

      (c)     Any nonresident alien who receives no earned income from the Employer which constitutes income from sources within the United States, including, without limitation, a local national Employee and an international Employee;

                          4

PA000012

(d)     Any Employee who is transferred to employment with an Employer from employment with an Affiliate located outside of the United States who continues to be covered by a retirement plan of such Affiliate;

(e)     any individual who performs services for an Employer under an agreement or arrangement (which may be written, oral or evidenced by the payroll practices of the Employer), with the individual or with another organization that provides the services of the individual to the Employer, under which the individual is treated as an independent contractor or is otherwise treated as an employee of an entity other than the Employer (such as a leasing organization), irrespective of whether the individual is treated as an employee of the Employer under common law employment principles or such characterization is subsequently challenged, changed or upheld by any court or governmental authority, including, without limitation, an individual classified by an Employer as a "leased employee" (as described in Section 414(n) of the Internal Revenue Code), "independent contractor," "consultant," "contract worker," "special worker," or "freelance worker";

(g)     Any individual who performs services for an Employer under an agreement or arrangement with the individual, or with another organization that provides the services of the individual to the Employer, that states that the individual is not eligible for participation in the Plan;

(h)     Any Employee or individual hired as (A) a temporary worker for a fixed period or periods or to complete a specific project or specific projects, (B)a worker for a fixed period to provide services in connection with the development of a specified project known as a "project worker," or (C) a worker who is a member of the substitute workforce of the Employer assigned to provide services based on availability to work, known as an "on call employee";

(i)     Solely with respect to the Profit Sharing Contribution as set forth in Section 5.2, any Employee or individual hired for a specified duration for services related to the business requirements of peak production periods known as a "seasonal worker;"

(j)     Any Employee who participates in the Standard & Poor's Savings Incentive Plan for Represented Employees or the Standard & Poor's Employee Retirement Account Plan; and

(k)     Any Employee who is not employed by an Employer.

"*Eligible Rollover Distribution*" means a distribution (including an in-service withdrawal) from an eligible retirement plan (as defined in Section 402(c)(8)(B) of the Internal Revenue Code) excluding: (a) any distribution which is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the employee and the employee's beneficiary, or for a specified period of ten years or more,

PA000013

(b) any distribution to the extent it is required under Section 401(a)(9) of the Internal Revenue Code, or (c) any distribution which is made upon hardship of the Employee.

"*Employee*" means any person who is a common-law employee of an Affiliate excluding a person acting only as a member of the Board of Directors or a freelance talent or talent hired on a fee per occasion basis.

"*Employer*" means the Corporation and any Affiliate that is listed in Appendix C and included in the Plan with the approval of the Executive Vice President – Human Resources of the Corporation; *provided, however*, an Affiliate listed in Appendix C ceases to be an Employer at the time said Employer:

> (a)    Ceases to be an Affiliate, unless the Executive Vice President – Human Resources of the Corporation expressly permits the former Affiliate to continue as an Employer for the purposes of the Plan; or

> (b)    Is removed from Appendix C by the Executive Vice President – Human Resources of the Corporation.

An Affiliate may be included in the Plan with respect to certain designated operating units or groups of Employees only, and in such event, the term "Employer" shall refer to the operating unit or group of Employees so designated.

"*Employer Matching Contribution*" means a contribution made pursuant to Section 5.1 that is credited to the Employer Matching Contribution Account of a Participant.

"*Employer Matching Contribution Account*" means that portion of a Participant's Account Balance attributable to (i) Employer Matching Contributions made on behalf of the Participant, (ii) employer contributions made on behalf of the Participant, if any, under the SRIP, (iii) employer contributions, if any, made on behalf of the Participant under the Broadcasting EIP and transferred to the Plan as of the close of business on December 31, 2003, and (iv) any income, gains, and losses attributable to the foregoing.

"*Employment Commencement Date*" means the date an Employee first performs an Hour of Service for an Affiliate.

"*Employment Termination Date*" means, subject to Section 12.6, the date on which an Employee terminates employment with an Affiliate for any reason.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the applicable rules and regulations thereunder.

"*Expatriate*" means an United States Employee of an Employer who is assigned to a work location outside the United States and is paid through a United States payroll and receives United States benefits.

"*Family and Medical Leave*" has the meaning given such term under Section 12.1.

PA000014

"*Five-Percent Owner*" means a Participant who is an owner of more than 5% (or considered an owner under Section 318 of the Internal Revenue Code) of the outstanding stock or the total combined voting power of the outstanding stock of any Employer at any time during the relevant Plan Year.

"*FMLA*" means the Family and Medical Leave Act of 1993, as amended from time to time, and the applicable rules and regulations thereunder.

"*Hardship Loan*" has the meaning given such term under Section 9.3.

"*Hardship Withdrawal*" has the meaning given such term under Section 9.2.

"*Highly Compensated Employee*" means any Employee who (i) was a Five-Percent Owner during the Plan Year or the preceding Plan Year or (ii) had compensation (as defined in Section 414(q)(4) of the Internal Revenue Code) for the preceding Plan Year in excess of $100,000, or such amount as adjusted pursuant to Section 414(q) of the Internal Revenue Code. A former Employee will be treated as a Highly Compensated Employee if such Employee was a Highly Compensated Employee at the time of the Employee's Employment Termination Date or such Employee was a Highly Compensated Employee at any time after attaining age fifty-five. Prior to January 1, 1997, Highly Compensated Employee was defined as provided in Appendix D.

"*Hour of Service*" means (i) each hour for which an Employee is directly or indirectly compensated or entitled to compensation by an Affiliate, whether for the performance of services or for other reasons such as vacation or sickness, (ii) each hour for which back pay, irrespective of mitigation of damages, has been awarded or agreed to by an Affiliate and (iii) each hour for which an Employee receives credit under Section 12.7, subject to the following:

    (a)    Hours of Service will be computed and credited in accordance with Department of Labor Regulation Sections 2530.200b-2(b) and (c), except for Section 2530.200b-2(c)(4).

    (b)    Each Eligible Employee for whom the rate of pay in the books and records of the Employer is not an hourly rate of pay will be credited with 190 Hours of Service for each month in which the Eligible Employee is credited with at least one Hour of Service.

    (c)    Solely for purposes of vesting under Section 10.1, each Eligible Employee for whom the rate of pay in the books and records of the Employer is an hourly rate of pay shall be credited with (i) one year of Continuous Service upon becoming a Participant and (ii) shall be credited with 190 Hours of Service for each month in which the Participant is credited with at least one Hour of Service thereafter.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the applicable rules and regulations thereunder.

7

"*Investment Options*" means the investment options under the Plan available for the investment of contributions, pursuant to Section 8.1.

"*Katrina Distribution*" has the meaning given such term in Section 9.6(c).

"*Leave of Absence*" has the meaning given such term under Section 12.1.

"*Mutual Fund Window*" has the meaning given such term under Section 8.1

"*Non-Highly Compensated Employee*" means an Employee who is not a Highly Compensated Employee.

"*Normal Retirement Date*" means the last day of the calendar month during which the Participant attains age 65.

"*Other Plan Loan*" has the meaning given such term in Section 9.3(a)(iii).

"*Parental Leave*" has the meaning given such term under Section 12.1.

"*Participant*" means any person who meets the participation requirements of Section III and who continues to have an Account under the Plan.

"*Pension Investment Committee*" means the committee established by the Board of Directors pursuant to Section 13.1(b) or its delegate.

"*Plan*" means the 401(k) Savings and Profit Sharing Plan of The McGraw-Hill Companies, Inc. and Its Subsidiaries, as set forth in and by this document and all subsequent amendments thereto.

"*Plan Administrator*" means, effective June 6, 2005, the individual who holds the position of Vice President, Employee Benefits of the Corporation or his delegate or such other person as may be appointed from time to time as Plan Administrator, or the delegate of such other person and, prior to such date, the individual who held the position of Senior Director, Benefit Plans Administration of the Corporation or his delegate.

"*Plan Year*" means a period of twelve consecutive months commencing as of each January 1 and ending on each December 31. The Plan Year is the "limitation year" for the purposes of Section 415 of the Internal Revenue Code.

"*Predecessor Profit Sharing Plan*" means the Employee Retirement Account Plan of The McGraw-Hill Companies, Inc. and Its Subsidiaries, as in effect on December 30, 2005.

"*Predecessor SIP*" means the Savings Incentive Plan of The McGraw Hill Companies Inc., and Its Subsidiaries, as in effect on December 30, 2005.

"*Profit Sharing Contribution*" means a contribution made pursuant to Section 5.2 that is credited to the Profit Sharing Contribution Account of a Participant.

PA000016

"*Profit Sharing Contribution Account*" means that portion of a Participant's Account Balance attributable to (i) Profit Sharing Contributions, if any, made by an Employer on behalf of such Participant, (ii) amounts transferred, on December 31, 2005, from the Participant's account in the Predecessor Profit Sharing Plan and (iii) any income, gains and losses attributable to such contributions and amounts.

"*Qualified Individual*" has the meaning given such term under Section 9.6(b).

"*Rollover Contribution*" means a before-tax contribution to the Plan made pursuant to Section 4.4 that is credited to the Rollover Contribution Account of a Participant.

"*Rollover Contribution Account*" means that portion of a Participant's Account Balance attributable to (i) Rollover Contributions made on behalf of such Participant, (ii) rollover contributions, if any, made on behalf of the Participant under the Broadcasting EIP and transferred to the Plan as of the close of business on December 31, 2003, and (iii) any income, gains and losses attributable to the foregoing.

"*Securities Exchange Act*" means the Securities Exchange Act of 1934, as amended from time to time, and the applicable rules and regulations thereunder.

"*Separation Pay Plan*" means the Separation Pay Plan of The McGraw-Hill Companies, Inc., The McGraw-Hill Companies, Inc. Management Severance Plan, The McGraw-Hill Companies, Inc. Executive Severance Plan, The McGraw-Hill Companies, Inc. Senior Executive Severance Plan or any other formal plan of severance offered by an Employer.

"*Social Security Wage Base*" means, with respect to any Plan Year, the maximum amount of compensation which may be considered wages under Section 3121(a)(1) of the Internal Revenue Code as of the beginning of such Plan Year.

"*Spouse*" means, as of the date of determination, the individual to whom a Participant is married within the meaning of (i) the laws of the jurisdiction of the Participant's domicile and (ii) the laws of the United States.

"*SRIP*" means the Plan as in effect on June 30, 1986, then known as the Supplemental Retirement Income Plan of McGraw-Hill, Inc. and Its Subsidiaries.

"*Stock Fund*" has the meaning given such term under Section 8.1.

"*Subsidiary*" means any corporation or other entity which is controlled directly or indirectly by the Corporation. For purposes of this definition, a corporation or other entity is "controlled" if the Corporation, directly or indirectly, holds an equity interest in it of more than 50%.

"*Survivor's Benefit*" has the meaning given such term under Section 10.3.

PA000017

"*Tax Deferred Contribution*" means a contribution made pursuant to Section 4.1 that is credited to the Tax Deferred Contribution Account.

"*Tax Deferred Contribution Account*" means that portion of a Participant's Account Balance attributable to (i) Tax Deferred Contributions made on behalf of such Participant, (ii) optional tax deferred contributions, if any, made on behalf of the Participant under the SRIP, (iii) tax deferred contributions, if any, made on behalf of the Participant under the Broadcasting EIP and transferred to the Plan as of the close of business on December 31, 2003, and (iv) any income, gains and losses attributable to the foregoing.

"*Trust Agreement*" means the agreement between the Corporation and the Trustee for the custody of the Trust Fund.

"*Trust Fund*" means all monies and property held by the Trustee pursuant to the Trust Agreement and the Plan and all investments made therewith and proceeds thereof and all income, gains, and losses thereon less any payments made by the Trustee as authorized in the Trust Agreement. The assets of the Trust Fund may be held in one or more trust accounts.

"*Trustee*" means The Northern Trust Company or any successor trustee thereto.

"*Uniformed Services Leave*" has the meaning given such term under Section 12.1.

"*USERRA*" means the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended from time to time, and the applicable rules and regulations thereunder.

"*Valuation Date*" means each business day and any other day on which the Trustee values the Trust Fund.

2.2     <u>Rules of Construction</u>.  The use of the masculine gender herein shall be deemed to encompass the feminine and the use of the singular form of a word shall be deemed to encompass the plural form, unless the context requires otherwise.  Unless otherwise noted, references to sections refer to sections of the Plan.

PA000018

## SECTION III

### PARTICIPATION

3.1    Previous Participants.  Each individual who was a Participant on December 31, 2006, and who is an Eligible Employee on January 1, 2007, will continue as a Participant on January 1, 2007.

3.2    New Participants.

(a)    The eligibility of an Eligible Employee to make Tax Deferred Contributions and After Tax Contributions and to have Employer Matching Contributions credited to his Account shall be determined solely in accordance with this Section 3.2(a).  Prior to January 1, 2001, each Eligible Employee became a Participant on the first day of the month coincident with or next following the date the Eligible Employee completed the enrollment process after completing one year of Continuous Service or, if later, attaining age 21.  Except as provided in Section 3.3, on and after January 1, 2001, each Eligible Employee will become a Participant for purposes of Tax Deferred Contributions, After Tax Contributions and Employer Matching Contributions as soon as practicable after the Eligible Employee completes the enrollment process following his Employment Commencement Date.

(b)    The eligibility of an Eligible Employee to have Profit Sharing Contributions credited to his Profit Sharing Contribution Account shall be determined solely in accordance with this Section 3.2(b).  Each Eligible Employee will become a Participant for purposes of Profit Sharing Contributions on the first day of the month coincident with or next following the date the Eligible Employee attained age 21 and completed one year of Continuous Service.  An Eligible Employee who does not satisfy the requirements of this Section 3.2(b) shall not have Profit Sharing Contributions credited to his Profit Sharing Contribution Account.

(c)    All enrollments pursuant to this Section 3.2 must be processed in accordance with systems and procedures approved by the Plan Administrator.

3.3    Deemed Elections.  Notwithstanding Section 3.2, each Eligible Employee who first performs an Hour of Service on or after January 1, 2003 (January 1, 2004 for Broadcasting Employees) and who does not make an election by submitting an enrollment application pursuant to Section 3.2(a), shall be deemed to have elected to make Tax Deferred Contributions in the amount of 3% of his Earnings, in accordance with Section 4.1, unless such Eligible Employee has affirmatively elected within 60 days of the first day on which he performs an Hour of Service not to have the operation of this Section 3.3 apply to him.  Such affirmative elections must be processed in accordance with systems and procedures approved by the Plan Administrator.  Each Eligible Employee who becomes a Participant pursuant to this Section 3.3, may elect to make additional Tax Deferred Contributions in accordance with, and subject to the limitations of, Section 4.1.

3.4    Participation Ends.  An individual will cease being a Participant upon the occurrence of the date that is the later of (i) the Participant's Employment Termination Date and

PA000019

(ii) the date of the actual or deemed distribution of the Participant's entire Account Balance, such that he ceases to have an Account.

       3.5    Resumption of Participation.  Upon resumption of employment with an Employer, an Eligible Employee who was a Participant may resume active participation in the Plan in accordance with systems and procedures approved by the Plan Administrator. Each other Eligible Employee, upon resumption of employment with an Employer, may become a Participant in accordance with the requirements of Section 3.2.

PA000020

## SECTION IV

## PARTICIPANT CONTRIBUTIONS

### 4.1    Tax Deferred Contributions.

(a)    In lieu of receiving a cash payment of Earnings, a Participant who is an Eligible Employee and who satisfies the requirements of Section 3.2(a) may request that such Participant's Employer reduce his Earnings and contribute an equivalent amount on his behalf to his Tax Deferred Contribution Account. Effective on and after January 1, 1998, a Tax Deferred Contribution may be an amount from 1% to (i) 10% prior to January 1, 2001, (ii) 15% on and after January 1, 2001, but before April 1, 2003 and (iii) 25% on and after April 1, 2003 (in any case, in whole percentage points) of a Participant's Earnings payable each payroll period without regard to the Earnings Limitation. The foregoing notwithstanding, the sum of the Tax Deferred Contributions made on behalf of a Participant for any Plan Year after 2002 may not exceed 25% of Earnings (15% for 2001 - 2002 and 10% for 1998 - 2000 (inclusive)), determined taking into account the Earnings Limitation, or, for each Participant who is a Highly Compensated Employee, such lower percentage of Earnings, determined taking into account the Earnings Limitation, as specified by the Plan Administrator.

(b)    (i) All Eligible Employees who are eligible to make Tax Deferred Contributions under the Plan, who have attained age 50 before the close of the Plan Year and who may not make any additional Tax Deferred Contributions to the Plan for such Plan Year due to the application of any limitation imposed by the Internal Revenue Code or the Plan shall be eligible to make catch-up contributions in a flat dollar amount in accordance with, and subject to the limitations of, Section 414(v) of the Internal Revenue Code for such Plan Year. Such catch-up contributions shall not be taken into account for purposes of the provisions of the Plan implementing the required limitations of Sections 402(g) and 415 of the Internal Revenue Code. The Plan shall not be treated as failing to satisfy the provisions of the Plan implementing the requirements of Sections 401(k)(3), 401(k)(12), 410(b), or 416 of the Internal Revenue Code, as applicable, by reason of the making of such catch-up contributions.

(ii)    Catch-up contributions shall not exceed the amount specified in Section 414(v) of the Internal Revenue Code ($4000 in 2005 and $5000 in 2006 and 2007), as such amount may be adjusted from time to time.

