# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

————————————

№ 08 Civ. 7890 (RJS)

————————————

PATRICK L. GEARREN and JAN DEPERRY, on behalf of themselves and all others similarly situated,

Plaintiffs,

VERSUS

THE MCGRAW-HILL COMPANIES, INC., *et al.*,

Defendants.

————————————

№ 09 Civ. 5450 (RJS)

————————————

HARVEY SULLIVAN, MARY SULLIVAN, and CYNTHIA DAVIS, on behalf of themselves and all others similarly situated,

Plaintiffs,

VERSUS

THE MCGRAW-HILL COMPANIES, INC., *et al.*,

Defendants.

————————————

OPINION AND ORDER
February 10, 2010

————————————

RICHARD J. SULLIVAN, District Judge:

Before the Court are two substantially identical cases that have been consolidated for resolution, with the parties' consent. Both are purported class actions brought by current and former employees of the McGraw-Hill Companies, Inc. ("McGraw-Hill" or "the company"), alleging that the company and some of its committees, directors, and employees violated the fiduciary duties imposed by the Employee Retirement Income Security Act of 1974.

Plaintiffs allege that Defendants knew or should have known that McGraw-Hill stock was likely to decline sharply in value once it was revealed that its Financial Services division, Standard & Poors ("S&P"), had given improperly high credit ratings to complex financial instruments like residential mortgage-backed securities and collateralized debt obligations. As a result of this purported knowledge, Defendants allegedly violated their fiduciary duties in two ways. First, they continued to offer the McGraw-Hill Stock Fund, which invested almost entirely in McGraw-Hill common stock, as an investment option under the retirement plans after it became imprudent to do so. Second, they failed to disclose to plan participants the information they knew about company stock. Plaintiffs also allege that some of the Defendants violated their duty of loyalty and their duty to properly appoint, monitor, and inform other Defendants, thereby making them secondarily liable for their co-Defendants' alleged breaches.

For the reasons that follow, the Court concludes that Plaintiffs have failed to state a claim upon which relief can be granted and therefore grants Defendants' motions to dismiss these cases pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I. BACKGROUND

The following facts, unless otherwise noted, are taken from the Complaint;[1] from documents attached thereto, incorporated therein by reference, or otherwise integral to Plaintiffs' claims, even if not explicitly incorporated by reference; and from publicly available documents of which the Court may take judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Police and Fire Ret. Sys. of Detroit v. Safenet, Inc.*, 645 F. Supp. 2d 210, 224 (S.D.N.Y. 2009).

### A. Facts

McGraw-Hill provides information to the financial services, education, and business information markets. (Compl. ¶ 10.) The company is divided into four operating divisions: Corporate, Education, Information & Media, and Financial Services. Its Financial Services division is known as Standard & Poors. (*Id.* ¶ 51.) S&P — through its Credit Market Services group — provides independent credit ratings for corporate and government entities, infrastructure projects, and (most relevantly) structured financial instruments, including

---

[1] All references to the Complaint are to the *Sullivan* Plaintiffs' Complaint, 09 Civ. 5450, Doc. No. 1, which is materially identical to the *Gearren* Plaintiffs' Amended Complaint, 08 Civ. 7890, Doc. No. 14. (*See* Decl. of Russell Hirschhorn ("Hirschhorn Decl.") Ex. A (comparing the *Gearren* and *Sullivan* complaints)).

residential mortgage-backed securities and collateralized debt obligations.[2]   S&P typically gave these residential mortgage-backed securities and collateralized debt obligations high, investment-grade ratings, indicating that they were safe investment vehicles. (*Id.* ¶ 57.)  As it turned out, many of them were much riskier than S&P's credit ratings had suggested, and their eventual defaults drastically exacerbated the financial crisis of the last few years.  (*See id.* ¶ 66 ("'The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities.  The tremendous reach of this crisis cannot be understated [sic] — our entire economy continues to feel aftershocks from the collapse of the mortgage industry.'" (quoting a press release of the Attorney General of New York) (additional quotations omitted)); *id.* ¶ 72 ("The high credit ratings, particularly for structured financial products, were widely viewed as contributing to the credit crunch

that has helped spark the financial crisis" (quotations omitted).)

According to Plaintiffs, this was not a simple case of a good-faith attempt to evaluate complex financial instruments that went awry.  Rather, Plaintiffs allege that S&P rated these securities in a manner that was either deeply careless or improperly biased by a desire to win business from the investment banks that were issuing the securities being rated.  (*Id.* ¶ 45.)  Furthermore, flaws in the ratings were apparent to at least some S&P employees, even from the outset.  (*Id.* ¶ 70.)  In 2001, one employee, when asked to rate a collateralized debt obligation, requested the underlying "collateral tapes" in order to evaluate their riskiness.  (*Id.*)  When told by S&P's managing director that his request was "totally unreasonable" and that he "must produce a credit estimate" and must "devise some method for doing so" in the absence of the underlying data, the analyst responded, "This is the most amazing memo I have ever received in my business career."   (*Id.* (capitalization and punctuation altered).)  In another email, "an analytical manager in the collateralized debt obligations group at S&P told a senior analytical manager . . . that 'rating agencies continue to create' an 'even bigger monster — the [collateralized debt obligations] market.  Let's hope we are all wealthy and retired by the time this house of cards falters.'" (*Id.* ¶ 69 (quoting a *Wall St. Journal* article disclosing company emails) (emoticon omitted).)

Even when the true riskiness of these financial instruments began to become clear, S&P did not adjust its ratings.  (*Id.* ¶ 57 ("'Some subprime-mortgage bonds that were assigned investment-grade ratings as recently

---

[2] A residential mortgage-backed security is a type of asset-backed security — that is, a security whose value is derived from a specified pool of underlying assets.  Typically, an entity (such as a bank) will buy up a large number of mortgages from other banks, assemble those mortgages into pools, securitize the pools (*i.e.*, split them into shares that can be sold off), and then sell them, usually as bonds, to banks or other investors.  Collateralized debt obligations are also a type of asset-backed security.  Typically, a collateralized debt obligation is created by setting up a "special purpose entity," which then acquires a portfolio of assets.  In recent years, these assets have largely been made up of mortgage-backed securities.  The special purpose entity will then pool these assets and sell securities called collateralized debt obligations, which entitle the owner to a share of the cash flow that the assets generate.  Thus, a mortgage-backed security is a share of a pool of mortgages; a collateralized debt obligation is a share of a pool of mortgage-backed securities.