### 4.2    After Tax Contributions.

A Participant who is an Eligible Employee and who satisfies the requirements of Section 3.2(a) (and, prior to April 1, 2003, who is also a Non-Highly Compensated Employee) may request that the Participant's Employer allocate a portion of the Participant's Earnings to be contributed to the Participant's After Tax Contribution Account in whole percentage points. Effective on and after January 1, 1998, an After Tax Contribution may be an amount from 1% to (i) 5% prior to January 1, 2001, (ii) 15% on and after January 1, 2001 but before April 1, 2003, (iii) 25% on and after April 1, 2003, and (iv) solely with respect to a Highly Compensated Employee, 4% on and after January 1, 2008, of a Participant's Earnings payable each payroll period without regard to the Earnings Limitation. In addition, and subject to the foregoing limits, effective on and after April 1, 2003 each Participant may make a lump-sum After Tax Contribution to the Plan at any time. From January 1, 1998,

13

through March 31, 2003, only Non-Highly Compensated Employees could make lump-sum After Tax Contributions. Notwithstanding anything in this Section 4.2 to the contrary, the sum of the After Tax Contributions made pursuant to Section 4.2 and Tax Deferred Contributions made pursuant to Section 4.1 (other than Tax Deferred Contributions made pursuant to Section 4.1(b)) made on behalf of a Participant for any Plan Year after 2002 may not exceed 25% of Earnings, (15% for 2001-2002 and 10% for 1998-2000 (inclusive)), determined, in each case, taking into account the Earnings Limitation. After Tax Contributions are not eligible for Employer Matching Contributions.

4.3     Initial and Subsequent Changes in Contribution Rate.  A Participant may make an initial election or elect to suspend, subsequently resume or change the rate of Tax Deferred Contributions and After Tax Contributions effective as of the first payroll period following the month in which the election is received by the Plan Administrator, *provided* such election is received no later than 4:00 p.m. Eastern Time on the fifteenth day of the preceding month (or such time as may be permitted by the Plan Administrator). Effective January 1, 2003, if the election is received after 4:00 p.m. Eastern Time on the 15th day of the preceding month (or such time as may be permitted by the Plan Administrator), such election will be effective as of the second payroll period following the month in which the election is received by the Plan Administrator. Prior to 2002, an election received after 4:00 p.m. Eastern Time on the 15th day of the preceding month was effective on the first payroll period of the second month following the month in which the election was received by the Plan Administrator. All contribution elections must be completed and submitted in accordance with systems and procedures approved by the Plan Administrator.

4.4     Rollover Contributions.

(a)     Any Eligible Employee may request the Plan Administrator to authorize the Trustee to accept the transfer of a Rollover Contribution with respect to the Eligible Employee.

(b)     The Plan Administrator, in his discretion and in accordance with the Internal Revenue Code and systems and procedures approved by the Plan Administrator which will be uniformly applied to all similarly situated individuals, will, as soon as practicable following his receipt of an Eligible Employee's request, determine whether the transfer of the Rollover Contribution will be permitted. Any request filed by an Eligible Employee pursuant to this Section 4.4 will set forth the fair market value of such Rollover Contribution, the nature of the property contained in the Rollover Contribution and a statement satisfactory to the Plan Administrator that the amount to be transferred constitutes a Rollover Contribution. All requests must be completed and submitted in accordance with systems and procedures approved by the Plan Administrator.

(c)     Each Participant or Eligible Employee may arrange for a direct rollover of an Eligible Rollover Distribution from (i) a qualified plan described in Section 401(a) or 403(a) of the Internal Revenue Code including after-tax contributions, (ii) an annuity contract or custodial account described in Section 403(b) of the Internal Revenue Code or (iii) a plan described in Section 457(b) of the Internal Revenue Code which is maintained by a state, political subdivision of a state or any agency as instrumentality of a state or political subdivision

PA000022

of a state to the Plan in accordance with systems and procedures approved by the Plan Administrator.

(d)      The Plan Administrator need not obtain a favorable determination letter from a distributing plan that is intended to be qualified under Sections 401(a) or 403(a) of the Internal Revenue Code prior to accepting a Rollover Contribution, but is authorized to accept such contribution on the basis of a good faith determination that such distributing plan satisfies the qualification requirements of Section 401(a) or 403(a) of the Internal Revenue Code.

(e)      A Participant or Eligible Employee who has distributed to him any portion of his interest in a plan which is (i) a qualified plan described in Section 401(a) or 403(a) of the Internal Revenue Code, (ii) an annuity contract or custodial account described in Section 403(b) of the Internal Revenue Code, or (iii) a plan described in Section 457(b) of the Internal Revenue Code that is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state (each an *"Other Plan"*) may, in accordance with systems and procedures approved by the Plan Administrator, roll over the distribution received from an Other Plan to the Trustee provided the following conditions are met:

(i)      the rollover occurs on or before the 60th day following his receipt of the distribution from the Other Plan (or such longer period as is approved by the Secretary of the Treasury or his delegate); and

(ii)      the distribution from the Other Plan is an Eligible Rollover Distribution.

(f)      In the event the Plan Administrator permits the transfer of a Rollover Contribution, the Plan Administrator will instruct the Trustee to accept such Rollover Contribution and the transfer of such Rollover Contribution will be deemed to have been made on the Valuation Date next following the date on which it was paid over to the Trustee. The Rollover Contribution will be maintained in a separate, fully vested Rollover Account for the benefit of the contributing Eligible Employee and will be invested in accordance with the Eligible Employee's investment election.

(g)      A Rollover Contribution will not be eligible for Employer Matching Contributions.

(h)      Effective as of January 1, 2005, each Rollover Contribution shall be in cash unless the Plan Administrator, in his discretion, approves of the transfer of other property (including, but not limited to, in situations involving a merger or acquisition by the Corporation or an Employer, an outstanding loan under a qualified defined contribution plan under Section 401(a) of the Internal Revenue Code that is maintained by the other party to such transaction, *provided* that such Eligible Employee (i) has an outstanding loan under such other party's plan on the day before the closing date of such transaction, (ii) elects to receive a complete distribution of all of his account balance under such other party's plan, (iii) files an election not later than 60 days after he terminates employment with the other party to such transaction, as a result of such transaction, to directly roll over the entire amount of such distribution that is eligible for a direct

PA000023

rollover pursuant to Section 4.4(c) and (iv) is employed by an Employer at the time he elects to receive (and directly roll over) such distribution).

PA000024

## SECTION V

### EMPLOYER CONTRIBUTIONS

5.1    Employer Matching Contribution.

(a)    Employer Matching Contributions shall be made as follows:

(i)    The Employer will make Employer Matching Contributions to the Trustee, which will be credited to Participants' Employer Matching Contribution Accounts. Such contributions will be made and credited to the Trust Fund at the same time that Tax Deferred Contributions are credited to the Trust Fund pursuant to the timing requirements set forth in Section 7.2. The amount of each Employer Matching Contribution for a Plan Year to be made will be the sum of (a) 100% of the first 3% of Participants' Earnings contributed to the Plan as Tax Deferred Contributions and (b) 50% of the next 3% of Participants' Earnings contributed to the Plan as Tax Deferred Contributions. Employer Matching Contributions will be made on a payroll basis except as provided in Section 5.1(a)(iii).

(ii)    A special annual make-up contribution will be made with respect to each Plan Year to ensure that Employer Matching Contributions made pursuant to Section 5.1(a)(i) to a Participant's Employer Matching Contribution Account for such Plan Year (determined on an annual basis) are equal to the sum of 100% of the first 3% of such Participant's Earnings contributed to the Plan as Tax-Deferred Contributions and 50% of the next 3% of such Participant's Earnings contributed to the Plan as Tax-Deferred Contributions. A true-up Matching Contribution for a Plan Year made pursuant to this Section 5.1(a)(ii), if any, shall be contributed to a Participant's Employer Matching Contribution Account no later than the time prescribed by law for filing the Corporation's income tax return for the fiscal year, including extensions, which coincides with, or ends within, such Plan Year. In no event shall the sum of the special annual make-up contributions, if any,  credited to a Participant's Account for a Plan Year, when combined with the Employer Matching Contribution credited to such Participant's Account pursuant to Section 5.1(a) for such Plan Year, exceed the limit on Employer Matching Contributions for a Plan Year set forth in Section 5.1(a).

(iii)    Notwithstanding anything in Section 5.1(a)(ii) to the contrary, effective January 1, 2007, a special quarterly make-up contribution will be made with respect to each calendar quarter of each Plan Year to ensure that, for any Plan Year (determined quarterly on a cumulative basis), the total amount of Employer Matching Contributions made pursuant to Section 5.1(a)(i) on behalf of a Participant who makes a contribution to the Plan pursuant to Section 4.1(b) shall be equal to the sum of 100% of the first 3% of such Participant's Earnings contributed to the Plan as Tax-Deferred Contributions and 50% of the next 3% of such Participant's Earnings contributed to the Plan as Tax-Deferred Contributions. Such special make-up contributions, if any, with respect to any Tax Deferred Contributions made during a Plan Year quarter, will be contributed to the Trust Fund and credited to Participants' Employer Matching Contribution Accounts no later than the last day of the immediately following Plan Year quarter. In no event shall

PA000025

the sum of the special quarterly make-up contributions, if any, credited to a Participant's Account for a Plan Year, when combined with the Employer Matching Contribution credited to such Participant's Account pursuant to Section 5.1(a) for such Plan Year, exceed the limit on Employer Matching Contributions for a Plan Year set forth in Section 5.1(a). For the avoidance of doubt, catch-up contributions contributed to the Plan pursuant to Section 4.1(b) will not be matched.

(iv)  For purposes of this Section 5.1, Earnings will be determined subject to the Earnings Limitation.

(b)  No Employer Matching Contributions will be made with respect to (i) After Tax Contributions, (ii) Rollover Contributions, (iii) Profit Sharing Contributions, and (iv) catch-up contributions.

5.2  Profit Sharing Contribution.

(a)  Effective December 31, 2005, the Employer will make Profit Sharing Contributions to the Trustee from Consolidated Net Profits for each Plan Year as the Compensation Committee of the Board of Directors may determine in its discretion, which will be credited to Profit Sharing Contribution Accounts of Eligible Employees who satisfy the requirements of Section 3.2(b). The determination of the amount of contribution may be different for each Employer and shall be final and conclusive upon all Eligible Employees and their Designated Beneficiaries. In no event shall the Profit Sharing Contributions of each Employer exceed the sum of (a) 2.5% of Earnings up to the Social Security Wage Base of the Eligible Employees of the Employer who were Participants at any time during the Plan Year, plus (b) 5% of the Earnings of each such Eligible Employee in excess of the Social Security Wage Base up to the Earnings Limitation.

(b)  For the purposes of this Section 5.2, the term "*Consolidated Net Profits*" for any Plan Year shall mean the net income before federal income taxes of the Corporation and its Subsidiaries for the calendar year coinciding with such Plan Year, excluding net income before federal income taxes of any domestic Subsidiary if the adoption of the Plan by such Subsidiary has not occurred prior to the close of the Plan Year. Any determination by the Corporation of the "Consolidated Net Profits" on which the Employer's Profit Sharing Contribution during a given Plan Year is to be based shall be final and conclusive for all purposes.

PA000026

## SECTION VI

### LIMITATIONS ON CONTRIBUTIONS

6.1    Definitions.  Whenever used in this Section VI, the following terms will have the respective meanings set forth below:

"*ACP Test*" means the Average Actual Contribution Percentage Tests described in Section 6.4(b).

"*Annual Additions*" means with respect to a Plan Year, the sum of contributions to the Plan and any other defined contribution plans (as defined in Section 414(i) of the Internal Revenue Code) maintained by an Affiliate in which the Participant participates, including but not limited to:  (i) Employer Matching Contributions, (ii) After Tax Contributions, (iii) Tax Deferred Contributions, (iv) Profit Sharing Contributions and (v) forfeitures, if any, allocated to a Participant's accounts.

"*Average Actual Contribution Percentage*" means the average of the Contribution Percentages of each of the Eligible Employees of any designated group of Eligible Employees for the Plan Year in reference.

"*Contribution Percentages*" means the ratio, expressed as a percentage, of the After Tax Contributions on behalf of an Eligible Employee for a Plan Year to the Eligible Employee's "compensation" (within the meaning of Section 414(s) of the Internal Revenue Code) subject to the Earnings Limitation for any portion of such Plan Year during which the Eligible Employee was an Eligible Employee.  The Contribution Percentage of an Eligible Employee who is a Highly Compensated Employee and who is eligible to have After Tax Contributions within the meaning of Section 401(m) of the Internal Revenue Code allocated to his account under the Plan or any other defined contribution plans (as defined in Section 414(i) of the Internal Revenue Code) that are maintained by an Affiliate shall be determined as if the total of such After Tax Contributions were made under each such plan.

"*Excess Contribution*" means, for an Eligible Employee who is a Highly Compensated Employee, the amount by which the After Tax Contributions of the Highly Compensated Employee must be reduced so that the Contribution Percentage of the Highly Compensated Employee will cause the ACP Test to be satisfied.

"*Excess Deferrals*" means Tax Deferred Contributions made on behalf of a Participant with respect to a calendar year if those Tax Deferred Contributions, when added to elective deferrals (as defined in Section 402(g)(3) of the Internal Revenue Code) under any other plans for such calendar year, would cause such contributions to exceed the Section 402(g) Limit.

"*Gap Period*" means the period beginning on the day after the end of the Plan Year and ending on the date a distribution is made pursuant to Section 6.2(c) or Section 6.4(c); *provided* that the Plan Administrator may in his discretion determine that the Gap

PA000027

Period ends on a day that is no more than seven days prior to the date that such distribution is made.

"*Section 402(g) Limit*" means $15,500 for 2007, and for each Plan Year thereafter, such greater amount as may be permitted by reason of the application of the dollar amount set forth in Section 402(g)(1) (without consideration of Section 402(g)(1)(C)) of the Internal Revenue Code, as adjusted in accordance with Section 402(g)(4) of the Internal Revenue Code.

6.2    Compliance with Section 402(g) of the Internal Revenue Code.

(a)    Except as permitted under Section 4.1(b) and Section 414(v) of the Internal Revenue Code, no Participant will be permitted to have Excess Deferrals contributed to the Plan on his behalf.

(b)    If any Excess Deferrals are made for any Participant in any calendar year, any provisions of the Plan to the contrary notwithstanding, not later than the April 15th following the close of the calendar year, the Plan and, as applicable, each such other plan will distribute to the Participant the amount of Excess Deferrals allocated to it plus any earnings on such amount through the date of distribution of such Excess Deferrals.

(c)    The earnings on Excess Deferrals is the amount of the allocable gain or loss for the Plan Year and the Gap Period. The method for determining allocable gains and losses for purposes of distributions of Excess Deferrals under this Section 6.2(c) shall be determined in accordance with Section 402(g) of the Internal Revenue Code. Such method shall be consistently used for all Participants and for all corrective contributions. The following shall apply for such distributions for Plan Years beginning after December 31, 2006: (1) allocable gains and losses shall include the amount of income and expenses and realized and unrealized gains and losses of the Trust Fund allocable for both the Plan Year and the Gap Period to the extent required by Section 402(g) of the Internal Revenue Code, and (2) the Plan may use any reasonable method to compute earnings allocable to Excess Deferrals permitted under Treasury Regulation Section 1.402(g)-1(e)(5).

6.3    Compliance with Section 401(k) of the Internal Revenue Code. The Plan will satisfy the nondiscrimination requirements contained in Section 401(k) of the Internal Revenue Code by complying with the matching contribution and notice requirements of Sections 401(k)(12)(B)(i) and (D) of the Internal Revenue Code. The matching contribution requirements are satisfied in Section 5.1. The notice requirement will be satisfied by distributing to each Participant a notice that describes in a manner calculated to be understood by the average Participant (i) the Employer Matching Contribution formula of the Plan (including a description of the levels of Employer Matching Contributions available under the Plan), (ii) any other contributions permitted under the Plan and the conditions under which such contributions may be made, (iii) the type and amount of Earnings subject to Tax Deferred Contributions, (iv) how to elect to make Tax Deferred Contributions, including any administrative requirements that apply to such elections, (v) the time periods and other restrictions imposed with respect to Tax Deferred Contribution elections, and (vi) withdrawal and vesting provisions applicable to contributions under the Plan. This notice will be distributed no earlier than 90 days and no later

PA000028

than 30 days prior to the beginning of each Plan Year commencing on or after January 1, 2001, and, in the case of a newly eligible Participant, no earlier than 90 days prior to and no later than the date the Participant first becomes eligible to participate in the Plan. In addition to any other elections made under the Plan, each Participant may make or modify a Tax Deferred Contribution election during the 30-day period immediately after the receipt of the notice described herein.

        6.4    Compliance with Section 401(m) of the Internal Revenue Code.

        (a)    For Plan Years commencing on and after January 1, 2001, the Plan will satisfy the average contribution percentage test with respect to Employer Matching Contributions described in Section 401(m) of the Internal Revenue Code by complying with the matching contribution and notice requirements of Internal Revenue Code Section 401(m)(11).

        (b)    For each Plan Year after 2002, the Plan will comply with, in a manner consistent with the applicable provisions of the Internal Revenue Code, one of the following ACP Tests with respect to any After Tax Contributions made to the Plan:

        (i)    the Average Actual Contribution Percentage for the group of Eligible Employees who are Highly Compensated Employees for the Plan Year will not exceed the Average Actual Contribution Percentage for the group of Eligible Employees who are Non-Highly Compensated Employees for the Plan Year multiplied by 1.25; or

        (ii)    the Average Actual Contribution Percentage for the group of Eligible Employees who are Highly Compensated Employees for the Plan Year will not exceed the Actual Contribution Percentage for the group of Eligible Employees who are Non-Highly Compensated Employees for the Plan Year multiplied by two; *provided, however*, that the Average Actual Contribution Percentage for the group of Eligible Employees who are Highly Compensated Employees for the Plan Year does not exceed the Average Actual Contribution Percentage for the group of Eligible Employees who are Non-Highly Compensated Employees by more than two percentage points.