3

as 2006 are even trading at prices that imply they could be as risky as junk bonds. Yet most of their ratings haven't changed.'" (quoting a *Wall Street Journal* article).) Nor did S&P promptly acknowledge its mistakes or the likely effects they would have on its business. (*Id.* ¶¶ 58-59.) To the contrary, the company continued to tout S&P's growth prospects, predicting double-digit growth in 2007. (*Id.* ¶¶ 59, 63, 64.) Finally, in March 2008, the company withdrew its earnings guidance, pushing the stock price down to roughly $38 per share. (*Id.* ¶ 65.) A few months later, after investigations by the European Union, the Securities and Exchange Commission, and several states' attorneys general, the company entered into a settlement agreement that required it "to change its fee structures, to obtain due diligence information for the first time, and to create due diligence and lender standards for residential mortgage-backed securities." (*Id.* ¶ 66.)

\* \* \*

Against this backdrop, McGraw-Hill offered two 401(k) savings plans to its employees — one for McGraw-Hill employees generally and one for S&P employees specifically.[3] (*Id.* ¶¶ 30, 32.) The plans allowed employees to divert a portion of their income into individual retirement savings accounts, with McGraw-Hill providing a partial matching contribution in cash. (*Id.*) Employees were then presented with an array of investment options, which were selected by the plans' administrators. (*Id.*) While most of these investment options were diversified mutual funds, one of them was always the McGraw-Hill Stock Fund, which invested almost entirely in McGraw-Hill common stock. (Hirschhorn Decl. Exs. C, D.)[4] Each participant could choose to invest his retirement money in any one of the funds, or parcel the money out between some or all of them. (*Id.*) Each participant was also free to alter the allocation of his money at any time. (*Id.*)

At the end of 2007, roughly $190 million of the plans' assets, or nearly 9.5% of the total, was invested in McGraw-Hill common stock. (Compl. ¶¶ 31, 33.) During the class period — December 31, 2006 through December 5, 2008 (*Id.* ¶ 2) — the price of McGraw-Hill common stock declined from $68.02 per share at the outset to $24.23 per share at the end, a decrease of 64.4%. (*Id.* ¶ 73.) As a result, Plaintiffs lost much of their retirement savings. (*Id.*)

Plaintiffs now seek to recover those losses under ERISA's liability provisions. Their theory of the case can be summarized as follows: Defendants knew or should have known that the investment-grade ratings that S&P was giving to residential mortgage-backed securities and collateralized debt

---

[3] Defendants also move to dismiss the claims related to the S&P 401(k) Plan on the grounds that none of the named Plaintiffs was employed by S&P. Because the Court concludes that Plaintiffs have failed to state a claim, it is unnecessary to resolve this separate argument for partial dismissal.

[4] The plan agreements, Summary Plan Descriptions, and Fund Fact Sheets (among other documents) are attached as exhibits to Mr. Hirschhorn's declaration. Because they are integral to Plaintiffs' claims, the Court may take notice of them without converting the motion, pursuant to Rule 12(d), into one for summary judgment. *See Police and Fire Ret. Sys. of Detroit v. Safenet, Inc.*, 645 F. Supp. 2d 210, 224 (S.D.N.Y. 2009).

obligations were wildly off-base. As a result, Defendants should have known that McGraw-Hill's stock price was inflated, in that it would surely decline once the market (and regulators) discovered that its ratings were flawed and once the mortgage bubble that it helped inflate burst. Because the stock was inflated, it was imprudent for the fiduciaries of the retirement plans to present the Stock Fund as an investment option and to invest the Fund's assets in McGraw-Hill common stock. And because the company knew that its stock price would suffer as soon as its poor ratings methodology was discovered, it violated its duty of disclosure by not revealing this knowledge to the plan participants and by incorporating allegedly misleading SEC filings into documents given to employees.

## B. Procedural History

The *Gearren* Plaintiffs' case was filed on September 10, 2008 (Doc. No. 1) and transferred to the docket of the undersigned on October 16, 2008 (Doc. No. 4). An Amended Complaint was filed on January 5, 2009. (Doc. No. 14.) On March 5, 2009, Defendants filed their motion to dismiss, which was fully submitted on April 27, 2009. (Docs. No. 19-22, 26-28.)

The *Sullivan* Plaintiffs' case was filed on June 12, 2009 and assigned to the undersigned as related to the *Gearren* case. (Doc. No. 1.) On September 17, 2009, Defendants filed their motion to dismiss, which was fully submitted on October 15, 2009. (Docs. No. 8-11, 20, 21.) Ever since the filing of the *Sullivan* Plaintiffs' case, the Court has treated the cases as consolidated and advised the parties of its intention to resolve both cases with one opinion. The parties have consented

to this plan and have never indicated that there is any reason to treat the cases differently. (*See, e.g.*, 08 Civ. 7890, Doc. No. 33; 09 Civ. 5450, Doc. No. 7.)

## II. STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must draw all reasonable inferences in the plaintiff's favor. *See ATSI Commc'ns*, 493 F.3d at 98; *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949.

Ultimately, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. By contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders

'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Under this standard, if Plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III. DISCUSSION

To state a claim for breach of fiduciary duty under ERISA, Plaintiffs must adequately allege that (1) Defendants were fiduciaries of the plan who, (2) while acting within their capacities as plan fiduciaries, (3) engaged in conduct constituting a breach of an ERISA fiduciary duty. *See* 29 U.S.C. § 1109; *Pegram v. Herdrich*, 530 U.S. 211, 222-24 (2000).

## A. ERISA Overview

The Employment Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq.*, was enacted "to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)). The Act's purpose "is to provide a uniform regulatory regime over employee benefit plans." *Id.* To accomplish this, Title I of ERISA "mandates minimum participation, vesting, and funding schedules for covered pension plans, and establishes fiduciary conduct standards for plan administrators." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 1 (2004).

These fiduciary conduct standards require a fiduciary to "discharge his duties with

respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). This should be done "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man" would use. *Id.* § 1104(a)(1)(B). If a fiduciary breaches these obligations — which have been called "'the highest known to the law,'" *see LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)) — he "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109(a).