        (c)    The Plan Administrator will cause the Plan to comply with the ACP Test for a Plan Year by reducing After Tax Contributions of Eligible Employees who are Highly Compensated Employees and distributing such After Tax Contributions and earnings thereon, pursuant to Section 6.4(d).

        (d)    (i) To the extent that the Plan Administrator needs to distribute After Tax Contributions to comply with the ACP Test, the Plan Administrator will reduce After Tax Contributions and the earnings thereon through the end of the Plan Year for which such After Tax Contributions were made, as may be necessary to reduce the Contribution Percentages of the Eligible Employees who are Highly Compensated Employees with the largest amounts of After Tax Contributions. Such After Tax Contributions will be distributed to the Eligible Employees who are Highly Compensated Employees with the largest dollar amounts of After Tax Contributions taken into account in calculating the ACP Test for the year in which the excess arose, beginning with the Highly Compensated Employee with the largest dollar amount of such

PA000029

After Tax Contributions and continuing in descending order until all the Excess Contributions have been allocated.

 (ii) Any distributions of Excess Contributions and the earnings thereon will be distributed, to the extent feasible, within two and one-half months after the end of the Plan Year to which such Excess Contributions relate, but no later than twelve months thereafter.

 (iii) The earnings on Excess Contributions are the amount of the allocable gain or loss for the Plan Year. The method for determining allocable gains and losses for purposes of corrective distributions under this Section 6.4(d) shall be determined in accordance with Section 401(k) of the Internal Revenue Code. Such method shall be consistently used for all Participants and for all corrective distributions. The following shall apply for such distributions for Plan Years beginning after December 31, 2005: (1) allocable gains and losses shall include the amount of income and expenses and realized and unrealized gains and losses of the Trust Fund allocable for both the Plan Year and the Gap Period (as defined in Section 6.1) and (2) the Plan may use any reasonable method to compute earnings allocable to Excess Contributions permitted under Treasury Regulation Section 1.401(k)-(2)(b)(2)(iv).

 6.5 Changes Effected by the Plan Administrator. Notwithstanding the preceding provisions of this Section VI, the Plan Administrator will be authorized to take such action with respect to Tax Deferred Contributions, After Tax Contributions and Employer Matching Contributions of any Participant or groups of Participants as may be necessary to avoid the disqualification of the Plan, the loss of any tax deduction or the imposition of any excise tax; *provided, however,* that any such action will generally be applied in a uniform and nondiscriminatory manner.

 6.6 Compliance with Section 415 of the Internal Revenue Code.

 (a) Except to the extent permitted under Section 4.1(b) and Section 414(v) of the Internal Revenue Code, if the Annual Additions for a Plan Year with respect to a Participant would cause the limits of Section 415(c) of the Internal Revenue Code applicable to that Participant to be exceeded, the excess amount over the maximum Annual Addition will be disposed of, first in accordance with the following provisions of this Section 6.6(a) and next in accordance with the applicable provisions under Standard and Poor's 401(k) Savings and Profit Sharing Plan for Represented Employees (if applicable), and will not be deemed an Annual Addition:

 (i) first, After Tax Contributions made by the Participant, as well as any earnings attributable thereto, will be returned to such Participant;

 (ii) second, to the extent an excess amount exists after application of Section 6.6(a)(i), the unmatched Tax Deferred Contributions made on behalf of the Participant, as well as any earnings attributable thereto, will be returned to such Participant;

 (iii) third, to the extent an excess amount exists after application of Sections 6.6(a)(i) and (ii), Employer Matching Contributions, if any, as well as earnings attributable thereto, will be reduced and allocated to a suspense account for the Plan Year

PA000030

and then will be allocated to all Participants in the next Plan Year to reduce Employer Matching Contributions for the next Plan Year; and

      (iv)    fourth, to the extent an excess amount exists after application of Sections 6.6(a)(i), (ii) and (iii), Profit Sharing Contributions, if any, as well as earnings attributable thereto, will be reduced and allocated to a suspense account for the Plan Year and then will be allocated to all Participants in the next Plan Year to reduce Profit Sharing Contributions for the next Plan Year.

      (b)    If a suspense account is in existence at any time during a Plan Year pursuant to this Section 6.6, such account will be invested in a money market or an equivalent Investment Option and will participate in the allocation of the Trust Fund's investment income, gains and losses in such Investment Option. If a suspense account is in existence at any time during a particular Plan Year, all amounts in the suspense account must be allocated and reallocated to Participants' Accounts before any Employer Matching Contributions or Profit Sharing Contributions may be made to the Plan for that Plan Year.

      (c)    Except as otherwise provided in Section 6.6(a), excess amounts above the maximum Annual Addition will not be distributed to Participants or former Participants.

      (d)    For purposes of this Section 6.6(d), an Annual Addition will be credited to a Participant's Accounts for a Plan Year if it is allocated to the Participant's Accounts under the terms of the Plan as of any date within that Plan Year. For purposes of this Section 6.6(d), Tax Deferred Contributions, Employer Matching Contributions and Profit Sharing Contributions will not be deemed credited to a Participant's Accounts for a particular Plan Year, unless said contributions are made to the Plan no later than thirty days after the end of the period described in Section 404(a)(6) of the Internal Revenue Code applicable to the taxable year within which the particular Plan Year ends.

      (e)    For purpose of this Section 6.6, compensation will have the meaning assigned to such term under Treasury Regulation Section 1.415(c)-2(d)(4).

      6.7    <u>Proportional Adjustment</u>. Any reduction in a Participant's Account Balance pursuant to this Section VI will be allocated among the Investment Options in which the Participant's Account Balance is invested in the same proportion that the Participant's investment in each such Investment Option bears to the Participant's Account Balance.

PA000031

## SECTION VII

### ALLOCATION OF CONTRIBUTIONS

7.1     Allocation.

(a)     The Employer will transmit contributions pursuant to the provisions of Sections IV, V and VI to the Trust Fund and such contributions will be allocated to Participants' Accounts as of each Valuation Date in accordance with this Section 7.

(b)     Profit Sharing Contributions to the Trust Fund will be allocated to Participants' Profit Sharing Contribution Accounts as of the last Valuation Date in a Plan Year. The Profit Sharing Contributions to the Trust Fund of each Employer in each Plan Year pursuant to the provisions of Section 5.2 shall be allocated first to restore forfeited amounts, if any, required to be contributed by the Employer pursuant to Section 10.2(d). The remaining Profit Sharing Contributions shall be allocated among the Employees of the Employer who were Participants at any time during the Plan Year as follows:

(i)     First, the amount of such remaining Profit Sharing Contributions not in excess of 2.5% of the Earnings of all such Participants shall be allocated in the proportion that the Earnings of each such Participant bears to the Earnings of all such Participants; and

(ii)     Second, the balance of such remaining Profit Sharing Contributions shall be allocated in the proportion that the Earnings of each such Participant in excess of the Social Security Wage Base bears to the Earnings of all such Participants in excess of the Social Security Wage Base.

7.2     Payment and Crediting of Contributions.

(a)     Tax Deferred Contributions and After Tax Contributions will be paid to the Trustee by a Participant's Employer as of the earliest date on which such contributions can reasonably be segregated from the Employer's general assets, but, no later than (i) the 15th "business day" (as defined under DOL Reg. § 2510.3-102(c)) of the month following the month in which the contributions are received by the Employer for amounts that a Participant pays to the Employer, or (ii) the 15th business day of the month following the month in which the amounts would otherwise have been payable to the Participant in cash for contributions that are withheld as reductions from Participant compensation. Contributions will be credited to Participants' Accounts as of a Valuation Date that is no later than thirty days after the close of the month in which such contributions are received by the Trustee.

(b)     Unless previously contributed, the Employer shall make its contribution for each Plan Year no later than the time prescribed by law for filing the Employer's Federal income tax return (including extensions thereof) for its fiscal year, which coincides with, or ends within, such Plan Year.

7.3     Records to Be Maintained. A record of the Accounts of each Participant and the Participant's Account Balance will be maintained by the Plan Administrator.

PA000032

## SECTION VIII

### INVESTMENT OF PLAN ACCOUNTS

8.1     Investment Options.  A Participant may direct the Plan Administrator to invest such Participant's Account Balance and contributions pursuant to Sections IV, V and VI made by or on behalf of the Participant in one or more of the Investment Options. The Pension Investment Committee shall determine in its sole discretion the Investment Options that shall be available under the Plan,  *provided that* (i) the Plan shall offer (a) the *"Stock Fund"* which will be invested primarily in the Common Stock of the Corporation and (b) effective as of December 1, 2006, a *"Mutual Fund Window"* providing access to various mutual fund investment options, and (ii) the Investment Options will include at least three investment funds that satisfy the requirements of Section 404(c) of ERISA.  Subject to the foregoing, any of the Investment Options offered by the Plan are subject to change at any time at the discretion of the Pension Investment Committee.

8.2     Changes in Investment Direction for Past or Future Contributions.

(a)     Subject to Section 8.2(b), a Participant may prospectively elect, as of any future Valuation Date, to reallocate the Participant's existing Account Balance among and between the Investment Options subject to Section 13.7.  Additionally, a Participant may prospectively elect, as of any future Valuation Date, to change the investment direction of any future contributions to be made by or on behalf of that Participant between and among the Investment Options.  All such reallocations and changes in investment direction must be in 1% increments.  All elections must be made in accordance with systems and procedures approved by the Plan Administrator.  Notwithstanding anything in the Plan to the contrary, a Participant shall not be permitted to reallocate his existing Account Balance between and among the Investment Options more frequently than once every seven days.

(b)     Notwithstanding anything in Section 8.2(a) to the contrary, the Plan Administrator shall adopt such other rules and procedures and take any and all actions as he deems necessary or advisable with respect to all matters relating to the election and use of the Investment Options, including, effective January 1, 2003, without limitation, rules, procedures and actions to prevent frequent trading with respect to the Investment Options that appears to be for the purpose of taking advantage of short-term fluctuations in the securities market (as determined by the Plan Administrator).  Without limiting the generality of the foregoing, the Plan Administrator shall have the right, without prior notice to any Participant, to suspend or limit transfers between and among Investment Options or to delay effecting transfers between and among Investment Options for one or more days if the Plan Administrator determines that such action is necessary or advisable (i) in light of unusual market conditions, (ii) in response to technical or mechanical problems with the automated response system or the Plan's recordkeeper, (iii) in connection with any suspension of normal trading activity on the New York Stock Exchange or the Nasdaq National Market, (iv) to prevent frequent trading or (v) to protect the interests of other Participants and their beneficiaries.

(c)     If a Participant fails to elect an Investment Option, contributions by or on behalf of said Participant will be invested in a default Investment Option selected from time to

PA000033

time by the Pension Investment Committee that applies to all Participants on a nondiscriminatory and uniform basis.

(d)    Notwithstanding anything in this Section VIII to the contrary, a Participant's election pursuant to Section 8.2(a) with respect to the investment direction of (i) future contributions and (ii) reallocations of his existing Account Balance among and between the Investment Options shall apply to all defined contribution plans (as such term is defined in Section 414(i) of the Internal Revenue Code), if any, maintained by the Employer in which such Participant is eligible to participate.

(e)    The Corporation may prescribe rules with respect to the timing and effect of transfers under this Section 8.2 to and from the Stock Fund by Participants who are officers of the Corporation subject to the provisions of Section 16 of the Securities Exchange Act and certain other Employees as designated by the Corporation. Such rules may include restrictions as to the dates on which such transfers may be made, requirements for suspension of contributions to the Plan for a period of six months and requirements for suspension of investment of future contributions in the Stock Fund for a period of six months.

8.3    Allocation of Income, Gains and Losses. As of each Valuation Date, the Trustee shall determine the value of the Trust Fund and each Investment Option, and the Plan Administrator shall cause the value of the Accounts of each Participant to be determined based upon such valuation. The valuation methodology used by the Trustee for purposes of valuing the Trust Fund shall be reasonable in light of prevailing commercial practices for defined contribution plans that utilize daily valuations and daily transfers and shall take into account all contributions, withdrawals, distributions, charges, income, gains and losses to the Trust Fund from the prior Valuation Date.

8.4    Records to Be Maintained. A record of the portion of each Participant's Account Balance that is allocated to each Investment Option will be maintained by the Plan Administrator.

8.5    Special Withdrawal Rules for Section 16 Officers and Others. The Corporation may prescribe rules as it deems necessary with respect to the timing and effect of withdrawals from the Stock Fund by Participants who are officers of the Corporation subject to the provisions of Section 16 of the Securities Exchange Act and certain other Employees as designated by the Corporation.

8.6    Mandatory No-Trading Periods. Effective as of April 1, 2003, the memorandum entitled, "*Earnings Release/Revised Limitations on Executive Trading of The McGraw-Hill Companies' Common Stock*" dated as of July 24, 2002, and as amended from time to time, imposing mandatory no-trading periods during each Plan Year, shall be incorporated herein by reference and all Participants who are Employees subject to such memorandum shall be subject thereto.

PA000034

## SECTION IX

### IN-SERVICE WITHDRAWALS AND PLAN LOANS

9.1    In-Service Withdrawals Other than for Hardship.

(a)    Effective as of January 1, 2006, a Participant who has attained age fifty-nine and one-half and who is an Employee may, at any time, withdraw all or any portion of the vested portion of his Account Balance, except as otherwise provided in this Section 9.1(a). Any withdrawal pursuant to this Section 9.1(a) shall be taken from the Participant's Accounts in the following order of priority: (i) After Tax Contribution Account, first from (A) After Tax Contributions made prior to 1987, and next from (B) After Tax Contributions made after 1986 and earnings attributable to After Tax Contributions made at any time, (ii) Rollover Contribution Account, (iii) Tax Deferred Contribution Account and (iv) the vested portion of the Employer Matching Contribution Account. Notwithstanding anything in this Section 9.1(a) to the contrary, a Participant shall not be permitted to take a withdrawal pursuant to this Section 9.1(a) of any portion of his Account Balance attributable to (x) amounts transferred from the Kenny Group, Inc. Pension Plan or any other money purchase pension plan subject to Section 412 of the Internal Revenue Code, or (y) Profit Sharing Contributions.

(b)    In accordance with Section 72 of the Internal Revenue Code, a Participant who is an Employee may elect to withdraw all or any portion of the Participant's After Tax Contribution Account, *provided, however,* that withdrawals may not be made more frequently than twice in any Plan Year. The withdrawal of amounts from a Participant's After Tax Contribution Account will be allocated (i) first to contributions made prior to January 1, 1987 until such contributions are fully exhausted, and (ii) then pro rata among the contributions made on or after January 1, 1987 and earnings on contributions made at any time. In accordance with the requirements of Section 72(e) of the Internal Revenue Code, the amount consisting of After Tax Contributions described in clause (ii) of this Section 9.1(b) shall be that portion of the amount to be withdrawn which bears the same ratio to the amount to be withdrawn as the balance of post-1986 After Tax Contributions bears to the balance of the entire After Tax Contributions and the remaining amount shall be earnings and gains thereon. In no event will amounts attributable to Employee matchable after tax contributions, if any, be withdrawn before all other amounts in a subaccount of a Participant's After Tax Contribution Account are withdrawn.

(c)    Effective as of January 1, 2006, a Participant who is an Employee may elect at any time to withdraw all or any portion of the Participant's Rollover Contribution Account. Notwithstanding the forgoing, to the extent that such withdrawal includes any portion of the Participant's Rollover Contribution Account attributable to a rollover contribution into the Kenny Group, Inc. Pension Plan, or any other money purchase pension plan subject to Section 412 of the Internal Revenue Code, if the Participant has a Spouse, such portion of the withdrawal shall be subject to the Spouse's consent.

(d)    A Participant who is, by reason of being a member of a reserve component (as defined in Section 101 of title 37, United States Code), ordered or called to active duty after September 11, 2001 and before December 31, 2007 for a period in excess of 179 days or for an

PA000035

indefinite period shall be permitted to withdraw all or any portion of his Tax Deferred Contribution Account; *provided, however* that the minimum distribution pursuant to this Section 9.1(d) shall be the lesser of $1,000 or the total balance of such Participant's Tax Deferred Contribution Account. A distribution pursuant to this Section 9.1(d) shall be made during the period beginning on the date of such order to active duty and ending at the close of such Participant's active duty period.

(e)    Any reduction in a Participant's Account Balance pursuant to a withdrawal under this Section 9.1 will be allocated among the Investment Options in which the Participant's Account Balance is invested in the same proportion that the Participant's investment in each such Investment Option bears to the Participant's Account Balance. All elections must be made in accordance with systems and procedures approved by the Plan Administrator.

9.2    In-Service Hardship Withdrawals.

(a)    A Participant who is an Employee and has made all permissible withdrawals under Section 9.1 may at any time request approval of the Plan Administrator to a Hardship Withdrawal of all or any part of the Participant's Tax Deferred Contribution Account (excluding earnings credited after December 31, 1988) and the vested portion of the Participant's Employer Matching Contribution Account, excluding (i) any portion of the Tax Deferred Contribution Account attributable to amounts transferred from the Kenny Group, Inc. Pension Plan, or any other money purchase pension plan subject to Section 412 of the Internal Revenue Code, (ii) Employer Matching Contributions made on or after January 1, 2001, or (iii) any other amount or earnings thereon contributed to the Plan or made part of the Plan that is a qualifying nonelective contribution or a qualifying matching contribution under Section 401(k) of the Internal Revenue Code. The amount of any such Hardship Withdrawal may not be less than $500. All elections must be made in accordance with systems and procedures approved by the Plan Administrator. For the avoidance of doubt, a Hardship Withdrawal may not include any amounts attributable to Profit Sharing Contributions.