## B. The McGraw-Hill Plans

As a general matter, a company creates a retirement plan through a written instrument called a plan agreement. A plan agreement must "provide for one or more named fiduciaries who jointly or severally . . . have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1). The McGraw-Hill plan agreements designate the Vice-President, Employee Benefits — who, during the class period, was Defendant Marty Martin — as the named administrator. (Compl. ¶ 11.) The agreements also designate the Pension Investment Committee, whose members are selected by the board of directors, as the entity with "the responsibility for selecting

6

Investment Options under the Plan."[5]   (*Id.* ¶ 12.)  This grant of responsibility came with an important proviso, though:  according to the plan agreements "[t]he Pension Investment Committee shall determine in its sole discretion the Investment Options that shall be available under the Plan, *provided that* (i) the Plan shall offer (a) the 'Stock Fund' which will be invested primarily in the Common Stock of the Corporation." (Hirshhorn Decl. Exs. G, H).

In addition to naming fiduciaries, a plan agreement also typically sets forth how the retirement plans will be structured.   The McGraw-Hill plan agreements set up the company's 401(k) plans as "eligible individual account plan[s]" within the meaning of 29 U.S.C. § 1107(d)(3).[6]   This

means that they permitted each eligible employee to divert a portion of his or her income into a retirement account and then choose how that income was to be invested by placing it into one or several of the investment funds offered.

These investment options — along with other information relevant to the plans — were set forth in Summary Plan Descriptions, which, pursuant to 29 U.S.C. § 1021, the company was required to provide to participants.   During the class period, participants were presented with approximately a dozen investment options. The Summary Plan Descriptions stated that "[t]hese investment options offer a wide range of investment choices that vary in their potential growth rate and risk," and directed participants to consult the "Fund Fact Sheets" for specific information about each fund. (Hirschhorn Decl. Exs. C, D.)  The Summary Plan Descriptions further advised participants: to "give careful consideration to the benefits of a well-balanced and diversified portfolio"; that "[i]f you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified"; that "diversification is not a guarantee against loss, [but] is an effective strategy to manage investment risk"; that "[b]efore making your investment decisions, you may want to contact a financial planner or an investment counselor"; and that participants should "Remember: Investment Decisions Are Your Responsibility." (*Id.*)

In presenting the investment options, the Summary Plan Descriptions stated that "[t]he Plan requires that The McGraw-Hill Companies Stock Fund is offered as an investment option." (*Id.*)   The Fund Fact

---

[5] During the class period, Defendants Robert J. Bahash, Henry Hirschberg, Alex Matturri, James McGraw, IV, David L. Murphy, John C. Weisenseel, Kathleen A. Corbet, and Phil Edwards were members of the Pension Investment Committee.   (Compl. ¶ 14.)  Defendants Pedro Aspe, Sir Winfried Bischoff, Douglas N. Daft, Linda Koch Lorimer, Robert P. McGraw, Harold McGraw III, Hilda Ochoa-Brillembourg, Sir Michael Rake, James H. Ross, Edward B. Rust, Kurt L. Schmoke, and Sidney Taurel were members of the board of directors. (*Id.* ¶ 15.)

[6] An "individual account plan" is "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  29 U.S.C. § 1002(34).  An "eligible individual account plan" is "an individual account plan which is (i) a profit-sharing, stock bonus, thrift, or savings plan; (ii) an employee stock ownership plan; or (iii) a money purchase plan which was in existence on September 2, 1974, and which on such date invested primarily in qualifying employer securities."  *Id.* § 1107(d)(3)(A).

Sheet for the McGraw-Hill Stock Fund stated that it was "comprised entirely of shares of the common stock of The McGraw-Hill Companies," except for "[s]ome cash [that] is held in the portfolio to facilitate withdrawals and transfers." (Hirschhorn Decl. Ex I.)  The Fund Fact Sheet classified the McGraw-Hill Stock Fund as "Aggressive," and stated that "[b]ecause this Fund invests in the common stock of one company, it has more risk than a diversified portfolio consisting of the stocks of many companies" and that its "future performance cannot be guaranteed." (*Id.*)

The Summary Plan Descriptions also incorporated the company's 10-K and 10-Q SEC filings by reference.  (Compl. ¶ 95.)  According to Plaintiffs, these filings "were materially false and misleading in that they misrepresented the truth" about the company's rating of residential mortgage-backed securities and collateralized debt obligations. (*Id.*)

C.  Count One:  Imprudent Investment

Plaintiffs first claim that Defendants violated their fiduciary duties by allowing employees to invest their retirement assets in McGraw-Hill common stock after it became imprudent to do so.  In essence, they allege that it was imprudent for Defendants to (1) offer the McGraw-Hill Stock fund as an investment option, and (2) invest the assets of the McGraw-Hill Stock Fund in company stock.

Defendants respond, first, that they cannot be held liable for either of these decisions because the plan agreements required them to offer the Stock Fund and to invest the assets of the Stock Fund in company stock.  They

contend that those decisions were non-discretionary and therefore non-fiduciary.  They further argue that, even if they were fiduciaries with regard to the challenged decisions, those decisions are entitled to a presumption of prudence that Plaintiffs cannot overcome.

Plaintiffs contend, in turn, that Defendants were fiduciaries; that a presumption of prudence should not apply to the contested decisions; and that even if a presumption of prudence does apply, it should not be given dispositive effect at this stage of the litigation.

1. Were Defendants Fiduciaries?

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is" whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint."  *Pegram*, 530 U.S. at 226.  Under ERISA,

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such a plan.

29 U.S.C. § 1002(21)(A).

As noted, the McGraw-Hill plan agreements stated that the Pension Investment Committee "shall determine in its sole discretion the Investment Options that shall be available under the Plan, *provided that* (i) the Plan shall offer (a) the 'Stock Fund' which will be invested primarily in the Common Stock of the Corporation." The plain language of the plan agreements thus states that the Committee must offer the Stock Fund and must invest the Stock Fund primarily in company stock. Courts have sometimes interpreted the phrase "invested primarily in" as a grant of limited discretion to forgo investment in company stock entirely. *See, e.g.*, *In re Ferro Corp. ERISA Litig.*, 422 F. Supp. 2d 850, 859 (N.D. Ohio 2006); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207, 1220-21 (D. Kan. 2004). It would be more accurate, however, to say that when a plan states that a fund shall be invested primarily in company stock, it requires fiduciaries to invest most of the fund's assets in company stock, while granting them discretion to determine precisely where within a limited range the allotment should fall.[7] This is not the same as giving fiduciaries discretion to forgo investment in company stock entirely.