(b)    "*Hardship Withdrawal*" means a withdrawal that is both on account of an immediate and heavy financial need of the Participant and is necessary to satisfy such financial need. For these purposes, "immediate and heavy financial need of the Participant" means (i) expenses for medical care (as described in Section 213(d) of the Internal Revenue Code without regard to whether the expenses exceed 7½% of adjusted gross income), (ii) costs directly related to the purchase (excluding mortgage payments) of a principal residence for the Participant, (iii) payment of tuition, related educational fees and room and board expenses for the next twelve months of post-secondary education for the Participant, the Participant's Spouse, or any of the Participant's children or dependents (as defined in Section 152 of the Internal Revenue Code and without regard to Sections 152(b)(i), (b)(2) and (d)(1)(B) of the Internal Revenue Code), (iv) payments necessary to prevent the eviction of the Participant from the Participant's principal residence or foreclosure on the mortgage of the Participant's principal residence, (v) funeral expenses for the Participant's or the Participant's Spouse, children or dependents (as defined in Section 152 of the Internal Revenue Code and without regard to Section 152(d)(1)(B) of the Internal Revenue Code) or (vi) expenses for the repair of damage to the Participant's principal residence that would qualify for the casualty deduction under Section 165 of the Internal Revenue Code (determined without regard to whether the loss exceeds 10% of adjusted

PA000036

gross income). Effective January 1, 2008, with respect to expenses described in 9.2(b)(i), (iii), and (v), a Participant may take a Hardship Withdrawal on account of an immediate and heavy financial need of a primary Beneficiary designated by the Participant who has an unconditional right to some or all of the Participant's Account upon the Participant's death.

(c)     The Plan Administrator will not approve a hardship withdrawal request unless the withdrawal satisfies the requirements of a Hardship Withdrawal and the Participant has obtained all distributions (other than a Hardship Withdrawal), and all non-taxable loans currently available under the Plan and all other tax qualified retirement plans maintained by the Employer. A Hardship Withdrawal may not exceed the amount of the Participant's immediate and heavy financial need, which may include any amounts necessary to pay all income taxes or penalties reasonably anticipated to result from such withdrawal.

(d)     For a period of six months after the Participant's receipt of the Hardship Withdrawal, (i) no Tax Deferred Contributions may be made on the Participant's behalf under Section 4.1, and (ii) the Participant may not make After Tax Contributions under Section 4.2.

(e)     Hardship Withdrawals will be allocated (i) first to the Participant's Tax Deferred Contribution Account excluding earnings credited after December 31, 1988 until such amount is fully exhausted, and (ii) then to the vested portion of the Participant's Employer Matching Contribution Account, subject to Section 9.2(a). Any reduction in a Participant's Account Balance pursuant to a withdrawal under this Section 9.2 will be allocated among the Investment Options in which the Participant's Account Balance is invested in the same proportion that the Participant's investment in each such Investment Option bears to the Participant's Account Balance.

9.3     Hardship Loans.

(a)     Subject to any uniform and nondiscriminatory rules established by the Plan Administrator, a Participant who (A) is an Employee, (B) does not have a Hardship Loan from the Plan outstanding, and (C) does not have any amounts credited to an After Tax Contribution Account or a Rollover Account or has submitted an election to withdraw all amounts from such accounts in accordance with Section 9.1, may at any time request approval of the Plan Administrator for a loan (a "*Hardship Loan*") which does not, as of the Valuation Date that the Hardship Loan is made, exceed the least of:

(i)     The sum of (A) the Participant's Tax Deferred Contribution Account, and (B) the vested portion of the Participant's Employer Matching Contribution Account;

(ii)     50% of the value of the Participant's Account Balance on such Valuation Date, without consideration of his Profit Sharing Contribution Account;

(iii)    When added to the outstanding balance of any loan from any other plan maintained by the Employer which is qualified under Section 401(a) of the Internal Revenue Code ("*Other Plan Loan*"), $50,000, reduced by the excess, if any, of (A) the highest outstanding balance of any other Hardship Loan to the Participant from the Plan and Other Plan Loans granted to the Participant during the one-year period ending on the

PA000037

day before the date of the Hardship Loan, over (B) the outstanding balance of such Hardship Loans and Other Plan Loans; and

      (iv)    The amount of the Participant's immediate and heavy financial need.

      (b)    In no event may the amount of any Hardship Loan be less than $1,000. No more than one Hardship Loan may be outstanding to a Participant at any time. A Hardship Loan may be for any of the purposes listed in Section 9.2(b) or for such other severe financial hardship as determined by the Committee. All requests for Hardship Loans must be made in accordance with systems and procedures approved by the Plan Administrator.

      (c)    The Plan Administrator will not approve a Participant's application for a Hardship Loan unless the Participant has obtained all available withdrawals from the Plan, other than Hardship Withdrawals.

      (d)    As a condition to the making of such Hardship Loan, the Participant will execute and deliver to the Plan Administrator a promissory note payable to the Trustee of the Trust Fund in the amount of such Hardship Loan.

      (e)    Hardship Loans made pursuant to this Section will:

      (i)    Be available to all Participants who are Employees on a reasonably equivalent basis;

      (ii)    Not be made available to Participants who are both Employees and Highly Compensated Employees in a percentage amount greater than the percentage amount made available to other Participants who are Employees;

      (iii)    Bear a rate of interest equal to the prime lending rate of The Northern Trust Corporation as in effect on the date of the Hardship Loan plus 1%, which will accrue ratably over the period of the Hardship Loan; *provided, however,* that during a Participant's Uniformed Services Leave, the rate of interest on a Hardship Loan granted prior to the commencement of the Uniformed Services Leave shall be reduced to six percent per year solely to the extent that such reduction is required by the Servicemembers Civil Relief Act, the interest in excess of six percent per year shall be forgiven and shall not be reflected in any future loan repayments;

      (iv)    Subject to Section 9.3(i), be secured by the Participant's pledge of 50% of the value of the Participant's Account Balance (excluding the Profit Sharing Contribution Account) and such additional security as the Plan Administrator may require;

      (v)    Mature at the earlier of (A) (I) one, two, three, four or five years from the date of the Hardship Loan or (II) ten years from the date of the Hardship Loan if the Hardship Loan is for the purchase of the Participant's principal residence or (B) the Employment Termination Date of the Participant, unless rolled over pursuant to Section 9.3 (k) below; *provided, however,* that, in the event of a default, the grace period provided in Section 9.3(g) shall apply; and *provided further* that, for purposes of Section 9.3, effective for Hardship Loans granted on or after January 1, 2004, if a Uniformed

PA000038

Services Leave occurs during the repayment period and such Member's Hardship Loan payments are suspended during the Uniformed Services Leave pursuant to Section 9.3(h), the duration of such repayment period shall be increased by the period of the Uniformed Services Leave;

(vi)    Not permit partial prepayments at any time, or full payment unless the Hardship Loan has been outstanding for at least one month; and

(vii)    Be repaid through either (A) payroll deductions withheld from the Participant's compensation and subsequently paid by the Participant's Employer to the Plan pursuant to the Participant's authorization executed at the inception of the Hardship Loan or (B) personal check, in accordance with rules established by the Plan Administrator which will be uniformly applied to similarly situated Participants.

(f)    At the time a Hardship Loan is made to a Participant, a separate Hardship Loan Account will be established on behalf of the Participant. The initial balance of the Hardship Loan Account will be equal to the principal amount of the Hardship Loan. At the time a Hardship Loan is made, the aggregate investment of the Participant in the Investment Options will be reduced by the principal amount of the Hardship Loan. This reduction will be allocated among the Investment Options in the same proportion that the Participant's investment in each such Investment Option bears to the Participant's Account Balance. As the Participant makes repayments on the Hardship Loan, the balance of the Hardship Loan Account will be reduced by the amount of principal attributable to each such repayment. At the time a Participant makes repayments on a Hardship Loan, the aggregate investment of the Participant in the Investment Options will be increased by the amount of the repayment. This increase will be allocated among the Investment Options in the same proportion that the Participant's Tax Deferred Contributions are allocated to the Investment Options.

(g)    (i) A Hardship Loan will be deemed to be in default if an installment payment has not been paid to the Plan by the last day of the calendar quarter following the calendar quarter in which it was due. If a Participant defaults in the repayment of a Hardship Loan, the Participant will be deemed to have received a distribution that is equal to the balance of the Participant's Hardship Loan account and the Participant's Account Balance will be reduced by the amount of such distribution. Notwithstanding anything in this Section IX to the contrary, a Hardship Loan granted on or after January 1, 2001 that is deemed distributed and that has not been repaid shall be considered outstanding for purposes of this Section 9.3. If a Participant whose first Hardship Loan is deemed distributed and not repaid (such as by a Hardship Loan offset) is granted a second Hardship Loan on or after January 1, 2004 pursuant to Section 9.3(a), the second Hardship Loan must be repaid solely in accordance with Section 9.3(e)(vii) through payroll deductions and shall be deemed distributed, subject to Section 9.3(h), effective as of the date that repayment via payroll deduction ceases (if not yet fully repaid).

(ii)    A deemed distribution shall be allocated (A) first to the Participant's Tax Deferred Contribution Account until such Account is fully exhausted, and (B) then to the Participant's Employer Matching Contribution Account. In accordance with rules established by the Plan Administrator, in the event of a Hardship Loan that is deemed distributed, the unpaid principal amount of the Hardship Loan plus accrued interest thereon will be considered

PA000039

outstanding for purposes of determining the maximum permissible Hardship Loan under Section 9.3(a)(iii).

(iii)    If a Participant defaults on a Hardship Loan and such Participant is eligible for a distribution from any of the Participant's Accounts in accordance with the terms of the Plan, the Plan Administrator shall cause a distribution from the Participant's Accounts to be applied towards satisfaction of the Participant's Hardship Loan Default effective as of the date of default and the balance of the Participant's Accounts shall be reduced accordingly.

(h)    (i) Any other provision in this Section IX notwithstanding, effective January 1, 2000, if a Participant is on a Leave of Absence, during which the Participant receives no salary, wages or other form of compensation from an Employer or receives compensation at a rate which is less than the Hardship Loan installment payment, then the Employer will permit the Participant to suspend payment of the Hardship Loan installment payments without causing a distribution from the Plan, for a period not to exceed twelve months. Such suspension of Hardship Loan installments for up to twelve months during the duration of a Leave of Absence will not alter the date on which the Hardship Loan is to be repaid as set forth in the promissory note executed by the Participant.

(ii)    Any other provision in Section IX notwithstanding, commencing December 12, 1994, a Participant who is on a Uniformed Services Leave may suspend Hardship Loan repayments during the period of such leave, pursuant to Section 414(u) of the Internal Revenue Code. The period for repayment of a Hardship Loan following such suspension shall be determined in accordance with Section 9.3(e)(v). Such suspension of Hardship Loan installments for the duration of a Uniformed Services Leave will not alter the date on which the Hardship Loan is to be repaid as set forth in the promissory note executed by the Participant, except to the extent provided in Section 9.3(e)(v) with respect to Hardship Loans to Participants on Uniformed Services Leave granted on or after January 1, 2004.

(iii)    To the extent necessary, installments due on a Hardship Loan shall be increased proportionately upon expiration of a Participant's Leave of Absence to compensate for the period of suspension and interest accrued during such suspension.

(i)    Solely to the extent that any portion of a Hardship Loan of a Participant who has a Spouse is secured pursuant to Section 9.3(e)(iv) by any portion of his Account Balance attributable to amounts transferred from the Kenny Group, Inc. Pension Plan or any other money purchase pension plan subject to Section 412 of the Internal Revenue Code (the "*Restricted Amounts*"), the Plan Administrator shall obtain, no earlier than the beginning of the ninety-day period that ends on the date on which the Hardship Loan is to be secured, the Spouse's Consent to such use such amounts as security for the Hardship Loan. Notwithstanding anything in this Section 9.3(j) to the contrary, if the portion of such amounts subject to the security does not exceed the Cash-out Amount, the Spouse's consent shall not be required.

(j)    Any other provision in this Section 9.3 notwithstanding, to the extent that any assets and liabilities transferred to the Plan pursuant to Section 16.2 include Participant loans granted for reasons other than hardship (within the meaning of Section 9.2(b)), the Plan shall permit the continuation of such non-Hardship Loans in accordance with the interest rate and

PA000040

duration applicable thereto as of the date transferred to the Plan, *provided, however,* that the non-Hardship Loans shall be administered in accordance with this Section 9.3 (excluding the hardship requirement) following the transfer of the loans to the Plan, and *provided further* that any subsequent loan taken by any Participant must comply with this Section 9.3, including, without limitation, Section 9.3(a).

(k)    A Participant who incurs an Employment Termination Date as a result of a corporate transaction shall be permitted to elect a direct rollover of such Participant's promissory note for a Hardship Loan to a qualified trust described in Section 401(a) of the Internal Revenue Code maintained by the other party to such transaction or a qualified annuity plan described in Section 403(a) of the Internal Revenue Code maintained by the other party to such transaction; *provided* that such qualified trust or such qualified annuity plan accepts contributions of loans in a direct rollover.

(l)    Hardship Loans will be allocated (i) first to the Participant's Tax Deferred Contribution Account until such amount is fully exhausted, and (ii) then to the vested portion of the Participant's Employer Matching Contribution Account. Any reduction in a Participant's Account Balance pursuant to a withdrawal under this Section 9.3 will be allocated among the Investment Options in which the Participant's Account Balance is invested in the same proportion that the Participant's investment in each such Investment Option bears to the Participant's Account Balance.

9.4    Special Withdrawal Rules for Section 16 Officers and Others. The Corporation may prescribe rules as it deems necessary with respect to the timing and effect of withdrawals under Sections 9.1, 9.2 and 9.3 from the Stock Fund by Participants who are officers of the Corporation subject to the provisions of Section 16 of the Securities Exchange Act and certain other Employees as designated by the Corporation.

9.5    In-Service Withdrawal Due to Disability.

(a)    In the event a Participant who is an Employee incurs a Disability Leave, the Participant may elect to withdraw the vested portion of his Account Balance as if he had reached his Employment Termination Date on the date the Participant is first approved for benefits under an Employer-sponsored long-term disability plan. Notwithstanding anything contained in this Section 9.5 to the contrary, if a Participant who is an Employee and on Disability Leave does not immediately elect to withdraw the vested portion of his Account Balance pursuant to the preceding sentence, such Participant may request at any time to withdraw all or any portion of such vested Account Balance, *provided* that the minimum withdrawal will be the lesser of $1,000 or the remaining amount of the Participant's vested Account Balance. All withdrawal requests provided for in this Section 9.5 shall be made as soon as practicable after such election is made. Such a withdrawal will be charged (i) first to contributions made to the Participant's After Tax Contribution Account prior to January 1, 1987 until such contributions are fully exhausted, (ii) then pro rata among the contributions made to the Participant's After Tax Contribution Account on or after January 1, 1987 and earnings on such contributions until such Account is fully exhausted, (iii) then to the earnings of contributions made to the Participant's After Tax Contribution Account prior to January 1, 1987 until such Account is fully exhausted, (iv) then to the Participant's Rollover Account until such

PA000041

Account is fully exhausted, (v) then to the Participant's Tax Deferred Contribution Account until such amount is fully exhausted, (vi) then to the vested portion of the Participant's Employer Matching Contribution Account and (vii) then to the vested portion of the Participant's Profit Sharing Contribution Account.  When a Participant makes a withdrawal under this Section and the Participant's Account Balance is invested in more than one of the Investment Options, the amount of such withdrawal will be charged against each Investment Option in the proportion which the amount of the Account Balance contained in each such Investment Option bears to the Participant's Account Balance.

(b)    In the event that a Participant elects to withdraw his entire Account Balance pursuant to this Section 9.5, he will cease to be a Participant for all purposes, and will be treated as though he has incurred an Employment Termination Date.

9.6    Hurricane Distributions.

(a)    A Participant who is an Employee and who is a Qualified Individual as defined in Section 9.6(b) may request approval of the Plan Administrator for a Hurricane Distribution as defined in Section 9.6(c).

(b)    A "*Qualified Individual*" is an individual whose principal place of abode on August 28, 2005 is located in the state of Louisiana, Mississippi, Alabama or Florida and who has sustained economic loss by reason of Hurricane Katrina, Rita or Wilma.

(c)    A "*Hurricane Distribution*" is a lump sum distribution from the Plan that is approved by the Plan Administrator as a Hurricane Distribution and that is made on or after August 25, 2005 and before January 1, 2007 to a Qualified Individual.  The total amount of any Hurricane Distributions shall be limited to $100,000 and may be made from a Participant's Tax Deferred Contributions Account and the vested portion of such Participant's Employer Matching Contribution Account, excluding amounts transferred to the Plan from any money purchase pension plan subject to Section 412 of the Internal Revenue Code.

PA000042

## SECTION X

### VESTING AND BENEFITS

10.1    Vesting of Account Balance.

(a)     A Participant's Tax Deferred Contribution Account, After Tax Contribution Account and Rollover Account will be fully vested and nonforfeitable at all times.

(b)     Employer Matching Contributions shall vest as follows:

(i)     A Participant shall be fully vested in his Employer Matching Contribution Account with respect to amounts attributable to Employer Matching Contributions made on and after January 1, 2001, and employer contributions transferred to the Plan from the Broadcasting EIP as of the close of business on December 31, 2003.