Because the plan agreements commanded the actions at issue, the question then becomes

whether plan agreements can effectively eliminate a named fiduciary's discretion, thereby rendering him immune from a claim of a breach of fiduciary duty. Put another way, the question is whether a fiduciary retains some discretion to override the terms of a plan agreement, such that he can be held liable for breaching ERISA's fiduciary duties even when he has followed the terms of the plan agreement. Courts have divided on this issue. Some have concluded that when a plan agreement explicitly commands a fiduciary to take a certain action, that action becomes non-discretionary and therefore not a fiduciary act at all. *See, e.g.*, *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790 (SHS), 2009 WL 2762708, at *10 (S.D.N.Y. Aug. 31, 2009) (rejecting the argument that fiduciaries have a duty to override express plan requirements, on the basis of "ERISA's language, structure, and purpose"); *Urban v. Comcast Corp.*, 2008 WL 4739519, at *12 (E.D. Pa. Oct. 28, 2008) ("[W]here a plan's settlor mandates investment in employer securities, the plan fiduciaries are immune from judicial inquiry related to such investments, essentially because they are implementing the intent of the settlor." (quotations omitted)).

Other courts have rejected this view, reasoning that while the exercise of discretionary authority or responsibility can render someone a fiduciary who would not otherwise be one, a plan agreement cannot extinguish the fiduciary status of a named fiduciary simply by commanding him to take certain actions. *See, e.g.*, *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, No. 03 Civ. 1060 (HGM) (DEP), 2006 WL 2934391 (N.D.N.Y. Oct. 12, 2006) ("ERISA casts upon fiduciaries an affirmative, overriding obligation to reject

---

[7] The phrase "invested primarily in" could, for example, require fiduciaries to invest more than 50% and up to 100% of the fund's assets in company stock. Whether the phrase should be interpreted to refer to that particular range or to a narrower one is not, however, an issue that requires judicial resolution here.

plan terms where those terms would require such imprudent actions in contravention of the fiduciary duties imposed under ERISA."); *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 473 (S.D.N.Y. 2005) ("ERISA commands fiduciaries to obey Plan documents only to the extent they are consistent with other fiduciary duties."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 549 (S.D. Tex. 2003).

The Court agrees with this latter view. As the Supreme Court has explained, "trust documents cannot excuse trustees from their duties under ERISA." *Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568 (1985). This is because ERISA requires a fiduciary to "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plans *insofar as such documents and instruments are consistent with the provisions of this subchapter*," which sets forth the prudent man standard of care. 29 U.S.C. § 1104(a)(1)(D) (emphasis added). As explained below, the degree of discretion granted by the plan agreement to the people tasked with administering it is relevant to whether a challenged action constitutes a breach of fiduciary duty. But the language of the plan agreement cannot extinguish fiduciary status altogether, since a named fiduciary retains the ability and discretion to ignore the terms of the plan, at least under certain circumstances. *See Agway*, 2006 WL 2934391; *Polaroid*, 362 F. Supp. 2d at 473.

2. Does a Presumption of Prudence Apply?

Having determined that Defendants were fiduciaries, the next question is whether their

decisions to offer the Stock Fund and to invest its assets in company stock are entitled to a presumption of prudence.

The leading case in evaluating imprudent-investment claims is *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995).[8] There, the Third Circuit considered the extent to which "fiduciaries of Employee Stock Ownership Plans (ESOPs) [can] be held liable under [ERISA] for investing solely in employer common stock, when both Congress and the terms of the ESOP provide that the primary purpose of the plan is to invest in the employer's securities." *Id.* at 556. An ESOP is a type of Eligible Individual Account Plan ("EIAP"). *See* 29 U.S.C. § 1107(d)(3)(A)(ii). Specifically, it is an individual account plan that "is a stock bonus plan . . . which is designed to invest primarily in qualifying employer securities." *See id.* § 1107(d)(6)(A). "Thus, unlike the traditional pension plan governed by ERISA, ESOP assets generally are invested 'in securities issued by [the plan's] sponsoring company.'" *Moench*, 62 F.3d at 568 (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1458 (5th Cir. 1983) (alteration in *Moench*)). As a result, "ESOPs, unlike pension plans, are not intended to guarantee retirement benefits, and indeed, by its very nature 'an ESOP places employee retirement assets at much greater

---

[8] The Second Circuit has not addressed the applicability of the *Moench* presumption, but numerous courts in this District have adopted it, *see, e.g.*, *In re Citigroup*, 2009 WL 2762708, at *16; *In re Avon Prods. Sec. Litig.*, No. 05 Civ. 6803 (LAK) (MHD), 2009 WL 848083, at *10 (S.D.N.Y. Mar. 3, 2009), as have several other Courts of Appeals, *see, e.g.*, *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008); *Pugh v. Tribune Co.*, 521 F.3d 686, 701 (7th Cir. 2008); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

risk than does the typical diversified ERISA plan.'" *Id.* (quoting *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992)).

The *Moench* court emphasized the inherent tension in this area between two congressional objectives.  On one hand, ESOPs were designed to encourage employee ownership of employer stock, which "constituted a goal in and of itself" for the purpose of "'expanding the national capital base among employees — an effective merger of the roles of capitalist and worker.'" *Id.* (quoting *Donovan*, 716 F.2d at 1458). On the other hand, ESOPs are still "covered by ERISA's stringent requirements, and except for a few select provisions . . . , ESOP fiduciaries must act in accordance with the duties of loyalty and care." *Id.* at 569. "In other words, Congress expressly intended that the ESOP would be both an employee retirement benefit plan and a technique of corporate finance that would encourage employee ownership." *Id.* (quotations omitted). The *Moench* court noted that the tension between these two objectives is "particularly stark" "when the plaintiff claims that an ESOP fiduciary violated its ERISA duties by continuing to invest in employer securities." *Id.* ERISA makes some accommodations for this tension — for example, by exempting ESOPs from "the diversification requirement of [29 U.S.C. § 1104(a)(1)(C)] and the prudence requirement (only to the extent that it requires diversification) of [29 U.S.C. § 1104(a)(1)(B)]," as well as from ERISA's strict prohibitions against self dealing. *Moench*, 62 F.3d at 568 (citing 29 U.S.C. § 1104(a)(2)).  But the court concluded that those accommodations alone were not enough to harmonize the goals of encouraging

employee ownership and requiring prudent management of retirement assets.