(ii)    A Participant shall have a vested interest in his Employer Matching Contribution Account with respect to amounts attributable to Employer Matching Contributions made prior to 2001 based on his years of Continuous Service, as follows:

| Years of Continuous Service: | Vested Percentage: |
| --- | --- |
| Less than 1 | 0% |
| 1 but less than 2 | 25% |
| 2 but less than 3 | 50% |
| 3 but less than 4 | 75% |
| 4 or more | 100% |

(c)     Profit Sharing Contributions shall vest as follows:

(i)     A Participant shall have a vested interest in Profit Sharing Contributions to his Account attributable to the 2007 Plan Year and subsequent Plan Years according to the following schedule:

| Years of Continuous Service: | Vested Percentage: |
| --- | --- |
| Less than 2 | 0% |
| 2 but less than 3 | 20% |
| 3 but less than 4 | 40% |
| 4 but less than 5 | 60% |
| 5 or more | 100% |

(ii)    A Participant shall have a 100% vested interest in Profit Sharing Contributions to his Account attributable to the 2006 Plan Year and prior Plan Years upon completion of five (5) years of Continuous Service.

PA000043

(d)    Sections 10.1(b) and (c) notwithstanding, the entire balance of a Participant's Employer Matching Contribution Account and Profit Sharing Contribution Account will become fully vested and nonforfeitable if, prior to incurring an Employment Termination Date, the Participant dies or attains age 65.

10.2    Distribution Upon Employment Termination Date.

(a)    Subject to Section 10.5, a Participant who incurs an Employment Termination Date for any reason other than the Participant's death or Disability Leave will be eligible to receive a distribution of the vested portion of the Participant's Account Balance; *provided, however,* if such Participant is receiving separation pay in a form of installment payments over a specified period of time under the Separation Pay Plan (the *"Period of Severance"*), any distribution provided for under this Section 10.2(a) will not be made until the expiration of the Period of Severance.

(b)    With respect to a Participant who has no Tax Deferred Contributions, After Tax Contributions or Rollover Contributions credited to his Account, any non-vested portion of the Account Balance of a Participant will be deemed to be distributed to him in the amount of zero on his Employment Termination Date.

(c)    Any non-vested portion of the Account Balance of a Participant will be forfeited as of the Valuation Date on or following the earlier of the date a distribution of the Participant's vested balance in his Account is made (including a deemed distribution under Section 10.2(b)) or on the date on which he has incurred five consecutive Breaks in Service. Forfeitures will be applied in accordance with the provisions of Section 17.6.

(d)    If the Participant resumes employment with an Affiliate prior to incurring five consecutive Breaks in Service, the amount forfeited will be contributed by the Corporation and allocated to the Participant's Employer Matching Contribution Account or the Profit Sharing Contribution Account, as applicable.  If such a Participant received a distribution or withdrawal of the vested portion of his Account Balance, upon the resumption of employment, the vested portion of the Participant's Employer Matching Contribution Account will be equal to an amount ("$X$") determined by the formula $X = P\,(AB + D) - D$, where P is the vested percentage upon a subsequent Employment Termination Date, AB is the Account Balance upon such Employment Termination Date, D is the portion of the previous distribution received by the Participant attributable to the Participant's Employer Matching Account.

(e)    A Participant may elect to have the Participant's Account Balance distributed as of any Valuation Date coincident with or following the Participant's Employment Termination Date, subject to Section 10.2(f).

(f)    Notwithstanding anything in the Plan to the contrary:

(i)    Except as otherwise provided in Section 10.2(f)(ii), a Participant's Account Balance will be distributed no later than April 1 of the calendar year following the calendar year in which the later of the following occurs: (A) the Participant attains age 70½ and (B) the Participant incurs an Employment Termination Date; *provided,*

PA000044

*however*, that clause (B) will not apply to a Participant who is a Five Percent Owner at any time during the year such Participant attains age 70½.

(ii)    Notwithstanding anything in Section 10.2(f)(i) to the contrary, in the case of a Participant who attained age 70½ after December 31, 1988, but before January 1, 1999, distributions will be made no later than the April 1 of the calendar year following the calendar year in which the Participant attains age 70½, even if the Participant continues employment with the Employer.

(iii)    The provisions of this Section 10.2 shall be applied in accordance with the minimum distribution and timing requirements of Section 401(a)(9) of the Internal Revenue Code (which are incorporated herein by reference, as are the rules promulgated by the Department of Treasury and the Internal Revenue Service with respect to compliance with Section 401(a)(9) of the Internal Revenue Code without violating Section 411(d)(6) of the Internal Revenue Code), including the incidental death benefit requirements of Section 401(a)(9)(G) of the Internal Revenue Code and the final regulations under Section 401(a)(9) of the Internal Revenue Code, effective as of January 1, 2003. Notwithstanding any provision of the Plan to the contrary, with respect to distributions for 2002, the Plan will apply the minimum distribution requirements of Section 401(a)(9) of the Internal Revenue Code in accordance with the regulations under Section 401(a)(9) of the Internal Revenue Code that were proposed on January 17, 2001. Distributions for 2003 and subsequent years shall comply with the final regulations issued under Section 401(a)(9) of the Internal Revenue Code in 2002. To the extent any provision of the Plan is inconsistent with Section 401(a)(9) of the Internal Revenue Code, such provision shall be disregarded.

(g)    If a Participant is entitled to a distribution pursuant to this Section 10.2 but does not receive such distribution prior to resuming Continuous Service, then no distribution shall be made as a result of the Participant's Employment Termination Date and the distributable amounts will be retained in the Participant's Accounts.

10.3    Survivor's Benefit.

(a)    A Participant's Designated Beneficiary who survives the Participant will be eligible to receive a Survivor's Benefit if the Participant dies before the Participant's Benefit Payment Date.

(b)    A Survivor's Benefit will be paid as a single lump sum.

(c)    The "Survivor's Benefit" with respect to a Designated Beneficiary will be equal to the Participant's Account Balance as of the Valuation Date which coincides with the Designated Beneficiary's Benefit Payment Date.

(d)    Survivor's Benefits will be paid as soon as administratively practicable after the first day of the month immediately following the death of the Participant. All elections must be made in writing on a form prescribed by the Plan Administrator and must be delivered to the Plan Administrator prior to the Designated Beneficiary's Benefit Payment Date.

PA000045

10.4    Form of Distribution.

(a)    Unless the Participant is entitled to make an election under Section 10.4(b), the Participant's Account Balance will be distributed in a single lump sum.

(b)    With respect to any distribution made prior to June 1, 2001 and with respect to any distribution made on or after June 1, 2001 that is attributable to amounts transferred from a qualified plan subject to Section 412 of the Internal Revenue Code, a Participant may elect to receive such distribution of the Participant's Account Balance in one, or in any combination, of the following forms:

(i)    To the Participant in a single lump sum.

(ii)    To an insurance company to purchase for the benefit of the Participant an annuity contract to provide equal payments in the form of a single life annuity paid over the Participant's life.

(iii)    To an insurance company to purchase for the benefit of the Participant an annuity contract to provide payments in the form of a joint and survivor annuity, which will be equal payments for the life of the Participant with a survivor annuity for the life of the Participant's designated joint annuitant. The Participant may designate that the survivor annuity be 50%, 75% or 100% of the amount payable prior to the Participant's death, subject to this Section 10.4(b).

(iv)    To an insurance company to purchase for the benefit of the Participant an annuity contract to provide equal payments for a term certain or more frequent installments over a period not exceeding ten years.

Distributions under any annuity contract purchased pursuant to this Section 10.4 shall comply with Section 401(a)(9) of the Internal Revenue Code (including the incidental death benefit requirement described in Section 401(a)(9)(G) of the Internal Revenue Code) and the regulations issued thereunder.

(c)    If the Participant has a Spouse as of the Participant's Benefit Payment Date and elects to receive any portion of the Participant's distribution in the form of a single life annuity under Section 10.4(b)(ii) or a joint and survivor annuity under Section 10.4(b)(iii), the Participant's entire Account Balance shall be distributed in the form of a Qualified Joint and Survivor Annuity, unless the Participant elects another form of distribution with Spouse's Consent.

(d)    In the case of a single lump sum distribution, the portion of the Participant's Account Balance which is invested in the Stock Fund will be distributed in cash, unless the Participant elects to receive such portion in shares of the Common Stock of the Corporation.

(e)    The Participant will be furnished with a Notice, no less than thirty days prior to the Participant's Benefit Payment Date; *provided, however,* that if the Notice is delivered to the Participant more than 90 days before the Participant's Benefit Payment Date, then the

PA000046

Participant shall also receive a Summary Notice, which shall be delivered to the Participant no earlier than 90 days and no later than 30 days prior to the Participant's Benefit Payment Date.

(f)     An election properly made during the Election Period may be revoked during the Election Period. Additional elections and revocations may be made during the Election Period. An election to waive receiving the *"Information Regarding Benefits Under A Qualified Joint and Survivor Annuity"* no less than 30 days prior to the Participant's Benefit Payment Date, may be waived at any time prior to the Benefit Payment Date.

(g)     If a Participant who has a Spouse dies prior to the Participant's Benefit Payment Date and after making an election described in Section 10.4(c), such election will be deemed to be canceled, and the Participant's Account Balance will be paid to the Participant's Spouse as if the Participant had died prior to the Participant's Benefit Payment Date without making any election. If a Spouse or other designated joint annuitant dies prior to the expiration of the Election Period, any election with respect to such Spouse or other joint annuitant will be deemed to be canceled, and the Participant may make another election during the Election Period.

(h)     All elections and consents must be completed and submitted in accordance with systems and procedures approved by the Plan Administrator.

(i)     For the purposes of this Section 10.4, the following terms will have the respective meanings set forth below:

*"Election Period"* means a period beginning no more than 180 days and no less than 30 days prior to the Participant's Benefit Payment Date. If the Notice or Summary Notice has not been mailed or delivered to the Participant on or before the first day of the Participant's Election Period, the Election Period will be extended to include at least 180 days following the mailing or delivery of the Notice or Summary Notice. A Participant may elect to waive receiving the Notice or Summary Notice no less than 30 days prior to the Participant's Benefit Payment Date; *provided, however,* that the Participant's Account Balance must be paid more than seven days after the Notice or Summary Notice has been provided to the Participant. The provisions of this Section 10.4 will be reasonably construed in a manner intended to comply with Section 411(a)(11) of the Internal Revenue Code and in a manner which is intended to allow Participants the maximum flexibility in designating beneficiaries and selecting payment options.

*"Notice"* means a description as contemplated by Treasury Regulation Section 1.411(a)-11(c), explaining the Plan distribution options, pursuant to Section 10.4.

*"Qualified Joint and Survivor Annuity"* means an insurance company annuity contract that provides a monthly annuity purchased with the Participant's Account Balance and that is paid for the life of the Participant with a survivor annuity for the life of the Participant's surviving Spouse that is one-half of the amount of the annuity payable during the life of the Participant.

*"Spouse's Consent"* means (i) the consent of a Participant's Spouse acknowledging the effect of the Participant's election and witnessed by a notary, or (ii) the Plan

PA000047

Administrator determines that the Spouse's consent may not be obtained because the Participant's Spouse cannot be located.

"*Summary Notice*" means a description, as contemplated by Treasury Regulation Section 1.411(a)-11(c).

10.5    Payment of Small Amounts. Effective with respect to distributions from a Participant's Account made on or after March 28, 2005, unless otherwise provided in this Section 10.5:

(a)    If the value of a Participant's Account Balance is equal to or less than $1,000 ($5,000 for distributions prior to March 28, 2005) as of a Valuation Date following the Participant's Employment Termination Date, as shall be determined by the Plan Administrator in his discretion, the Participant's Account Balance will be paid immediately in a lump sum without the consent of the Participant. If, as shall be determined by the Plan Administrator in his discretion, the value of a Participant's Account Balance is greater than $1,000 but not greater than $5,000 as of a Valuation Date following the Participant's Employment Termination Date, then the Participant's Account Balance will be distributed to the Participant at any time following his Employment Termination Date; *provided* that the Participant elects to receive such distribution in the manner prescribed by the Plan Administrator and shall be paid as soon as practicable following the Plan Administrator's receipt of such election, but in no event later than April 1 of the calendar year following the calendar year in which the Participant attains age 70½. Such Account Balance shall be paid in the form of a lump sum and, if applicable, the Participant shall not be eligible to have such distribution paid in an optional form pursuant to Section 10.4(b).

(b)    If a benefit to be paid is to an Alternate Payee or a Designated Beneficiary is equal to or less than $5,000 (i) with respect to an Alternate Payee at the time the applicable "qualified domestic relations order" (as defined in Section 17.2) is qualified, or (ii) with respect to a Designated Beneficiary at the date of the Participant's death, the benefit of the Alternate Payee or Designated Beneficiary will be paid immediately in a lump sum without the consent of the Alternate Payee or Designated Beneficiary.

10.6    Direct Rollover of Eligible Rollover Distribution.

(a)    Any other provision of the Plan notwithstanding, a Distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any or all of an Eligible Rollover Distribution paid directly to an Eligible Retirement Plan specified by the Distributee in a Direct Rollover. In no event may more than one Eligible Retirement Plan be specified for the Direct Rollover of an Eligible Rollover Distribution.

(b)    The following terms will have the respective meanings set forth below:

(i)    "*Eligible Rollover Distribution*" means an Eligible Rollover Distribution as defined in Section 2.1.

PA000048

(A)    For purposes of this Section 10.6, a distribution shall not fail to be an Eligible Rollover Distribution because it includes amounts payable under a Hardship Loan pursuant to Section 9.3(k).

(B)    For purposes of this Section 10.6, a portion of a distribution shall not fail to be an Eligible Rollover Distribution merely because such portion consists of After Tax Contributions. However, the after-tax portion may be transferred only (x) to an individual retirement account described in Section 408(a) of the Internal Revenue Code or an individual retirement annuity described in Section 408(b) of the Internal Revenue Code, or (y) in a Direct Rollover to a qualified trust described in Section 401(a) or an annuity contract described in Section 403(b) of the Internal Revenue Code (other than an endowment contract) that agrees to account separately for amounts so transferred, and earnings thereon, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible. With respect to a non-Spouse Beneficiary or non-Spouse Alternate Payee, the portion of such distribution that qualifies as an Eligible Rollover Distribution shall be determined in accordance with Section 401(a)(9)(B) of the Internal Revenue Code and distributed as a Direct Rollover if specified by the Distributee.

(ii)    "*Eligible Retirement Plan*" means (A) an individual retirement account described in Section 408(a) of the Internal Revenue Code, (B) an individual retirement annuity described in Section 408(b) of the Internal Revenue Code, (C) an annuity plan described in Section 403(a) of the Internal Revenue Code, (D) a qualified trust described in Section 401(a) of the Internal Revenue Code, and (E) either (1) an annuity contract or custodial account described in Section 403(b) of the Internal Revenue Code, or (2) an eligible plan under Section 457(b) of the Internal Revenue Code which is maintained by a state, political subdivision of a state or any agency or instrumentality of a state or political subdivision of a state which in either case agrees to accept and separately account for an Eligible Rollover Distribution from the Plan. In the case of a distribution to (i) a Spouse, Eligible Retirement Plan shall have the meaning set forth in this definition; and (ii) effective January 1, 2008, a non-Spouse Beneficiary or a non-Spouse Alternate Payee, Eligible Retirement Plan means solely an individual retirement account described in Section 408(a) of the Internal Revenue Code or an individual retirement annuity described in Section 408(b) of the Internal Revenue Code (other than an endowment contract) established for purposes of receiving a distribution on behalf of an individual who is a non-Spouse Beneficiary or non-Spouse Alternate Payee.

(iii)    "*Distributee*" means a (A) Participant, (B) a Participant's surviving Spouse, (C) a Participant's former Spouse who is the Alternate Payee, and (D) effective as of January 1, 2008, a non-Spouse Beneficiary or non-Spouse Alternate Payee, but only with respect to the interest in the Plan of such non-Spouse Beneficiary or non-Spouse Alternate Payee and only to the extent that such interest is distributed as a Direct Rollover.

PA000049

(iv)    *"Direct Rollover"* means a payment of an Eligible Rollover Distribution by the Plan to an Eligible Retirement Plan specified by the Distributee.

PA000050

## SECTION XI

### DESIGNATED BENEFICIARIES

11.1   Spouse's Consent. If a Participant has a Spouse at the time of the Participant's death, the Designated Beneficiary with respect to such Participant will be the Participant's Spouse unless (a)(i) the Spouse consents in writing to the election of some other beneficiary, (ii) the Participant designates a specific beneficiary or beneficiaries which may not be changed without the Spouse's consent (or the Spouse expressly permits modification by the Participant without any further consent by the Spouse), (iii) the Spouse's consent acknowledges the effect of such an election, and (iv) the Spouse's consent is witnessed by a notary public, or (b) it is established to the satisfaction of the Plan Administrator that the Spouse's consent may not be obtained because there is no Spouse or because the Spouse cannot be located. A consent that permits modification of a designation by the Participant without any requirement of further consent by such Spouse must acknowledge that the Spouse has the right to limit consent to a specific Designated Beneficiary, and that the Spouse voluntarily elects to relinquish such rights. Any consent by a Spouse obtained under this Section 11.1 (or establishment that the consent of a Spouse may not be obtained) will be effective only with respect to such Spouse.

11.2   Beneficiary Designation. Each Participant may designate one or more Designated Beneficiaries, including alternate beneficiaries and contingent beneficiaries or classes of such beneficiaries, to receive a Survivor's Benefit with respect to the Participant in the event of the Participant's death. Any person (including a trust) is eligible to be designated as the Participant's Designated Beneficiary. The designation of a Designated Beneficiary must be made in a manner approved by the Plan Administrator and will be effective after it is received and approved by the Plan Administrator. In the event that more than one Designated Beneficiary survive the Participant, the Survivor's Benefit shall be divided equally among the Designated Beneficiaries unless the beneficiary designation executed by the Participant provides otherwise.