The court then attempted to develop a standard that would balance these competing objectives.  It did so by relying in large part on trust law, since the Supreme Court has noted that "ERISA abounds with the language and terminology of trust law" and that the language and legislative history of the Act authorize courts to develop a "federal common law of rights and obligations under ERISA," *see Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989) (quotations omitted).  The *Moench* court noted that "trust law distinguishes between two types of directions:  the trustee either may be *mandated* or *permitted* to make a particular investment." *Moench*, 62 F.2d at 571 (emphasis added).  In the former, mandatory scenario, "the trustee must comply unless compliance would be impossible . . . or illegal"; in the latter, merely permissive scenario, "the fiduciary must still exercise care, skill, and caution in making decisions to acquire or retain the investment." *Id.* (quotations omitted).

The court further reasoned that an intermediate standard was necessary for a case like the one under consideration, in which "the fiduciary [wa]s not absolutely required to invest in employer securities but [wa]s more than simply permitted to make such investments."[9] *Id.*  In such intermediate

---

[9] The *Moench* court appears to have placed great weight on the degree of discretion granted to fiduciaries under the terms of the plan agreement.  The opinion clearly implies that if the terms of an ESOP merely gave the fiduciary permission to invest in employer stock, his decision to do so would be subject to non-deferential judicial review, while if the terms absolutely required

cases, "the fiduciary presumptively is required to invest in employer securities," but there may nevertheless "come a time when such investments no longer serve the purpose of the trust, or the settlor's intent." *Id.* Accordingly, the court adopted an abuse-of-discretion standard for reviewing fiduciary decisions, holding "that in the first instance, an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that [he] acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused [his] discretion by investing in employer securities." *Id.* To do so, a plaintiff "may introduce evidence that owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust." *Id.* (quotations omitted, alteration in original). "[I]n other words, the plaintiff must show that the ERISA fiduciary could not have believed reasonably that continued

_____

the fiduciary to invest in employer stock, his decision to do so would likely be immune from judicial review. *See Moench*, 62 F.3d at 571. This is somewhat odd, since an ESOP by definition "is designed to invest *primarily* in qualifying employer stock." 29 U.S.C. § 1107(d)(6)(A) (emphasis added). If a plan merely gave a fiduciary permission to invest in employer stock, it is not clear that it would be an ESOP. And if a plan required a fiduciary to invest *exclusively* in employer stock, it is not clear that the plan could function, since most funds need some cash or other assets on hand to maintain sufficient liquidity to let employees move money into and out of the fund. Furthermore, as explained above, the use of the word "primarily" grants fiduciaries discretion to determine, within a range, how much of the assets to invest in company stock; it does not grant them discretion to avoid investment in company stock entirely.

adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate." *Id.*

Twelve years later, the Third Circuit extended the application of this standard — which it referred to as the presumption of prudence — in two important ways. *See Edgar v. Avaya*, 503 F.3d 340 (3d Cir. 2007). First, the *Avaya* court held that the presumption was applicable to Eligible Individual Account Plans generally, not just to Employee Stock Ownership Plans — which are a subset of EIAPs. *See id.* at 347. Second, the court held that the presumption applies at the motion-to-dismiss stage and will be dispositive absent allegations that the defendant company was in dire financial straits. *See id.* at 349.

The plan under consideration in *Avaya* was virtually identical to the McGraw-Hill plans. It was set up as an EIAP in which plan participants were presented with twenty-three investment options. *Id.* at 343. The plan agreements provided that the investment options "'shall include the Avaya Stock Fund, which shall be invested primarily in shares of Avaya common stock, with a small portion in cash and other liquid investments.'" *Id.* (quoting plan agreements).

The *Avaya* court reasoned, first, that "[b]ecause one of the purposes of EIAPs is to promote investment in employer securities, they are subject to many of the same exceptions that apply to ESOPs." *Id.* at 347. The court further reasoned that "EIAPs, like ESOPs, 'place employee retirement assets at much greater risk' than traditional ERISA plans." *Id.* at 347 (quoting *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1097 n.2

(9th Cir. 2004)). From there, it concluded that "*Moench*'s abuse of discretion standard governs judicial review of defendants' decision to offer the Avaya Stock Fund as an investment option." *Id.* at 347-48.

Applying this abuse-of-discretion standard, the court concluded that the plaintiff had "failed to plead facts sufficient to establish that defendants abused their discretion." *Id.* at 348. The plaintiff had alleged that defendants

> abused their discretion by knowingly or recklessly disregarding the fact that: (1) the cost of integrating a recent corporate acquisition was greater than defendants publicly represented; (2) rather than having a positive financial impact, the acquisition reduced Avaya's earnings by at least $.06 per share during the 2005 fiscal year; (3) changes to Avaya's method of delivering products to market were causing severe disruptions in sales; and (4) the company was experiencing a dramatic reduction in demand for its products.

*Id.* As a result of these developments, Avaya stock decreased from $10.69 per share to $8.01 per share (a 25.1% drop) following its announcement that it would be unable to meet its previously forecasted earnings. *Id.* The court concluded that these developments and the resultant drop in share price did not "create[] the type of dire situation which would require defendants to disobey the terms of the Plans by not offering the Avaya Stock Fund as an investment option, or by divesting the Plans of Avaya securities." *Id.* As a result it saw "no reason to allow this case to proceed to discovery when, even if the allegations are proven true, Edgar cannot establish that defendants abused their discretion." *Id.* at 349.