11.3   Revocation or Modification of Designated Beneficiary. A Participant may revoke the designation of any Designated Beneficiary at any time prior to the Participant's Benefit Payment Date. Subject to the Spouse's consent pursuant to Section 11.1, a Participant may modify the designation of any Designated Beneficiary at any time. The revocation or modification of the designation of a Designated Beneficiary must be made on a form approved by the Plan Administrator and will be effective after it is received and approved by the Plan Administrator. The number of revocations will not be limited.

11.4   Absence of Designated Beneficiary. If there is no Designated Beneficiary at the time of the Participant's death, the Participant's surviving Spouse will be deemed to be the Participant's Designated Beneficiary. If the Participant is not married at the time of death, the members of the first of the following classes in which there is at least one person who survives the Participant will be deemed to be the Participant's Designated Beneficiaries: the Participant's children, the Participant's parents, and the Participant's siblings. If there are no members of any of these classes who survive the Participant, the Participant's Designated Beneficiary will be deemed to be the Participant's estate.

11.5   Beneficiary Designations Made Prior to December 31, 2006.

PA000051

(a)    If a Participant makes a beneficiary designation pursuant to the Prior SIP before December 31, 2005, and does not make a subsequent beneficiary designation pursuant to Section 11.2 of the Plan, such designation shall be honored for that portion of the Participant's Account Balance that equals the sum of the After Tax Contribution Account, Employer Matching Contribution Account, Tax Deferred Contribution Account, and Rollover Contribution Account.

(b)    If a Participant makes a beneficiary designation pursuant to the Prior Profit Sharing Plan before December 31, 2005, and does not make a subsequent beneficiary designation pursuant to Section 11.2 of the Plan, such designation shall be honored for that portion of the Participant's Account Balance that equals the Profit Sharing Contribution Account.

(c)    If a Participant (i) makes a beneficiary designation with respect to the Prior SIP before December 31, 2005, but does not make a beneficiary designation with respect to the Prior Profit Sharing Plan before December 31, 2005, and (ii) does not make a subsequent beneficiary designation pursuant to Section 11.2, then the Designated Beneficiary with respect to the amounts described in Section 11.(b) shall be established pursuant to Section 11.4.

(d)    If a Participant (i) makes a beneficiary designation with respect to the Prior Profit Sharing Plan before December 31, 2005, but does not make a beneficiary designation with respect to the Prior SIP before December 31, 2005, and (ii) does not make a subsequent beneficiary designation pursuant to Section 11.2, then the Designated Beneficiary with respect to the amounts described in 11.(a) shall be established pursuant to Section 11.4.

PA000052

## SECTION XII

## <u>LEAVES OF ABSENCE AND SEVERANCE</u>

    12.1  <u>Definitions</u>.  Whenever used in the Plan, the following terms will have the respective meanings set forth below:

    "*Disability Leave*" means, with respect to each Participant who is entitled to collect benefits under an Employer-sponsored long-term disability plan upon the expiration of any required waiting period under such plan, the period commencing on the last date on which the Participant was actively at work with the Employer and ending on the earliest of the following: (i) the date the Participant ceases to be disabled under the terms of the Employer's long-term disability plan, (ii) the date of the Participant's death or his resignation from employment with an Employer, or (iii) the Participant's Benefit Payment Date or the date benefits begin to be paid to the Participant under any defined benefit plan of an Affiliate.

    "*Family and Medical Leave*" means a leave of absence permitted under the FMLA or any absence from work that has been approved by the Participant's Employer on a uniform and nondiscriminatory basis applicable to similarly situated Employees.

    "*Leave of Absence*" means an absence from work that has been approved by the Participant's Employer on a uniform and nondiscriminatory basis to similarly situated Employees and that is not a Disability Leave, Family and Medical Leave, Parental Leave or Uniformed Services Leave.

    "*Parental Leave*" means an absence from work by reason of the (i) pregnancy of the Employee, (ii) birth of a child of the Employee, (iii) placement of a child with the Employee in connection with the adoption of such child by the Employee, or (iv) caring for such child for a period immediately following such birth or placement. An Employee will not be deemed to be absent from work for Parental Leave unless the Employee furnishes to the Plan Administrator such timely information as the Plan Administrator may reasonably require to establish that the absence is for one of the reasons specified and the number of days for which there was such an absence.

    "*Uniformed Services Leave*" means, effective December 12, 1994, an absence from employment with an Employer due to the performance of duty, on a voluntary or involuntary basis, in a uniformed service of the United States, under competent authority and includes active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, and a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty. An individual will not be deemed to have been absent due to Uniformed Services Leave unless (i) such person has given advance notice of such uniformed service to the individual's Employer, (ii) the cumulative length of the absence and all previous Uniformed Services Leaves from the Employer does not exceed five years or such other period of time permitted by USERRA, and (iii) such individual reports to, or submits an application for reemployment to, the Employer in accordance

PA000053

with Sections 4312(e) and (f) of USERRA. Notwithstanding anything contained herein to the contrary, the Plan Administrator may, on a uniform and nondiscriminatory basis, deem an individual's absence to be a Uniformed Services Leave if such absence would qualify for a Uniformed Services Leave but for the fact that the time period exceeds the maximum period of Uniformed Services Leave set forth in clause (ii) above.

12.2    Disability Leave. Each Participant shall be credited with Continuous Service while on Disability Leave for purposes of vesting under Section 10.1 and shall be entitled to withdraw amounts from his Account Balance in accordance with Section 9.5.

12.3    Family and Medical Leave and Leave of Absence. A Participant on a Family and Medical Leave or a Leave of Absence will be credited with the Hours of Service which would otherwise normally have been credited to the Participant but for such absence (or if such Hours of Service cannot be determined, eight Hours of Service for each normal workday of absence).

12.4    Parental Leave. A Participant on a Parental Leave will be credited with the Hours of Service which would otherwise normally have been credited to the Participant but for such absence (or if such Hours of Service cannot be determined, eight Hours of Service for each normal workday of absence) up to a maximum of 501 Hours of Service. Hours of Service will be credited for the twelve consecutive month period beginning on a Participant's Employment Commencement Date or any anniversary thereof (i) in which the absence from work begins if a Participant would incur a Break in Service if such Hours of Service were not credited to such period, or otherwise (ii) immediately following the period in which the absence from work begins.

12.5    Uniformed Services Leave. Effective December 12, 1994:

(a)    A Participant on a Uniformed Services Leave will be credited with the Hours of Service which would otherwise normally have been credited to the Participant but for such absence (or if such Hours of Service cannot be determined, eight Hours of Service for each normal workday of absence).

(b)    Notwithstanding any other provisions of the Plan, a Participant on Uniformed Services Leave who thereafter performs an Hour of Service with an Employer (a "Returning Veteran") shall be entitled to make Tax Deferred Contributions, After Tax Contributions and to receive Employer Matching Contributions and Profit Sharing Contributions in accordance with Section 414(u) of the Internal Revenue Code. The provisions of this Section 12.5 shall apply only to the extent required by USERRA and Section 414(u) of the Internal Revenue Code.

(c)    A Returning Veteran will be treated as having received Earnings during such Uniformed Services Leave in an amount equal to the Earnings such Returning Veteran would have received from the Employer but for the Uniformed Services Leave; *provided*, *however*, that, if a Returning Veteran's Earnings during Uniformed Services Leave would not have been reasonably certain, such Returning Veteran will be treated as having received Earnings during such Uniformed Services Leave based upon the

46

PA000054

Returning Veteran's average Earnings from the Employer either (i) during the twelve-month period preceding the Uniformed Services Leave or (ii) the Returning Veteran's period of service preceding the Uniformed Services Leave, if shorter.

(d)    A Returning Veteran may make Tax Deferred Contributions and After Tax Contributions without regard to any limitations that would otherwise apply in the year such contributions are actually made. The Tax Deferred Contributions and After Tax Contributions must meet the applicable limitations for the year with respect to which such contributions relate. An Employer shall permit a Returning Veteran to make additional Tax Deferred Contributions and After Tax Contributions to the Plan during the period which begins on the date of reemployment and ends on the earlier of (i) three times the period of qualified military service and (ii) five years.

(e)    An Employer shall make contributions which satisfy any obligation of the Plan to provide an accrued benefit within the meaning of Section 411(a)(7) of the Internal Revenue Code to a Returning Veteran. For this purpose, make-up Employer Matching Contributions and Profit Sharing Contributions shall be allocated on behalf of the Returning Veteran with respect to each Plan Year or portion thereof in which the Returning Veteran was absent on Uniformed Services Leave. Such make-up Employer Matching Contributions and Profit Sharing Contributions shall not be subject to any limitations that would otherwise apply in the years that such Employer Matching Contributions and Profit Sharing Contributions are made. The Employer shall neither be required to credit earnings to the Returning Veteran with respect to Tax Deferred Contributions, After Tax Contributions, Employer Matching Contributions or Profit Sharing Contributions before such contributions are made, nor to allocate forfeitures which occurred during the period of qualified military service to a Returning Veteran.

(f)    Make-up Employer Matching Contributions and Profit Sharing Contributions on behalf of a Returning Veteran shall not be considered Annual Additions (as such term is defined in Section 6.1) for the Plan Year in which such make-up Employer Matching Contributions and Profit Sharing Contributions are made, but shall be considered Annual Additions for the Plan Year to which the Employer Matching Contributions and Profit Sharing Contributions relate.

(g)    Nothing in this Section 12.5 will in any way be construed as obligating the Corporation or any other Employer to make any duplicative contributions in respect of any Returning Veteran or any other person.

12.6    Separation Pay Plan. While a Participant is receiving separation pay in the form of installment payments over a specified period of time under a Separation Pay Plan ("*Period of Severance*"), for the purposes of vesting under Section 10.1 only, the Participant will be credited with the Hours of Service which would otherwise normally have been credited to the Participant but for such Period of Severance (or if such Hours of Service cannot be determined, eight Hours of Service for each normal workday during the Period of Severance). No Break in Service will occur during a Period of Severance. A Participant may not make Tax Deferred Contributions during a Period of Severance. A Participant's Employment Termination Date will occur at the end of his Period of Severance.

PA000055

12.7   <u>Service Credit Upon Return From Leave</u>.  An Employee who is not a Participant who takes a Disability Leave, Family and Medical Leave, Leave of Absence or Parental Leave will be credited with the Hours of Service which would otherwise have been credited but for such absence (or if such Hours of Service cannot be determined, eight Hours of Service for each normal workday of absence) up to a maximum of two years of Continuous Service.

PA000056

## SECTION XIII

## ADMINISTRATION

13.1    Plan Administrator; Pension Investment Committee.

(a)    Effective as of June 6, 2005, the operation and administration of the Plan will be managed and controlled as hereinafter provided by the Plan Administrator and the Pension Investment Committee.

(b)    The Pension Investment Committee will be appointed by and will serve at the pleasure of the Board of Directors. Subject to the limitations contained herein, the Board of Directors may augment or diminish the number of members of the Pension Investment Committee and fill vacancies among its members.

(c)    Nothing contained herein will be deemed to prevent the same individual from being the Plan Administrator or Appeal Reviewer and also serving on the Pension Investment Committee or serving in other fiduciary capacities with respect to the Plan.

13.2    Pension Investment Committee — Internal Organization.

(a)    The Board of Directors shall appoint the Chief Financial Officer of the Corporation as Chairman of the Pension Investment Committee. The Board of Directors shall appoint a secretary who need not be a member. The Pension Investment Committee may authorize one or more of its members to execute or deliver any instrument or make any payment in its behalf.

(b)    The Pension Investment Committee will hold its respective meetings upon such notice, at such place or places, and at such time or times as it may determine from time to time.

(c)    A majority of the members of the Pension Investment Committee then in office will constitute a quorum for the transaction of the business of the Pension Investment Committee.

(d)    All resolutions or other actions taken by the Pension Investment Committee will be either by the vote of a majority of the members present at a meeting, or, if it acts without meeting, will be in writing and signed by all members of the Pension Investment Committee.

(e)    No member of the Pension Investment Committee will receive any compensation for services as such, but the Employer may reimburse any member of the Pension Investment Committee for any necessary expenses incurred.

(f)    Any member of the Pension Investment Committee may resign by delivering written resignation to the Board of Directors and to the secretary of the Committee. Notwithstanding the foregoing sentence, a member of the Pension Investment Committee, who is

PA000057

an employee of the Employer, will be deemed to have effectively resigned when the member's active service with the Employer ceases.

### 13.3   Pension Investment Committee — Responsibilities.

(a)   Except as hereinafter provided, the Pension Investment Committee shall have responsibility for selecting Investment Options under the Plan.  The Pension Investment Committee will have the authority to hold hearings, conduct investigations, make factual determinations, set policies, issue rules, delegate responsibilities and take other administrative actions as it deems appropriate for the purpose of fulfilling its responsibilities.

(b)   The Pension Investment Committee may appoint persons constituting "Investment Managers" as defined in  Section 3(38) of ERISA to manage all or a part of the Plan assets, or may remove or change them, and, except as otherwise provided in the charter or other governing document of the Pension Investment Committee, may delegate to such Investment Managers the exclusive authority to manage (including the power to acquire and dispose of) all or part of the Plan assets as the Pension Investment Committee shall designate at any time or from time to time.  In the exercise of said powers and discharge of said responsibilities, each Investment Manager of the Trust Fund or a portion or portions thereof will direct and instruct the Trustee of the Plan as to investments of the Trust Fund or such portion or portions thereof as the case may be.

(c)   The decisions of the Pension Investment Committee or its actions in respect to investments of the Plan assets and the records of the Pension Investment Committee will, to the extent permitted by ERISA, be conclusive and binding upon each Employer and all persons having or claiming to have any right or interest in or under the Plan.

(d)   In connection with its responsibilities, the Pension Investment Committee may employ such counsel, consultants, financial advisors, actuaries, accountants, agents and clerical services as it may require.

### 13.4   Plan Administrator — Responsibilities.

(a)   Effective as of June 6, 2005, except as otherwise provided herein, the Plan Administrator will control and manage the operation and administration of the Plan with respect to all matters not explicitly within the responsibilities of the Pension Investment Committee as defined in Section 13.3.  The decisions of the Plan Administrator with respect to his responsibilities under the Plan pursuant to this Section 13.4 will be conclusive and binding upon the Employer and upon all persons having or claiming to have any right or interest in or under the Plan.  Such decisions may only be reversed under judicial review upon a finding that the Plan Administrator acted in an arbitrary and capricious manner.

(b)   In addition to any implied powers and duties with which the Plan Administrator shall be empowered to carry out the provisions of the Plan, the Plan Administrator shall have the following specific powers and duties:

(i)   To make and enforce such rules and regulations as it shall deem necessary or proper for the efficient administration of the Plan;

PA000058

(ii)     To construe and interpret the terms and provisions of the Plan and all documents which relate to the Plan and to decide any and all matters arising thereunder, including the right to remedy possible ambiguities, inconsistencies or omissions;

(iii)    To determine the eligibility for benefits under the Plan by investigation and review of the facts or otherwise;

(iv)    To investigate and make such factual or other determinations as shall be necessary or advisable for the administration of the Plan or for the determination of benefits under the Plan;

(v)     To authorize disbursements and distributions from the Trust Fund;

(vi)    To monitor and supervise the activities of the Plan's recordkeeper and other third-party administrators appointed for the Plan;

(vii)   To review benefit claims in accordance with Section 13.5 and approve or deny any benefit claim;

(viii)  To review domestic relations orders and determine whether any such domestic relations order constitutes a QDRO;

(ix)    To approve Hardship Loans, hardship withdrawals, other in-service withdrawals or Plan distributions;

(x)     To compute the Account Balance or the amount which shall be payable to any Participant, Designated Beneficiary or Alternate Payee in accordance with the provisions of the Plan or review the computation or amount computed by any third-party administrator;

(xi)    To supervise the Employees of the Corporation who are retained in connection with the operation of the Plan;

(xii)   To communicate, report and disclose information concerning the Plan and benefits under the Plan to Participants and Designated Beneficiaries;

(xiii)  To file all returns, reports and notices required by ERISA.

(xiv)   To establish and administer rules and procedures with respect to all matters relating to the election and use of the Investment Options; and

(xv)    To determine which Plan expenses shall be charged to the Trust Fund.

(c)     The Plan Administrator will provide for the maintenance of accounts showing the fiscal transactions of the Plan, and will keep in convenient form such data as may be necessary for actuarial valuations of the assets and liabilities of the Plan.

PA000059

(d)     The Plan Administrator may, to the extent permitted by ERISA, delegate such other of his functions to any other person found by him to be qualified to perform any such function if he finds that such delegation would facilitate the administration of the Plan.

(e)     In connection with his responsibilities, the Plan Administrator may employ such counsel, consultants, financial advisors, actuaries, accountants, agents and clerical services as he may require.

13.5    Claims Procedure.

(a)     Any claim for benefits must be promptly filed by a Participant, a Designated Beneficiary, or an authorized representative (the "*claimant*") with the Plan Administrator.

(b)     The claimant will be sent a written notice of the Plan Administrator's determination with respect to the claim of the claimant within 90 days of receipt of the claim, unless special circumstances require an extension of time for processing the claim. Such extension will not exceed 90 days and notice thereof will be given within the first 90-day period. If the claim is denied in whole or in part, the notice will indicate the specific reasons for the denial (including reference to the Plan provisions on which the denial is based), describe any additional information or material needed and, include the reasons why such additional information or material is necessary, explain the claim review procedure and inform the claimant that he may bring an action under Section 502(a) of ERISA if the appeal is denied.