Underlying the *Avaya* court's decision to extend the presumption of prudence to EIAPs was its observation that EIAPs and ESOPs are essentially indistinguishable with regard to the characteristics that justified the presumption in the first place. But it is not entirely clear that this observation is accurate. While it is true that EIAPs are exempt from the requirement to diversify and from the prohibitions on self-dealing, it is not self-evidently true that "one of the purposes of EIAPs is to promote investment in employer securities." *See id.* at 347. As noted, an EIAP is a pension plan that (1) "provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account," and (2) is "(i) a profit-sharing, stock bonus, thrift, or savings plan; [or] (ii) an employee stock ownership plan." 29 U.S.C. § 1107(d)(3)(A). Thus, an EIAP could be set up to provide individual accounts for employees, without even giving them the *option* to invest their money in employer stock. Or an EIAP could be set up to allow employees to invest only a small fraction of their retirement savings in employer stock. Or it could be set up in any one of numerous other possible permutations. It may be true as a descriptive matter that most EIAPs offer employer stock as an investment option. But nothing in the statutory definition of an EIAP requires this feature in the same way that the statutory definition of an ESOP does.

For the same reasons, there is some doubt about the accuracy of the *Avaya* court's observation that "EIAPs, like ESOPs, 'place employee retirement assets at much greater risk' than traditional ERISA plans." EIAPs are certainly riskier than traditional *defined-benefit* pension plans. But they are not necessarily any riskier by definition than a plan in which all employee assets are, for example, pooled and then invested in a mutual fund. Where, as here, an EIAP is set up to allow, and even encourage, employees to place their retirement assets into a diversified portfolio, it is no riskier than a typical retirement account, whether sponsored by an employer or not. It is far less risky than a typical ESOP, in which the employees' assets are invested primarily in the stock of one company.

The *Moench* court emphasized that the ERISA-imposed duty to manage retiree assets prudently was counterbalanced by (1) the congressionally defined goal of promoting employee ownership of company stock and (2) the trust-law principle that a fiduciary should not be held liable for following the directions set forth by the company, acting in a capacity analogous to that of a settlor of a trust. Because ESOPs are "designed to invest primarily in qualifying employer securities" as a matter of statutory definition, *see* 29 U.S.C. § 1107(d)(6)(A), both of the counterbalancing considerations identified in *Moench* will always be present. By contrast, neither of the counterbalancing considerations identified in *Moench* needs to be present with an EIAP: that is, the plan might not offer company stock to employees, and the plan agreements might give fiduciaries unfettered discretion to invest the retirement assets however they see fit.

Thus, taking the *Moench* presumption and applying it wholesale to EIAPs raises several difficult questions. For example, does the presumption apply to a plan in which one of the factors is absent — such as a plan that requires fiduciaries to offer a certain investment option that is not employer stock, or a plan in which fiduciaries choose to offer company stock as an act of freely exercised discretion? Does the presumption apply even when *both* factors are absent? To take an extreme example, would a presumption of prudence apply to an EIAP fiduciary's fully discretionary decision to offer a basket of lottery tickets as an investment option for plan participants?

Although these and similar concerns might dissuade the Court from applying the presumption of prudence to *all* decisions concerning EIAPs, the cases at hand do not require it to set the outer bounds of the presumption's applicability. When the terms of the plan agreements require or strongly encourage a fiduciary to take a certain action, and that action is the congressionally approved step of facilitating employee ownership of employer stock, the action should be presumed to be reasonable. Thus, even if there are certain actions undertaken by EIAP fiduciaries that are not entitled to a presumption of prudence, the actions at issue here are not examples of them, since the plans actually have both of the requisite elements — (1) constrained fiduciary discretion that (2) encourages employee ownership of company stock. The Court therefore holds that the presumption of prudence applies to both the decision to offer the Stock Fund and the decision to invest nearly all of its assets in company stock.

14

### 3. Does the Presumption Apply at the Pleadings Stage?

To conclude that the presumption of prudence applies does not, however, necessarily mean that its applicability should be relevant at this stage of the proceedings. Several courts have concluded that the presumption is an evidentiary burden that either should not or may not be applied at the pleadings stage. *See, e.g.*, *In re Pfizer Inc. ERISA Litig.*, No. 04 Civ. 10071 (LTS), 2009 WL 79545, at *11 (S.D.N.Y. Mar. 20, 2009) ("Whether a plaintiff can overcome the presumption of prudence is an evidentiary question ill-suited to resolution on a motion to dismiss." (quotations omitted)); *Alvadires v. Countrywide Fin. Corp.*, No. 07 Civ. 5810 (RGK), 2008 WL 819330, at *2 (C.D. Cal. Mar. 18, 2008) ("Assuming the *Moench* presumption applies in this case, the determination of whether Plaintiff can overcome this presumption is properly made at the evidentiary stage of litigation, not at the pleadings stage."); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 86 F. Supp. 2d 481, 492 (E.D. Pa. 2000) ("[I]t would be premature to dismiss even a portion of the ERISA complaint without giving plaintiffs an opportunity to overcome the presumption [of prudence].").

Other courts, however, have concluded that the presumption may be applied at the pleadings stage. *See Avon Prods.*, 2009 WL 848083, at *10 ("Although *Moench* involved a summary-judgment motion, in applying its analysis most courts — including the Third Circuit — have recognized that the ESOP presumption in question imposes a pleading burden on the plaintiff to allege facts that, if credited, would justify overcoming the

presumption."); *see also Avaya*, 503 F.3d at 349; *Wright*, 360 F.3d at 1098; *Citigroup*, 2009 WL 2762798, at 16; *In re Bausch & Lomb Inc. ERISA Litig.*, 06 Civ. 6297 (MAT), 2008 WL 5234281, at *5-6 (W.D.N.Y. Dec. 12, 2008).

To resolve this question, it is useful to remember that the term "presumption of prudence" is merely a shorthand way to refer to what the *Moench* court called a standard of review. The terminology, therefore, should not be dispositive, and the use of the phrase "presumption of prudence" should not necessarily trigger the rule that evidentiary presumptions are inapplicable at the motion-to-dismiss stage. Instead, it is more accurate to say that when the presumption of prudence applies, it affects whether a given allegation can plausibly constitute a breach of fiduciary duty. At least post-*Iqbal*, it is not enough simply to make a conclusory allegation that the defendants breached their fiduciary duties. Instead, a plaintiff must allege facts that make it plausible that a breach of fiduciary duty actually occurred. The applicability of the presumption of prudence directly affects the plausibility of an allegation that a particular action was imprudent. When the presumption applies, the factual allegations in the complaint must make it plausible that the defendants could not have reasonably believed that continued adherence to the terms of the plan "was in keeping with the settlor's expectations of how a prudent trustee would operate." *Moench*, 62 F.3d at 571.