(c)     If a claim is denied in whole or in part, the claimant may request a review of the decision. Effective June 1, 2003, this request must be submitted in writing within 60 days of receipt of the notice of denial to the individual who holds the position of Executive Vice President-Human Resources of the Corporation (or in the absence of an individual in such position, the most senior Human Resources officer of the Corporation) ("*Appeal Reviewer*"). The claimant may review or receive (without charge) copies of relevant documents and may submit in writing additional comments, documents, records and other information relating to the claim.

(d)     A review decision will generally be made by the Appeal Reviewer within 60 days of the receipt of the request for review, unless special circumstances apply as set forth below. In making such decision, the Appeal Reviewer will take into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial review of the claim. If there are special circumstances (such as the need for a hearing) which require an extension of the time for processing, a benefit determination shall be made no later than 120 days following receipt of the request for review. Notice of such extension must be given prior to the commencement of the extension. Such notice shall include the reason for the extension and the date on which it is anticipated that the appeal will be reviewed. The review decision will include the information described in Section 13.5(b) for notice of denial of an original claim.

(e)     The decisions of the Appeal Reviewer pursuant to this Section 13.5 will be conclusive and binding upon the claimant and upon all persons having or claiming to have any

PA000060

right or interest in or under the Plan. Such decisions may only be reversed under judicial review upon a finding that the Appeal Reviewer acted in an arbitrary and capricious manner. In fulfilling its responsibilities pursuant to Section 13.5(c) and (d), the Appeal Reviewer shall have the authority to make factual determinations, construe and interpret the Plan and all documents which relate to the Plan and to decide any and all matters arising thereunder.

(f)     A claimant wishing to seek judicial review of an adverse benefit determination under the Plan, whether in whole or in part, must file any suit or legal action, including, without limitation, a civil action under Section 502(a) of ERISA, within one year of the date the final decision on the adverse benefit determination on review is issued or should have been issued under Section 13.5(d) or lose any rights to bring such an action. If any such judicial proceeding is undertaken, the evidence presented shall be strictly limited to the evidence timely presented to the Appeal Reviewer. Notwithstanding anything in the Plan to the contrary, a claimant must exhaust all administrative remedies available to such claimant under the Plan before such claimant may seek judicial review pursuant to Section 502(a) of ERISA.

13.6    Liability and Indemnification of Fiduciaries.

(a)     The liabilities of a fiduciary of the Plan who is or was the Plan Administrator, the Appeal Reviewer, one of the individuals composing the Board of Directors, the board of directors of any Employer, the Pension Investment Committee or any Employee to the extent he exercises discretionary authority concerning the administration of the Plan, will in no event be greater than the liabilities imposed upon such fiduciary under the terms of ERISA. In particular, such fiduciaries of the Plan will be entitled to the extent allowed by ERISA to rely upon all tables, valuations, certificates and reports furnished by any duly appointed actuary, upon all certificates and reports made by any duly appointed accountant, and upon all opinions given by any duly appointed legal counsel. No such fiduciary will be liable for any act or omission by any co-fiduciary or any delegate except to the extent required by ERISA.

(b)     Each individual who is or was the Plan Administrator, the Appeal Reviewer, one of the individuals composing the Board of Directors, the board of directors of any Employer, the Pension Investment Committee or any Employee to the extent he exercises discretionary authority concerning the administration of the Plan, will be indemnified by the Corporation against expenses (including, but not limited to, amounts paid in settlement with the approval of the Corporation and reasonable legal fees) reasonably incurred by the individual in connection with any claim, action, suit or proceeding to which the individual may be a party or with which the individual will be threatened with respect to the Plan, except in relation to matters as to which the individual will be adjudged in such claim, action, suit or proceeding to be liable for gross negligence or willful misconduct in the performance of the individual's duties with respect to the Plan. The foregoing rights of indemnification will be in addition to any other rights to which said individuals may be entitled as a matter of law.

(c)     No person shall be a fiduciary of the Plan solely on account of this Section 13.6.

13.7    Fees and Expenses. The administrative expenses of the Plan, the investment management fees and any other fees or expenses incurred by an investment manager

PA000061

appointed pursuant to the provisions of Section 13.3(b) and acting in accordance with the powers and responsibilities granted to it by the Pension Investment Committee will be paid from the Trust Fund unless the Corporation decides in its discretion to pay or to reimburse the Trust Fund for all or a portion of such fees and expenses.  Administrative expenses will include, but will not be limited to, reasonable compensation for the services of the Trustee, counsel, consultants and investment advisors, fees for fidelity bonding and actuarial, accounting, record keeping and clerical services and other reasonable costs of administrating the Plan and the Trust Fund. Administrative expenses shall be allocated pro rata to Participants' Accounts; *provided, however*, that all, or a portion of, the costs incurred by the Plan in connection with the qualification of a domestic relations order as a QDRO, as shall be determined by the Plan Administrator in a non-discriminatory manner, shall be charged to the Account of the Participant on behalf of whom the domestic relations order is qualified; and *provided further* that, if the Participant reallocates his existing Account Balance among and between Investment Options more than eight times in any Plan Year, a reasonable fee, which shall be determined by the Plan Administrator in his discretion and uniformly applied to all similarly-situated Participants, shall be charged to the Participant's Account.

PA000062

## SECTION XIV

### ADMINISTRATION OF THE TRUST FUND

14.1    Exclusive Benefit. All assets of the Plan will be held in trust for the exclusive benefit of Participants, Designated Beneficiaries and Alternate Payees, and no part of the corpus or income will be used for, or diverted to, purposes other than for the exclusive benefit of Participants, Designated Beneficiaries and Alternate Payees and defraying expenses of the Plan and the Trust Fund.

14.2    Establishment of Trust Fund. The Corporation has entered into the Trust Agreement establishing the Trust Fund forming part of the Plan. The Trust Agreement will be deemed to form part of the Plan and any and all rights and benefits which may accrue to any person under the Plan will be subject to all the terms and provisions of the Trust Agreement. The Pension Investment Committee will act on behalf of the Corporation in appointing or dismissing the Trustee and in entering into or amending the Trust Agreement.

14.3    Voting of the Common Stock of the Corporation. Each Participant will be entitled to direct the Trustee with respect to the voting of shares of Common Stock of the Corporation represented by the portion of the Participant's Account Balance which is invested in the Stock Fund. The shares of Common Stock of the Corporation for which no timely instructions are received from a Participant will be voted by the Trustee in the same proportion as the shares of such common stock for which timely instructions are received. A Participant will be named a fiduciary within the meaning of Section 403(a)(1) of ERISA, with respect to the instructions given under this Section 14.3. The Corporation will establish and maintain a procedure by which Participants will be timely notified of their right to direct the voting of Common Stock of the Corporation, and the manner in which any such directions are to be conveyed to the Trustee. The Corporation will prepare all materials necessary to give effect to this Section 14.3, including proxies and related materials, and will mail or otherwise deliver all such materials to each Participant entitled to exercise voting rights pursuant to this Section 14.3. All directions by Participants will be held in strict confidence and will not be disclosed to any person.

14.4    Tender Offers for McGraw-Hill Stock. Each Participant will be entitled to instruct the Trustee that all, but not less than all, of the shares of Common Stock of the Corporation represented by the portion of the Participant's Account Balance which is invested in the Stock Fund will be tendered or exchanged in the event of a tender or exchange offer for the Common Stock of the Corporation. The Trustee will not tender or exchange such shares unless the Participant has timely directed the Trustee to do so in response to a request for instructions as to whether to tender or exchange such shares. The Participant will be named a fiduciary, within the meaning of Section 403(a)(1) of ERISA, with respect to the instructions given under this Section 14.4. The Corporation and the Trustee will establish a procedure by which a Participant will be timely notified of the right to direct the tender or exchange of Common Stock of the Corporation, and the manner in which any such directions are to be conveyed to the Trustee. The Corporation will promptly provide to the Participant a copy of any such tender or exchange offer and any other information distributed to shareholders of the Corporation. All instructions by the Participant will be held in strict confidence and will not be disclosed to any person. Any

PA000063

securities received by the Trustee as a result of a tender or exchange as provided in this Section 14.4 will be held, and any cash so received will be invested in short-term investments, pending directions by the Pension Investment Committee.

14.5    Limitation of Contribution.  All contributions to the Trust Fund by an Employer are conditioned upon deductibility under Section 404 of the Internal Revenue Code. Any provisions of the Plan to the contrary notwithstanding, in the case of any contribution (including, without limitation, contributions pursuant to Sections 4.1, 4.2, 5.1, and 5.2) to the Trust Fund that is made by an Employer as a result of a mistake of fact or that is not deductible under Section 404 of the Internal Revenue Code, such contribution, to the extent made by a mistake of fact or to the extent that the deduction for such contribution is disallowed, shall be returned to the Employer; *provided, however*, that a contribution shall be returned within one year after it is mistakenly made or one year after such deduction is disallowed, as the case may be.  Any contribution refunded as provided in the preceding sentence shall only be adjusted to reflect its proportionate share of the Trust Fund's loss, if any, and shall not be adjusted to reflect its proportionate share of the Trust Fund's gain, if any.

PA000064

## SECTION XV

### OBLIGATIONS OF THE EMPLOYER

    15.1    <u>Employer Obligations</u>. Except for any liability under ERISA, an Employer will have no liability with respect to payments or benefits or otherwise under the Plan, except to pay over to the Trustee, as provided in the Plan, such contributions as are made by each Employer and the Participants; and each Employer will have no liability in respect to the administration of the Trust Fund or the Investment Options, securities or other assets paid over to the Trustee; and each Participant, Designated Beneficiary and Alternate Payee will look solely to such Trust Fund for any payments or benefits under the Plan. No Participant, Designated Beneficiary or Alternate Payee nor any other person will have any interest in or right to any part of the earnings of the Trust Fund, or any rights in, to or under the Trust Fund or any part of its assets, except to the extent expressly provided in the Plan.

PA000065

**SECTION XVI**

PLAN MERGER, CONSOLIDATION, TRANSFER AND WITHDRAWAL OF EMPLOYER

16.1    Employer Withdrawal. The Board of Directors shall have a continuous right, in its discretion, to prospectively terminate any Employer's participation in the Plan by providing notice to such Employer. An Employer may prospectively revoke its participation in the Plan by notice to the Board of Directors.

16.2    Merger, Consolidation or Transfer of Plan Assets. To the extent permitted by ERISA and the Internal Revenue Code, the Executive Vice President – Human Resources of the Corporation may direct, pursuant to Section 13.1, that the Plan be merged or consolidated with one or more other tax qualified retirement plans or that a portion of the Plan's assets attributable to one or more Participants may be transferred to one or more other tax qualified retirement plans or spun off and a new tax qualified retirement plan established. The Plan Administrator may request appropriate indemnification from the employer or employers maintaining such tax qualified retirement plan before making such a transfer.

16.3    Participation and Service Upon Merger, Transfer or Consolidation. Anything contained herein to the contrary notwithstanding, in the event of the acquisition by the Corporation or an Affiliate of the stock or assets of another corporation or other entity, the Plan may be amended to provide, on a uniform and nondiscriminatory basis for similarly situated Employees with respect to such acquisition, that each person who becomes an Employee as a result of such acquisition will become a Participant on the date of the acquisition. Service with a corporation or other entity prior to its becoming an Affiliate (including service with a business unit if the assets are acquired by an Affiliate) will be counted as Continuous Service for purposes of determining whether an Employee is an Eligible Employee, and determining vesting under Section 10.1, to the extent determined by the Executive Vice President, Human Resources, but will not be considered Continuous Service for any other purpose except to the extent determined by the Executive Vice President, Human Resources. If a Participant terminates employment with an Affiliate that has not adopted the Plan after transferring employment to such Affiliate from employment with an Employer, the Participant's service with such Affiliate will be considered Continuous Service for the purpose of determining vesting under Section 10.1, but will not be considered Continuous Service for any other purpose unless otherwise specifically provided for under the Plan.

16.4    Transfers from the Plan to the Plan of an Affiliate. If a Participant is transferred from an Employer to an Affiliate which has adopted The Standard & Poor's Savings 401(k) Savings Plan and Profit Sharing Plan for Represented Employees (the "*Standard & Poor's Plan*"), the Participant's Account Balance will be credited with contributions made by such Participant or with respect to such Participant up to the date of transfer, including any net gains or losses thereto. As soon as practicable after the transfer, the Participant's Account Balance, as adjusted in accordance with the preceding sentence, will be transferred to the Standard & Poor's Plan together with any adjustments for net gains or losses until the date of transfer. Following the transfer of the Participant's Account Balance as provided in the immediately preceding sentence, the Plan will be discharged from any liability with respect to such Participant's Account Balance.

PA000066

16.5   Transfers from a Plan of an Affiliate to the Plan.   In the event a Participant in the Standard & Poor's Plan is transferred to the Corporation, the Plan will accept the transfer of the Participant's account balance from such plan.  Amounts attributable to accounts transferred from the Standard & Poor's Plan will become vested based on the vesting schedule included in the Standard & Poor's Plan.  The transfer of accounts from the Broadcasting EIP to the Plan as a result of the merger of the Broadcasting EIP with the Plan as of January 1, 2004, will be subject to the provisions of Appendix T.

16.6   Plan Merger and Transfer.   No merger or consolidation with, or transfer of assets or liabilities may be made to, any other tax qualified retirement plan unless each Participant would (if such other plan then terminated) receive a benefit immediately after the merger, consolidation or transfer which is equal to or greater than the benefit the Participant would have been entitled to receive immediately before the merger, consolidation, or transfer (if the Plan had then terminated).

16.7   Determinations, Approvals and Notifications.   All determinations, approvals and notifications that the Executive Vice President – Human Resources deems necessary or appropriate with respect to any withdrawal of an Employer or any transaction shall be in form and substance and from a source satisfactory to the Plan Administrator.

16.8   Transfers from the Kenny Group, Inc. Profit Sharing Plan to the Plan.

(a)   Upon the transfer to the Plan of assets from the Kenny Group, Inc. Profit Sharing Plan (the "*Profit Sharing Plan*") and the Kenny Group, Inc. Pension Plan (the "*Pension Plan*"), separate accounts will be maintained under the Plan for the amounts transferred from the Profit Sharing Plan and the Pension Plan.  Participants in the Profit Sharing Plan will have a fully vested and nonforfeitable interest in the portion of their separate accounts attributable to the Deferred and Supplemental Deferred Accounts under the Profit Sharing Plan.  Participants in the Profit Sharing Plan and the Pension Plan will have a vested percentage in the portion of their separate accounts attributable to their Basic Cash and Supplemental Cash Accounts under the Profit Sharing Plan and their Pension Accounts under the Pension Plan as determined in accordance with the vesting percentage applicable to Employer Matching Contribution Accounts.

(b)   Anything contained herein to the contrary notwithstanding, if a Participant is married on the date of death or the Participant's Employment Termination Date, then the following provisions will be applicable with respect to the Participant's separate account attributable to amounts transferred from the Pension Plan:

(i)   payments upon the Participant's Employment Termination Date must be made in the form of a qualified joint and survivor annuity pursuant to Section 401(a)(11) of the Internal Revenue Code, unless the Participant has Spouse's Consent; and

(ii)   payments upon the Participant's death prior to the Participant's Employment Termination Date must, in the absence of Spouse's Consent, be made in the form of an annuity for the Spouse's life.

PA000067

16.9    Transfers from the Castelazo & Associates Profit Sharing Plan to the Plan. Upon the transfer to the Plan of assets from the Castelazo & Associates Profit Sharing Plan (the *"Castelazo Plan"*), a special Investment Option (the *"Castelazo Fund"*) was established under the Plan with respect to the non-liquid assets of the Castelazo Plan solely for the benefit of the participants of the Castelazo Plan. The assets of the Castelazo Fund were completely liquidated as of January 27, 2000. Notwithstanding anything contained in the Plan to the contrary, prior to January 27, 2000, no transfers into or out of the Castelazo Fund were permitted, and a Participant could not direct any future contributions to the Castelazo Fund. In addition, notwithstanding anything contained in the Plan to the contrary, no distribution of benefits or withdrawal of the portion of a Participant's Account Balance held in the Castelazo Fund was permitted. As the assets of the Castelazo Fund were liquidated, a Participant, as applicable, (i) directed transfers of his applicable interest therein to the other Investment Options, or (ii) received a distribution of his applicable interest therein.

16.10    Participants Employed by Tower Group. The Account Balances of Participants who are Employees of Tower Group International, Inc. (*"Tower"*) as of February 29, 2000, were transferred in trust-to-trust transfer to the Federal Express Corporation Profit Sharing Plan. Any other provision of the Plan notwithstanding, as of February 29, 2000:

(a)    Tower shall cease to be an Employer;

(b)    Participants who are Tower Employees shall not be eligible to make Tax Deferred Contributions or Employee After Tax Contributions or to receive Employer Matching Contributions;

(c)    Participants who are Tower Employees shall not be eligible for Hardship Loans or Hardship Withdrawals; and

(d)    Participants who are Tower Employees shall become fully vested in their Employer Matching Contribution Accounts.

16.11    Other Transfers. Additional provisions specific to (a) transfers of the assets or liabilities of other tax qualified retirement plans into the Plan and (b) transfers of the assets or liabilities of the Plan to other tax qualified retirement plans shall be set forth in the appendices to the Plan.