### 4. Does the Complaint Survive the Presumption?

Having concluded that the presumption applies on these motions to dismiss, the next

inquiry is whether the facts alleged by Plaintiffs suffice to state a claim. Most courts that have considered what allegations are sufficient to state a claim in this context have concluded that allegations of a dramatic drop in share price can suffice. Although a company need not "be on the brink of bankruptcy before a fiduciary is required to divest a plan of employer securities," *Avaya*, 503 F.3d at 349 n.13, Plaintiffs' allegations of a 64% drop in share price, while significant, does not amount to the sort of catastrophic decline necessary to rebut the presumption. *See Wright*, 360 F.3d at 1096-98 (holding that a 75% drop in share price is insufficient to overcome the presumption); *Kuper*, 66 F.3d at 1451 (holding that an 80% drop is insufficient); *Crowley v. Corning*, 234 F. Supp. 2d 222, 227 (W.D.N.Y. 2002) (holding that an 80% drop is insufficient); *cf. Citigroup*, 2009 WL 2762708, at *18-19 (holding that a 52% drop is insufficient). This is particularly true where, as here, the stock price has since rebounded to nearly $34 per share, and there is "'no indication' that, during the class period, [McGraw-Hill's] 'viability as a going concern was ever threatened.'" *Id.* at *18 (quoting *Kirschbaum*, 526 F.3d at 255).

Even assuming that a plaintiff could state a claim absent a catastrophic drop in share price by alleging other facts, Plaintiffs have not done so here. As the Fifth Circuit recently explained:

> One cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from ESOP or EIAP plan provisions. Instead, there ought to be

persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest. Less than rigorous application of the *Moench* presumption threatens its essential existence.

*Kirschbaum*, 526 F.3d at 256. Here, no such allegations have been made.

### 5. Request To Amend

On October 19, 2009, the *Gearren* Plaintiffs submitted a pre-motion letter requesting leave to amend the complaint yet again — despite previous representations that they intended to proceed with the Amended Complaint — to add new allegations. Specifically, they seek leave to add allegations about a recent ruling by Judge Scheindlin, who, in a separate case against McGraw-Hill, granted in part and denied in part a motion to dismiss. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009). Perhaps anticipating the possibility that the Court would apply a presumption of prudence and conclude that the 64% drop in stock price was insufficient to rebut it, Plaintiffs suggest that Judge Scheindlin's recent ruling will "open the flood gates" of litigation and thereby eventually threaten the "very viability" of the company. In other words, they contend that the true impact of the company's rating of collateralized debt obligations and residential mortgage-backed securities is not yet known because several lawsuits are still pending; once the impact is known, the company's share price will drop cataclysmically. Plaintiffs' prediction is entirely speculative and likely fanciful. A

plaintiff may not avoid the pleading requirements laid out above simply by pointing to a recent event that could possibly result in a future drop in share price sufficient to state a claim. Therefore the request to file a motion to amend, pursuant to Federal Rule of Civil Procedure 15(a), is denied on the grounds that amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200-02 (2d Cir. 2007).

\* \* \*

To summarize, the Court concludes that because Defendants' decisions to offer the Stock Fund and to invest the assets of the Stock Fund in company stock were in accordance with the terms of the plan agreement, a presumption of prudence attaches to those decisions. As such, to state a claim for a breach of fiduciary duty, Plaintiffs must allege facts that make it plausible that Defendants could not have reasonably believed that offering the Fund and investing its assets in company stock was in keeping with the intentions of the company when, acting in its capacity as settlor, it established the retirement plan. Because the drop in share price does not satisfy this test and because Plaintiffs have not alleged other facts that could suffice, Plaintiffs have failed to state a claim for breach of fiduciary duty with regard to their allegation of imprudent investment.

### D. Count Two: Failure To Disclose

Plaintiffs' second claim asserts that Defendants breached their fiduciary duties by making misstatements and failing to disclose material information about company stock to plan participants.[10] Plaintiffs do not allege that these purported misstatements concern how the plans themselves operate or are structured, how benefits are paid, or whether employees are eligible for benefits. Nor do they allege that Defendants made misleading statements to plan participants that they did not make to investors at large. Rather, they simply allege that Defendants' SEC filings contained misstatements and omissions and that, by incorporating those filings by reference into the Summary Plan Descriptions, Defendants violated the fiduciary duties imposed by ERISA. *See Gearren* Pls.' Opp'n at 13 ("Plaintiffs do not claim that corporate officers issuing SEC filings violated ERISA, but that plan fiduciaries violated their duties when incorporating the documents by reference."). These allegations likewise fail to state a claim.

First, Defendants have no affirmative duty under ERISA to disclose information about the company's financial condition to plan participants. As Judge Stein recently explained, there is an important distinction between an ERISA fiduciary's obligation to disclose "information about plan *benefits*" and his obligation to disclose "information about the financial status of plan *investments*." *Citigroup*, 2009 WL 2762798, at \*21. The former duty "derives straightforwardly from the fiduciary's obligation to discharge his duties . . . for the exclusive purpose of providing benefits to participants." *Id.* at \*22 (quotations omitted). This places on an

---

[10] These alleged failures are also the subject of a securities-based lawsuit pending before another judge in this District. *See Reese v. Bahash*, 08 Civ. 7202 (SHS).

ERISA fiduciary "'an affirmative duty to inform when the [fiduciary] knows that silence might be harmful.'" *Polaroid*, 362 F. Supp. 2d at 478 (quoting *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993) (alteration in *Polaroid*)). The latter duty, on the other hand, finds no basis in the statutory language and is inconsistent with the Second Circuit's reasoning in *Board of Trustees of CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139 (2d Cir. 1997), which held that it is "inappropriate to infer an unlimited disclosure obligation [under ERISA] on the basis of general provisions that say nothing about disclosure." *Id.* at 147; *accord Citigroup*, 2009 WL 2762798, at *21. To require plan fiduciaries to provide financial information about the companies that participants are allowed to invest in "would transform fiduciaries into investment advisors, and as the Third Circuit has written, fiduciaries do 'not have a duty to "give investment advice" or "to opine on" the stock's condition.'" *Citigroup*, 2009 WL 2762798, at *22 (quoting *Avaya*, 503 F.3d at 350 (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 443 (3d Cir. 1996))).