PA000068

## SECTION XVII

### MISCELLANEOUS

17.1    No Right to Assign, Transfer, Encumber, Commute or Anticipate Benefits. No Participant, Designated Beneficiary or joint annuitant will have the right to assign, transfer, encumber, commute or anticipate the Participant's Account Balance, and such Account Balance will not in any way be subject to any legal process to levy upon or attach the same for payment of any claim against any Participant, Designated Beneficiary or Alternate Payee. The creation, assignment, or recognition of a right to any benefit payable with respect to a Participant pursuant to a qualified domestic relations order as provided in Section 17.2 or in a manner consistent with U.S. Treasury Department Regulation Section 1.401(a)-13(b)(2) related to federal tax levies will not be treated as an assignment or alienation prohibited in this Section 17.1. The foregoing notwithstanding, a Participant's Account Balance may be reduced to satisfy liabilities of the Participant to the Plan due to the Participant being convicted of committing a crime involving the Plan, a civil judgment (or consent order or decree) entered by a court in an action brought in connection with a violation of such Participant's fiduciary duties with respect to the Plan or a settlement agreement between the Secretary of Labor and the Participant in connection with a violation of the fiduciary provisions of ERISA; *provided, however,* that the court order establishing such liability shall require that the Participant's Account Balance be applied to satisfy the liability.

17.2    Qualified Domestic Relations Orders. Anything contained in the Plan to the contrary notwithstanding, a "qualified domestic relations order" (as such term is defined is Section 414(p) of the Internal Revenue Code) may provide for the immediate payment of all or any portion of a Participant's Account Balance to an "Alternate Payee" (as such term is defined in Section 414(p) of the Internal Revenue Code) whether such payment is before or after the date the Participant has attained "earliest retirement age" (as such term is defined in Section 414(p) of the Internal Revenue Code). The Plan Administrator will establish and may change from time to time reasonable procedures to determine the qualified status of any domestic relations order.

17.3    No Employment Agreement. The establishment of the Plan will not be construed as conferring any legal rights upon any Employee or any person for a continuation of employment, nor will it interfere with the rights of the Employer to discharge any Employee or to treat the Employee without regard to the effect which such treatment might have upon the Employee as a Participant of the Plan.

17.4    Unclaimed Benefits. Each person entitled to payments from the Plan must file with the Plan Administrator, in writing, the person's mailing address and each change of mailing address. Any communication, statement or notice addressed to such person at such address shall be deemed sufficient for all purposes of the Plan, and there shall be no obligation on the part of the Plan Administrator, any Affiliate or the Trustee to search for or to ascertain the location of such person. In the event that a notice that payment is due under the Plan is mailed to the last known address of such person as shown on the records of the Plan Administrator, the Plan Administrator has made reasonable efforts to locate such person and, within six months after such mailing, such person has not made claim therefor, such benefit shall be forfeited; *provided, however,* that such benefit shall be restored (in an amount equal to the amount

PA000069

forfeited) upon proper claim made by such Participant or Designated Beneficiary prior to termination of the Plan. Forfeitures will be applied in accordance with the provisions of Section 17.6.

17.5    Payment of Benefits on Behalf of Disabled Individual.  If the Plan Administrator receives an order from a court of competent jurisdiction that a person entitled to payments under the Plan is incompetent by reason of physical or mental disability, the Plan Administrator will cause the payments becoming due under the Plan to be paid to the person designated by such order, without responsibility of the Plan Administrator or Trustee to see to the application of such amounts. Payments made pursuant to the power herein conferred upon such Plan Administrator will operate as a complete discharge of the obligations of the Trust Fund, the Trustee, the Plan and the Plan Administrator.

17.6    Forfeitures.  Forfeitures arising under the Plan for any reason will not be used to increase the benefits any Participant would otherwise receive under the Plan at any time prior to termination of the Plan or prior to the complete discontinuance of contributions by the Employer. The amounts so forfeited will be used to reduce the Employer Matching Contributions and Profit Sharing Contributions under the Plan and, effective September 1, 2005, to pay any administrative expenses of the Plan.

17.7    Headings and Titles.  The headings and titles of Sections of the Plan are features of convenience and will not be considered part of the substance of the Plan.

17.8    Governing Law.  To the extent not preempted by ERISA, the provisions of the Plan will be construed according to the laws of the State of New York applicable to agreements to be wholly performed therein.

PA000070

## SECTION XVIII

### AMENDMENT AND TERMINATION OF PLAN

18.1    Amendment of Plan.  The Corporation reserves the right at any time and from time to time, by action of the Board of Directors or the individual who holds the position of Executive Vice President-Human Resources of the Corporation (or in the absence of an individual in such position, the most senior Human Resources officer of the Corporation), to modify or amend in whole or in part any or all of the provisions of the Plan, and any such amendment may be given retroactive effect.  Prior to the satisfaction of all liabilities for benefits under the Plan, no part of the assets of the Plan will, by reason of any modification or amendment, be used for, or diverted to, purposes other than for the exclusive benefit of Participants and their beneficiaries under the Plan.

18.2    Termination of Plan.

(a)    The Corporation has established the Plan with the bona fide intention and expectation that from year to year it will be able to and will deem it advisable to make its contributions as herein provided.  However, the Board of Directors may terminate the Plan at any time and for any reason by appropriate resolutions.  In the event of such termination, upon the complete discontinuance of contributions, or if the Plan Administrator determines that a partial Plan termination has occurred, the rights of all affected Participants to the amounts credited to the Account Balances of Participants will be nonforfeitable.  The Plan Administrator may authorize payment of such amounts in cash, or in assets of the Trust Fund, in his discretion.

(b)    After the date specified in such resolution, no further contributions will be made under the Plan and Trust Agreement.  All of the provisions of the Plan which are determined necessary in the opinion of the Plan Administrator, other than the provisions for contributions will remain in force; and solely to the extent determined necessary in the opinion of the Plan Administrator, the Trust Fund will remain in existence and all of the provisions of the Trust Fund will remain in force, other than the provisions relating to contributions.

(c)    All of the assets on hand on the date specified in the resolutions referred to in Section 18.2(a) will be held, administered and distributed by the Trustee and the Plan Administrator in the manner provided in the Plan and Trust Agreement.

(d)    In the event that the Board of Directors will decide to terminate completely the Plan and Trust Fund, such termination will be effective as of a date to be specified in the resolution adopted by the Board of Directors pursuant to Section 18.2(a).  Upon termination of the Plan and the Trust Fund, the Account Balances of all Participants will become nonforfeitable.  The Plan Administrator may authorize payment of such amounts in cash, or in assets of the Trust Fund, in his sole discretion.

PA000071

## SECTION XIX

### TOP HEAVY PROVISIONS

19.1    Definitions.  Whenever used in this Section XIX, the following terms will have the respective meanings set forth below:

"*Aggregation Group*" means each defined benefit plan and defined contribution plan of the Corporation intended to qualify under Section 401(a) of the Internal Revenue Code, whether or not terminated, (i) in which a Key Employee participates, (ii) which enables any plan in which a Key Employee participates to meet the requirements of Section 401(a)(4) or Section 410 of the Internal Revenue Code, and (iii) that the Corporation designates as part of the Aggregation Group, *provided* that the resulting Aggregation Group satisfies the requirements of Section 401(a)(4) and Section 410 of the Internal Revenue Code.

"*Compensation*" means the total of all amounts paid during a Plan Year to an employee of any Related Member by such Related Member for personal services actually rendered during a year, including but not limited to commissions, bonuses, premium pay, reductions in compensation made pursuant to The McGraw-Hill Companies, Inc. Flexible Spending Account Plan or the Plan, but excluding (i) any distributions from a plan of deferred compensation, (ii) any amounts realized from the exercise of a non-statutory stock option, or when restricted stock (or property) becomes freely transferable or is no longer subject to a substantial risk of forfeiture, (iii) any amounts realized from the sale, exchange or other disposition of stock acquired under a statutory stock option (i.e., a qualified stock option or incentive stock option), and (iv) other amounts which receive special tax benefits, such as premiums for group term insurance that are not included in gross income; *provided, however,* compensation shall include any amounts attributable to elective contributions excluded from income under Internal Revenue Code Sections 401(k), 132(f) or 125.

"*Key Employee*" has the meaning assigned to such term in Section 416(i) of the Internal Revenue Code.

"*Non-Key Employee*" means an Employee who is not a Key Employee.

"*Related Member*" means (i) any Employer, (ii) any member of a controlled group of corporations, as defined in Section 414(b) of the Internal Revenue Code, of which any Employer is a part, (iii) any commonly controlled trade or business, as defined in Section 414(c) of the Internal Revenue Code, of which any Employer is a part, (iv) any member of an affiliated service group, as defined in Section 414(m) of the Internal Revenue Code, of which any Employer is a part, and (v) any other entity required to be aggregated with any Employer pursuant to Section 414(o) of the Internal Revenue Code.

19.2    Top-Heavy.  Notwithstanding any other provisions of the Plan to the contrary, the Plan shall be subject to this Section XIX for any Plan Year in which it is subject to Section 416 of the Internal Revenue Code and is determined to be a top heavy plan as of the

PA000072

Determination Date (as such term is defined in Section 19.3). The Plan will be top-heavy for any Plan Year if the sum of (a) the present value of accrued benefits for the Key Employees under all defined benefit plans included in the Aggregation Group and (b) the aggregate value of the accounts for the Key Employees under all defined contribution plans included in the Aggregation Group exceeds 60% of a similar sum determined for all Participants under all plans in the Aggregation Group. The present values of accrued benefits and the amounts of accounts of an Employee as of the Determination Date shall be increased by the distributions made with respect to the Employee under any plan in the Aggregation Group during the one-year period ending on the Determination Date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been included in the Aggregation Group. In the case of a distribution made for a reason other than severance from employment, death, or disability, this provision shall be applied by substituting "five-year period" for "one-year period." The accrued benefits and accounts of any individual who has not performed services for a Related Member during the one-year period ending on the Determination Date shall not be taken into account.

19.3    Determination Date and Valuation Date. For any Plan Year, the sum referred to in Section 19.2 will be determined for the Plan as of December 31 immediately preceding such Plan Year (the "*Determination Date*"). For all defined benefit plans in the Aggregation Group, the present values will be calculated on the January 1 immediately preceding such December 31, will reflect only a benefit payable at the later of the attained age or the Normal Retirement Date, and will be determined on the basis of the 1971 Group Annuity Mortality Table and 5% interest compounded annually. For all defined contribution plans in the Aggregation Group, the present values of accounts as of any December 31 will be calculated on such December 31.

19.4    Vesting Requirements. If at any time the Plan becomes top-heavy as described in Section 19.2, then the vesting provisions otherwise applicable notwithstanding, a Participant who has completed at least three years of Continuous Service will become fully vested and nonforfeitable in the entire balance of his Employer Matching Contribution Account and Profit Sharing Contribution Account.

19.5    Minimum Benefit. If at any time this Plan becomes top-heavy as described in Section 19.2, then the minimum benefit for each Participant who is a Non-Key Employee will be determined under Section 14.5 of the Employee Retirement Plan of The McGraw-Hill Companies, Inc. and Its Subsidiaries.

PA000073

APPENDIX A

SRIP Contribution for the Period
from January 1, 1986 to June 30, 1986

       In addition to the Employer contributions under Section VI.1 and Section VI.6 for the Plan Year ending December 31, 1986 as the Plan document provided at that time, each Employer will contribute to the Plan the amount provided under Section IX.2 of the SRIP for the six-month period commencing on January 1, 1986 based on the Earnings of Participants for such period. Such contribution will be paid to the Trustee on such date or dates as the Employer elects, and will be credited to the Participant's Account Balance as of the close of the month in which it is paid. Allocation of contributions for the Plan Year ending December 31, 1986 will include such contribution, which will be allocated in accordance with Section VI.1 of the SRIP based on the Participant's Earnings for such six-month period. Earnings will be determined taking into account the Earnings Limitation.

PA000074

APPENDIX B

Participants Employed by Shepard's/McGraw-Hill, Inc.

Notwithstanding any other provision, in connection with the closing of the transactions contemplated under the Exchange Agreement by and among The Times Mirror Company, Mosby-Year Book, Inc. and The McGraw-Hill Companies, Inc., dated July 3, 1996 (the "*Exchange Agreement*"), which occurred on October 15, 1996 (the "*Closing Date*"), the following applies:

      1.     Shepard's/McGraw-Hill, Inc. ("*Shepard's*") ceased to be an Employer under the Plan.

      2.     Participants who were Employees of Shepard's as of the Closing Date were no longer eligible to make Tax Deferred Contribution or Employee After Tax Contribution to the Plan after the Closing Date or to receive Employer Matching Contribution after the Closing Date.

      3.     Participants were Employees of Shepard's as of the Closing Date will became fully vested in their Employer Matching Contribution Accounts effective as of the Closing Date.

      4.     Participants were Employees of Shepard's as of the Closing Date, and whose Tax Deferred Account, Employee After Tax Contribution Account or Employer Matching Contribution Account (each, an "*Account*") had not been distributed from the Plan prior to the Closing Date, became entitled to a distribution of such Account under the Plan in the same manner as if such Participant's employment with Shepard's had terminated as of the Closing Date.

PA000075

APPENDIX C

List of Participating Employers

The McGraw-Hill Companies, Inc.
BizNet.TV, Inc.
Capital IQ, Inc.
CTB/McGraw-Hill LLC
ClariFI, Inc. (effective as of May 15, 2007)
Grow.net, Inc.
J.D. Power and Associates
Power Information Network, Inc.
McGraw-Hill Broadcasting Company, Inc.
Money Market Directories, Inc.
Standard & Poor's Investment Advisory Services LLC (non-Guild Employees only)
Standard & Poor's Securities Evaluations, Inc.(non-Guild Employees only)
Vista Research, Inc.
Vista Research Brokerage, Inc. (effective until September 7, 2007)

PA000076

APPENDIX D

Superseded Provisions

Definition of Highly Compensated Employee. Prior to January 1, 1997, the definition of Highly Compensated Employee included each Employee who, during the Plan Year or the preceding Plan Year, owned at any time more than 5% of the stock of the Employer, had total compensation in excess of $75,000, had total compensation in excess of $50,000 and was in the top-paid group of Employees, or was at any time one of fifty officers of the Employer who had the greatest total compensation and had total compensation in excess of 150% of the amount in effect under Section 415(c)(1)(A) of the Internal Revenue Code for such Plan Year. Prior to January 1, 1996, an Employee who was not a Highly Compensated Employee for the preceding Plan Year was not treated as a Highly Compensated Employee during the current Plan Year unless such Employee is a member of the group consisting of the 100 Employees who had the greatest total compensation for the Plan Year for which such determination is made. An Employee's "total compensation" is the sum of the total compensation received from an Employer in any Plan Year, the Tax Deferred Contributions made and any reduction in compensation pursuant to The McGraw-Hill Companies, Inc. Flexible Spending Account Plan, excluding amounts realized from the exercise of a non-qualified stock option, or when restricted stock either becomes freely transferable or is no longer subject to a substantial risk of forfeiture. Total compensation was limited by the Earnings Limitation. The "top-paid group of Employees" for any Plan Year were those Employees in the top 20% of Employees when ranked on the basis of total compensation for such Plan Year. No more than 50 Employees (or, if lesser, 10% of all Employees) shall be treated as officers for any Plan Year. For purposes of determining the actual deferral percentage of a highly compensated Employee who is in the group of the ten highly compensated Employees paid the greatest total compensation during the Plan Year, the Tax Deferred Contributions and Earnings of a member of such Employee's "family" (as defined in Section 414(q)(6)(B) of the Internal Revenue Code) were treated as Tax Deferred Contributions and Earnings of the highly compensated Employee.

PA000077

APPENDIX E

Participants Employed by Tribune Education Company and Its Subsidiaries ("*Tribune*")

        Notwithstanding any other provision of the Plan, in connection with the closing on September 5, 2000 (the "*Closing Date*") of the transactions contemplated under the Stock Purchase Agreement between the Corporation and the Tribune Company, dated June 22, 2000, the following shall occur:

        1.     The Tribune, Landoll, Inc., NTC/Contemporary Publishing Group, Inc., Ideal/Instructional Fair Group, Inc., Everyday Learning Corporation, Tribune Education Sales, Inc., Creative Publications, Inc., Breakthrough to Literacy, Inc., Shortland Publications, Inc. and Wright Group Publishing, Inc. (collectively referred to as the "*Companies*") shall become Employers under the Plan effective as of the Closing Date.

        2.     After the Closing Date, employees of the Companies as of the Closing Date who become Employees of the Corporation and its Subsidiaries following the Closing Date shall be given Continuous Service credit for their service with the Companies prior to the Closing Date for purposes of eligibility (as provided in Section III of the Plan) and vesting under the Plan (as provided in Section 10.1 of the Plan).

PA000078

## APPENDIX F

<u>Participants Employed by Mayfield Publishing Company and Its Subsidiaries ("*Mayfield*")</u>

Notwithstanding any other provision of the Plan, in connection with the closing on January 3, 2001 (the "*Closing Date*") of the transactions contemplated under the Stock Purchase Agreement between the Corporation and Mayfield, dated November 22, 2000, the following shall occur:

     1.    Mayfield shall become an Employer under the Plan effective as of the Closing Date.

     2.    After the Closing Date, employees of Mayfield as of the Closing Date who become Employees of the Corporation and its Subsidiaries following the Closing Date shall be given Continuous Service credit for their service with Mayfield prior to the Closing Date for purposes of eligibility (as provided in Section III of the Plan) and vesting under the Plan (as provided in Section 10.1 of the Plan).

PA000079

APPENDIX G

<u>Participants Employed by Portfolio Management Data LLC ("*Portfolio*")</u>

Notwithstanding any other provision of the Plan, in connection with the closing on May 3, 2000 (the "*Closing Date*") of the transactions contemplated under the Asset Purchase Agreement between the Corporation and Portfolio, the following shall occur:

1.      After the Closing Date, employees of Portfolio as of the Closing Date who become Employees of the Corporation and its Subsidiaries following the Closing Date shall be given Continuous Service credit for their service with Portfolio prior to the Closing Date for purposes of eligibility (as provided in Section III of the Plan) and vesting under the Plan (as provided in Section 10.1 of the Plan).

PA000080