Although Defendants had no affirmative duty to disclose financial information about company stock, they did disclose such information, both by emphasizing the riskiness of investing in an undiversified fund and by incorporating the company's SEC filings by reference into the Summary Plan Descriptions. As previously noted, the "threshold question" in any claim for breach of fiduciary duty is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint." *Pegram*, 530 U.S. at 226.

As the Supreme Court has explained, when company representatives make statements about the company's financial health, they may do so in their capacities as employers or in their capacities as ERISA fiduciaries (or both). *See Varity Corp. v. Howe*, 516 U.S. 489 (1996). As such, "statements concerning a company's financial condition become subject to ERISA fiduciary duties only if they are made in an ERISA fiduciary capacity, which means that the statements are made by the plan administrator and are intentionally connected to statements regarding a plan's benefits." *Bausch & Lomb*, 2008 WL 5234281, at *7. On the basis of this requirement, "courts have dismissed ERISA claims alleging breaches of fiduciary duty to disclose in the employer stock context where the challenged statements consisted of SEC filings and statements made to the market." *Id.* As Judge Cote explained in *WorldCom*:

> A corporation and its board may wear two "hats" — that of employer and of ERISA fiduciary. ERISA liability arises only from actions taken or duties breached in the performance of ERISA obligations. . . . The SEC filings are documents that directors must execute to comply with a corporation's obligations under federal securities laws. Although the [Summary Plan Description] incorporates SEC filings by reference and is part of the Section 10(a) prospectus, those connections are insufficient to transform those documents into a basis for ERISA claims against their signatories.

18

*In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 760 (S.D.N.Y. 2003) (citations omitted).

In short, the Defendants who prepared the SEC documents did so in a corporate, rather than fiduciary, capacity and therefore did not incur liability through their preparation. And the Defendants who incorporated the SEC documents by reference into the Summary Plan Descriptions did not intentionally connect the content of those SEC filings to statements about plan benefits. Thus, if any of the Defendants violated securities law, they will be liable to Plaintiffs in their capacities as shareholders under securities law; they are not additionally liable under ERISA for the same alleged violations. *See Hull v. Policy Mgmt. Sys. Corp.*, 2001 WL 1836286, at *8 (D.S.C. Feb. 9, 2001) ("If the allegations of wrongdoing, including allegations of providing misinformation and failing to provide accurate information, ultimately prove true, the Plan's remedy will be the same as for the plaintiff class in the related securities action. This result is not at all unreasonable as the duties of disclosure owed to the Plan by the corporate defendants are not based on the duties owed by an ERISA fiduciary to a plan and its participants, but the general duties of disclosure owed by a corporation and its officers to the corporation's shareholders.").

Plaintiffs' alternative theory — that Defendants are liable under ERISA *even if* they are found not to have violated securities law — has no basis in the statute or in case law, and its practical consequences are unappealing. Plaintiffs' theory would seem to require that, in order to comply with both securities law and ERISA, companies would need to disclose to employees certain corporate information that has not been disclosed to shareholders generally, thus facilitating systemic insider trading. Plaintiffs understandably disavow this argument, maintaining instead that when a company offers its stock to employees, its disclosure obligations, as to all current and potential investors, are governed by ERISA rather than securities law. This conclusion would either render much of securities law a dead letter, or (more likely) dissuade employers from offering company stock to employees in the first place, in direct contravention of Congress's objectives when it passed ERISA. As such, the Court sees no reason to depart from the reasoning of other courts that have dismissed allegations that companies, directors, and plan administrators breached ERISA's fiduciary duties when they incorporated by reference SEC filings that allegedly contained misstatements. Accordingly, the Court concludes that Plaintiffs have failed to state a claim for breach of the purported fiduciary duty to disclose information about company stock.

### E.  Counts Three and Four:  Secondary Liability

Plaintiffs' third and fourth claims allege secondary liability of co-Defendants, on the grounds of divided loyalty and failure to monitor. As Plaintiffs have acknowledged, "if Defendants' Motion to Dismiss is granted as to their First and Second Claims, then the Third and Fourth Claims would fail." *Gearren* Pls.' Opp'n. at 20; *Sullivan* Pls.' Opp'n. at 16. The Court agrees and concludes that because Plaintiffs have failed to state a claim for imprudent investment or failure to disclose, they have likewise failed to state a claim under their theories of secondary

19

liability. *See Citigroup*, 2009 WL 2762708, at \*25-27.

## IV. CONCLUSION

For the forgoing reasons, Defendants' motions are granted, and these two related cases are both hereby dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). The Clerk of the Court is respectfully directed to close both cases.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: February 10, 2010
      New York, New York

\* \* \*

The *Sullivan* Plaintiffs are represented by Edwin J. Mills and Michael Jason Klein of Stull, Stull & Brody, 6 East 45th Street, 5th Floor, New York, New York 10017, and by Major Khan of Major Khan LLC, 20 Bellevue Street, Weehawken, New Jersey 07086. The *Gearren* Plaintiffs are represented by Frank James Johnson, Albert Yong Chang, and Derek J. Wilson of Johnson Bottini, LLP, 501 W. Broadway, Suite 1720, San Diego, California 92101, and by Francis A. Bottini of Johnson & Silie, LLP, 337 East 149th Street, Second Floor, Bronx, New York 10451. Defendants in both cases are represented by Myron D. Rumeld and Russell Laurence Hirschhorn of Proskauer Rose LLP (New York), 1585 Broadway, New York, New

York 10036, by Harold Shapiro of Proskauer Rose LLP (New Orleans), 650 Poydras Street, Suite 1800, New Orleans, Louisiana 70130, and by Floyd Abrams, Susan Buckley, and Tammy Lynn Roy of Cahill Gordon & Reindell LLP, 80 Pine Street, New York, New York 10005.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/10/2010

20